STATE OF MAINE                          BUSINESS AND CONSUMER COURT

Cumberland, ss.

L.L. BEAN, INC.                              )
                                             )
    Plaintiff/Counterclaim Defendant         )
                                             )
        v.                                   )        Docket No. BCD-CV-09-39
                                             )
WORCESTER RESOURCES, INC.                    )
                                             )
    Defendant/Counterclaim Plaintiff         )


## DECISION AND JUDGMENT

This civil action involves a claim for declaratory judgment by Plaintiff L.L. Bean, Inc. ("L.L. Bean" or "Bean") against Defendant Worcester Resources, Inc. ("Worcester") regarding the parties' contract for the 2008 holiday season, and a counterclaim by Worcester seeking payment.

The case came to trial on a jury-waived basis over the course of nine days in October 2011. The evidentiary record includes the testimony and exhibits presented by both parties during the trial, and also a number of Joint Stipulations presented by the parties and adopted by the court. Those Joint Stipulations are hereby incorporated by reference in their entirety in these Findings and Conclusions. After trial, the parties filed proposed findings of fact and conclusions of law and presented oral argument.

After the oral argument, the parties were given leave to submit demonstrative exhibits and written argument related thereto, all admitted solely as aids to the court and not for any evidentiary purpose. Based on the entire record, the court makes and adopts the following findings of fact and conclusions of law, and directs the entry of judgment accordingly.

1

This decision is structured as follows:

- The first section contains what are referred to as "General Findings of Fact," focusing mainly on the history of the parties' business relationships; the events and documents culminating in their contract for the 2008 season ("the 2008 letter agreement"); their dealings during the 2008 season; their disagreement in early 2009 about payment by L.L. Bean to Worcester for the 2008 season; their efforts to resolve it, and the eventual termination of their relationship.

- The second section addresses L.L. Bean's affirmative defense to the effect that Worcester has forfeited any entitlement to damages against L.L. Bean as a result of what L.L. Bean characterizes as Worcester's intentional breach of contract. For the reasons set forth in that section, the court concludes that L.L. Bean has failed to show that Worcester intentionally or willfully breached the contract between the parties.

- The third section calculates Worcester's total entitlement *before* any deductions for savings or other reasons are applied. Worcester's total entitlement is calculated based on (1) the face amount of the purchase orders, (2) direct ship fees for the items actually shipped, and (3) the value of L.L. Bean's commitment to reimburse Worcester for the cost of components, less the amount paid to Worcester by L.L. Bean for the 2008 balsam product season.

- The fourth section addresses each of the deductions that L.L. Bean claims should be made from Worcester's claim—deductions for what Worcester saved or could have saved in stopping production; a deduction from L.L. Bean's component liability for what Worcester has or should have done to recoup its investment in components by selling the components or using them in products for sale to other customers. L.L. Bean's claim that it is entitled to a credit for being double-charged for shipping fees is addressed in the previous section.

- The final section nets deductions against what would otherwise be due to Worcester and addresses costs and interest.

### I. General Findings Of Fact

THE HISTORY AND NATURE OF THE WORCESTER-L.L. BEAN
RELATIONSHIP AND THE GOODS AND THE MARKET INVOLVED

1) The long-standing relationship between Worcester and Bean is described in the Court's prior orders on motions for partial summary judgment and also in the parties' Joint Stipulations and therefore need not be set forth here, at least in detail.

2

2)    In summary, L.L. Bean is a retailer of outdoor, clothing and home products through stores and catalogs based in Freeport, Maine, and Worcester Resources (formerly Worcester Wreath) is a manufacturer and retailer of balsam products based in Harrington, Maine.

3)    L.L. Bean and Worcester had a business relationship that began in 1983 and that continued without interruption through 2008. (Joint Stipulations, ¶ 5). There was no continuing contract between L.L. Bean and Worcester, and each year required the negotiation of a new contract. (Joint Stipulations, ¶ 7).

4)    That arrangement meant that Worcester had no enforceable expectation or claim regarding L.L. Bean's business, and that either party was free to terminate their relationship prospectively.

5)    Throughout their relationship, Worcester produced balsam products that L.L. Bean purchased and sold to its customers. (Joint Stipulations, ¶ 5).

6)    Each of Worcester's balsam products—whether sold to L.L. Bean or elsewhere—was created according to particular specifications, somewhat akin to, and in fact sometimes referred to as, a "recipe." (Ex. 449, 450; Scott, Day 7 at 1801).[1]

7)    L.L. Bean's specifications for its balsam products were based in part on input from Worcester. (Ex. 449, 450; Morrill Worcester, Day 2 at 463). Worcester was required to manufacture finished products for L.L. Bean in accordance with L.L. Bean's specifications. (Ex. 449, 450; Scott, Day 7 at 1801).

8)    These balsam products were composed of perishable balsam and, non-perishable decorative items, such as bells and artificial berries, and in certain products metal frames as well. The non-perishable ingredients of the products Worcester sold

---

[1] This and similar citations to witness testimony through this document include the witness's name, trial day, and transcript page number.

to L.L. Bean—the decorations, metal frames and the like—are called "components." (Joint Stipulations, ¶9).

9) Because Worcester's products contained perishable balsam, they could not be fully assembled too early in the season or the balsam elements would deteriorate before or shortly after reaching the L.L. Bean customer. Worcester's practice was to assemble the non-perishable parts of a product well ahead of time, and add the perishable balsam shortly before the product was actually shipped. (Morrill Worcester, Day 1 at 166, 217-22). Worcester assembled some of the durable parts of some of its products after the components arrived, sometimes in the summer time. (Morrill Worcester, Day 1 at 219-225, Scott, Day 7 at 1782).

10) During most if not all of the parties' long relationship, Worcester was a "direct ship" vendor, meaning that it shipped the balsam products directly to L.L. Bean customers, instead of shipping the items to L.L. Bean for re-shipment to the customers. Under that arrangement, after receiving an order for a balsam product from a customer, L.L. Bean relayed the order to Worcester, and Worcester shipped the product directly to the L.L. Bean customer. (Joint Stipulations, ¶ 6).

11) At some point before 2008, L.L. Bean began to pay Worcester and other direct ship vendors a charge to compensate those vendors for the costs associated with L.L. Bean's "direct ship" program. L.L. Bean paid this cost for items actually shipped by its direct ship vendor to L.L. Bean's customers. Direct ship vendors billed L.L. Bean for this cost on a per-item-shipped basis. L.L. Bean referred to this charge as a "direct ship fee" or "fulfillment" cost. (Holden, Day 5 at 1229-1233, Day 6 at 1397-1398).

12) The direct ship fee was $0.25 per unit when Mr. Holden first started dealing with Worcester and increased over time. (Holden, Day 6 at 1398).

4

13) Worcester cooperated with L.L. Bean in converting its shipping systems to become one of the direct ship vendors in L.L. Bean's system. (Michael Worcester, Day 9 at 14; Holden, Day 5 at 1231).

14) In 2008, the direct ship fee for Worcester shipments to L.L. Bean customers was $0.64 per item shipped. (Holden, Day 6 at 1398; Michael Worcester, Day 9 at 19-21).

15) The market for Worcester's balsam products with L.L. Bean customers was limited to the holiday period from around Thanksgiving to Christmas. There was no market of any significance for Worcester's balsam products with L.L. Bean customers any other time of year. (Morrill Worcester, Day 4 at 166).

16) Because Worcester's products included perishable balsam elements, if they were not sold in the year in which the product was fully assembled, they could not be preserved in fully assembled form until sold in the next season. (Scott, Day 8 at 31-33; Philip, Day 3 at 538, 566).

17) In most years from 1983 through 2007, demand for Worcester products from L.L. Bean customers increased over the prior year. (Morrill Worcester, Day 1 at 170-171, 185-186; Day 2 at 381). There were significant increases from 1994 forward. (Philip, Day 3 at 542-544).

18) At no point in their 26-year relationship did Worcester fail to meet any order that L.L. Bean placed with them. (Morrill Worcester, Day 8 at 220). At no point from 2002 forward, did Worcester fail to fill any order that L.L. Bean customers placed for Worcester products. (Holden, Day 6 at 1343; Philip, Day 3 at 561).

19) Worcester has numerous facilities in the Washington County area. As of 2008, centerpieces were manufactured at the Topsfield facility; tabletop trees were

manufactured at the Baileyville (also known as the Woodland) facility and in the Columbia facility. There are three facilities in Harrington. Wreaths are manufactured at Worcester's main facilities in Harrington. (Scott, Day 7 at 1786-88, 1822).

20) In 2007, L.L. Bean sold approximately 478,000 units of Worcester's balsam products to its customers. (Morrill Worcester, Day 8 at 220).

21) Worcester took steps to ensure that its production and shipping capabilities could meet the increase in demand from L.L. Bean's customers including erecting buildings for product assembly, product and component storage, and shipping of L.L. Bean products. (Morrill Worcester, Day 8 at 232; Philip, Day 3 at 533-537). Worcester's expansion resulted from a combination of a steady increase in L.L. Bean's annual requirements and Worcester's eagerness to grow its business. (Philip, Day 3 at 544-45).

22) L.L. Bean asked Worcester to "make an effort to get Maine balsam" for its products, in keeping with the L.L. Bean's "Maine made" marketing approach, so that L.L. Bean could market its products as "Maine balsam." (Morrill Worcester, Day 1 at 176-177, 180-83).

23) By acquiring forestland and preparing it for the growth of a balsam forest, Worcester was able to meet L.L. Bean's "Maine balsam" requirements. (Morrill Worcester, Day 1 at 182-183). However, this land was not purchased by and is not owned by Worcester Resources, but by a different entity owned by members of the Worcester family. (*Id.* at 184). Worcester Resources itself did not make any investment in balsam forestland, and instead it purchased cut balsam from its sister entity.

6

## WORCESTER'S OTHER BUSINESS DURING ITS RELATIONSHIP WITH L.L. BEAN

24) During the 1980s and 1990s, L.L. Bean had a policy of discouraging its vendors from soliciting business or doing business with L.L. Bean's competitors in the catalog business. (Fessenden, Day 4 at 811-812; Morrill Worcester, Day 1 at 171-174).

25) Worcester abided by L.L. Bean's restriction not to solicit business from L.L. Bean's competitors. (Morrill Worcester, Day 1 at 171-174). However, Worcester for many years did sell balsam product to other retailers who competed with L.L. Bean, if at all, only in narrow areas such as balsam products, including internet sellers such as 1-800-FLOWERS. (Holden, Day 5 at 1188-1196). Worcester also made mail order sales directly to customers through Worcester's own website, without objection by L.L. Bean. (*Id*).

26) At some point in the 1990s, Rol Fessenden of L.L. Bean changed L.L. Bean's position and permitted L.L. Bean vendors, such as Worcester, to solicit business from L.L. Bean's competitors. (Fessenden, Day 4 at 811-812).

27) Neither Rol Fessenden nor anyone else at L.L. Bean advised Morrill Worcester or anyone else at Worcester that L.L. Bean had changed this position and that Worcester was free to solicit business from L.L. Bean's competitors. (Fessenden Day 4 at 812; Morrill Worcester, Day 2 at 470-471).

28) In 2008, L.L. Bean orders constituted approximately 90% of Worcester's business. (Morrill Worcester, Day 2 at 264, 471; Fessenden, Day 3 at 756).

## WORCESTER'S COMPONENT PURCHASING PRACTICES BASED ON L.L. BEAN FORECASTS

29) L.L. Bean's requirements varied from year to year, but by mid-February of each year, L.L. Bean would issue its initial forecasts for particular balsam items

7

produced by Worcester. Those forecasts would project L.L. Bean's estimate of customer demand for each Worcester item. (Ex. 406, 653, 654, 68, 443; Morrill Worcester, Day 1 at 188-189).

30) L.L. Bean's forecasts of customer demand were set forth in terms of each product type, referred to as Stock Keeping Units (SKUs). The SKUs were sometimes identified by letter-number designations used commonly by Worcester and L.L. Bean. (Joint Stipulations, ¶ 8; Morrill Worcester, Day 1 at 188-189, 198-199).

31) In 2005 through 2007, and prior to the 2008 season, L.L. Bean sent letters to Worcester setting forth L.L. Bean's initial forecast of expected customer demand for Worcester products for the coming fall season. (Ex. 406, 653, 654, 68, 443; Morrill Worcester, Day 1 at 188-189; Holden, Day 6 at 1325; Fessenden, Day 4 at 814, 819-820).

32) Such letters were typically drafted by L.L. Bean and issued by L.L. Bean to Worcester, sometimes with input from Worcester through a negotiated process. Such letters were sometimes referred to as letter agreements. (Fessenden, Day 4, at 812-814, 819-821).

33) L.L. Bean's forecasts were stated in terms of the types and quantities of particular products that L.L. Bean projected it would be purchasing from Worcester. (Joint Stipulations, ¶ 11)

34) In the letter agreements before the one in 2008, L.L. Bean would not fully commit to Worcester for the season's production until a date specified in L.L. Bean's letter agreement. (Ex. 406, 433, 435, 653, 654, 68, 443). On the other hand, L.L. Bean expected Worcester to have an adequate supply of components on hand to meet L.L. Bean's requirements in timely fashion.

8

35)    To assure that it could meet L.L. Bean's needs in a timely way, Worcester made efforts to have ready a sufficient quantity of components to meet L.L. Bean's forecast for each item as well as a percentage above forecast for each item ranging from 10 per cent to 20 per cent depending on the item. (Ex. 653, 654, 68, 443; Morrill Worcester, Day 1 at 205-206). In the letter agreements for the years before 2008, Bean had required Worcester to purchase an additional percentage of components beyond forecasts, to assure that Worcester would be able to produce and ship items ordered above forecast amounts in a timely way. (Ex. 406, 433, 435, 653, 654, 68, 443).

36)    Worcester would arrange for a sufficient supply of components by first determining what components it already had that were left over from the previous season and that could be used in the upcoming season, and then purchasing what else was needed to meet L.L. Bean's forecasts (with additional percentages as noted above) for the upcoming season. (Scott, Day 8 at 94-95).

37)    This was consistent with what might be called Worcester's FIFO (first in, first out) practice regarding drawing upon its inventory of components for incorporation into products for L.L. Bean. Worcester used components left over from prior seasons before using newly purchased inventory. (Scott, Day 7 at 1805, Day 8 at 16, 18-19, 113-14).

38)    To assure timely delivery of components sufficient to meet L.L. Bean's requirements, Worcester had to make its purchases for the upcoming season by no later than April to meet L.L. Bean's annual forecast as well as any amount above that forecast. (Scott, Day 7 at 1789-1791, 1795).

39)    Until 2008, if Worcester purchased any components for L.L. Bean products beyond what was necessary to fill L.L. Bean's orders, Worcester would retain

9

the components for use in the next year's season. If any such components were not usable in the following year as a result of L.L. Bean discontinuing a product line, L.L. Bean would pay Worcester for them; otherwise, Worcester would be paid when it made and shipped a product in the following season incorporating the leftover components. (Ex. 406, 653, 654; Fessenden, Day 4 at 881-883; Scott, Day 8 at 19-20; Dunham, Day 5, 1106-09).

40) Worcester's inventory controls were by no means exact. Instead of tracking inventory continuously via computer or by hand counts of every item, Worcester relied on visual estimates of what quantities of different component items were on hand in Worcester's several component storage facilities.

41) The products that Worcester made for sale to L.L. Bean were "very similar," and in some cases "identical," in terms of appearance and components used, to products Worcester made for sale to other customers. (Michael Worcester, Day 9 at 49, 104-09). That fact, and the fact that components designated for Bean products were not necessarily stored separately from components designated for non-Bean products, created the potential for commingling of inventory. (Scott, Day 8 at 72-73, 111-112).

THE PARTIES' PRACTICES REGARDING YEAR-END INVOICES AND MEETINGS

42) At the end of each season from 2002 to 2008, L.L. Bean and Worcester would typically meet to review the immediately past season. (Holden, Day 5 at 1279-80).

43) From 2002 to 2008, the meetings between Worcester and L.L. Bean typically took place very early in the year following the sales year that had just concluded. (Holden, Day 5 at 1279-1281).

10

44)    Before the year-end meeting, Worcester would submit an invoice to L.L. Bean in the amount that Worcester calculated was due for purchase orders, shipping fees and other items, with a credit to L.L. Bean for amounts already paid. L.L. Bean did not pay the invoice in full, however, because there were usually further deductions from the invoice to be discussed. That discussion took place at the annual post-season meeting.

45)    Discussion at post-season meetings covered, among other things, the experience in the year just passed, including, among other things, customer charge-backs. (Holden, Day 5 at 1279-1281; Fessenden, Day 4 at 845-847).

46)    L.L. Bean would track customer complaints leading L.L. Bean to issue refunds or to send replacement products to its customers. L.L. Bean's refunds and replacement products were referred to as "charge-backs." (Holden, Day 5 at 1196-1198).

47)    L.L. Bean would typically withhold an amount from its final year-end payment to Worcester primarily to account for charge-backs that L.L. Bean assessed against Worcester. (Holden, Day 5 at 1294-1295).

48)    L.L. Bean tracked customer complaints through 14-16 different reason codes. Depending on the reason given by the customer for the complaint, responsibility for the cost of a charge-back could be on Worcester, on the shipper involved, or on L.L. Bean. (Philip, Day 3 at 564-569; Holden, Day 5 at 1198-99).

49)    At the year-end meetings, L.L. Bean shared with Worcester the reasons given for charge-backs relating to Worcester's products. For example, in advance of a meeting in late January 2008 to discuss the 2007 season, L.L. Bean generated a "post-

11

mortem" agenda and a memorandum summarizing its perspective on Worcester's performance during the 2007 season. (Ex. 425).

50) Through a process of give-and-take, Worcester and L.L. Bean would reach agreement on an appropriate dollar amount to be subtracted from the amount due from Bean to Worcester. Sometimes that dollar figure was lower than the charge-back figure that L.L. Bean had initially identified as being Worcester's responsibility. (Morrill Worcester, Day 1 at 237-238, Day 9 at 16; Michael Worcester, Day 9 at 86).

51) Ultimately, although the amount deducted by agreement from Worcester's year-end invoice was influenced by each party's position on the amount and reason for chargebacks and other issues, it was a negotiated figure, not a mathematically derived figure.

52) The practice before the 2008 season of L.L. Bean holding back a portion of the amount otherwise due to Worcester pending discussion of charge-backs at the year-end meetings is plainly relevant to Worcester's understanding of how it and L.L. Bean would reach agreement on the amount due to Worcester for the 2008 season.

THE TERMS OF THE PARTIES' FEBRUARY 13, 2007 LETTER AGREEMENT

53) As was the case in prior years, the essential terms of the parties' contract for the 2007 season were memorialized in a letter agreement signed by the parties and dated February 13, 2007. The parties' respective rights and obligations for the 2007 season are not directly at issue in this case, but the terms of their 2007 letter agreement are relevant, chiefly for how they compare to the terms of the 2008 letter agreement that does govern the issues in this case.

54) The parties' letter agreement of February 13, 2007 was representative of such agreements for preceding years in most respects.

55) L.L. Bean's February 13, 2007 letter agreement set the initial forecast for the 2007 season at 470,000 units, but it also permitted L.L. Bean to revise its forecast upward or downward "based on customer demand" until January 2, 2008. (Ex. 406, 653). It also provided that Worcester should be capable of producing more units at a rate of as much as 20% above the forecast for certain items, if requested and agreed upon by the parties. (Ex. 654).

56) The term "customer demand" was a term used by L.L. Bean in the regular course of its business and, as it appeared in L.L. Bean's letter agreements to Worcester "customer demand" meant "actual sales" or projected sales of Worcester-produced items to customers of L.L. Bean. (Ex. 406, 653, 654, 68, 443; Fessenden, Day 3 at 769).

57) By allowing L.L. Bean to "revise" its forecasts upward or downward "based on customer demand" the 2007 letter agreement permitted L.L. Bean, at least in theory, to direct Worcester to increase or decrease production as late as early January, or to request Worcester to stop production if L.L. Bean concluded that its customer demand warranted an order to stop production. (Ex. 406, 409,653, 45, 654; Fessenden, Day 3 at 768-772, 783-784).

58) The February 13, 2007 letter agreement also did not obligate L.L. Bean to pay Worcester for any products it ordered from Worcester other than those products L.L. Bean actually sold to its customers or which became "finished goods," provided the goods were not produced above L.L. Bean's commitment quantity. (Ex. 45, 654).

59) L.L. Bean's obligation to pay for "finished goods" arose in the event that L.L. Bean ordered or requested Worcester to stop production of any or all items in L.L. Bean's forecast and before Worcester could bring production to halt, some additional

13

items were completed and became "finished goods" for which there was no concomitant "customer demand." (Fessenden, Day 4 at 855).

60)    Under the 2007 letter agreement, L.L. Bean's commitment to pay for "finished goods" did not extend to finished goods that Worcester might produce that exceeded L.L. Bean's commitments for the particular item or items in question. (Ex. 45, 654).

61)    In order to be capable of meeting both the February 13, 2007 forecast and the projection above that forecast, Worcester had to purchase or have on hand sufficient quantities of components to meet L.L. Bean's requirements, in order avoid a potential breach of contract claim. (Ex. 45, 654; Morrill Worcester, Day 1 at 205-206).

62)    In issuing its letter agreements, L.L. Bean expected that Worcester would purchase or have on hand sufficient quantities of components to meet L.L. Bean's forecast and L.L. Bean's projection above forecast. (Ex. 406, 653, 654, 68, 443; Morrill Worcester, Day 1 at 205-206; Fessenden, Day 3 at 778).

63)    By the end of the 2007 season, L.L. Bean had sold more Worcester products than in any previous year, with more than 478,000 balsam items having been sold. (Morrill Worcester, Day 1 at 170).

WORCESTER'S COMPONENT INVENTORY AFTER THE 2007 SEASON

64)    At the end of the 2007 season, Worcester had significant quantities of components left over and not incorporated in any finished products. Some of the leftover components were purchased for the products L.L. Bean had ordered from it and which L.L. Bean had included in its projection above forecast, and an additional quantity reflected purchases made by Worcester beyond Bean's forecasts, to assure it would be

14

able to fill L.L. Bean's orders. (Morrill Worcester, Day 1 at 37). Still other leftover components were undoubtedly purchased for products to be sold to other customers.

65) Total numbers for Worcester's year-end inventories do appear, however, in its tax returns that were entered as exhibits at trial. According to those returns, Worcester's total inventory at the end of 2006 was $293,180. (Ex. 202) and Worcester's total inventory at the end of 2007 was $1,462,326. (Ex. 202, 203).

66) In early 2008, Morrill Worcester told Bill Holden that he had in excess of $1,000,000 worth of inventory left over after the 2007 season. When asked why he had so much left over inventory, Mr. Worcester explained to Mr. Holden that he should not worry, that not all of it was L.L. Bean's, and that he purchased the rest "on his own nickel." (Holden, Day 5, pgs. 1208–09).

67) The portion of Worcester's leftover inventory as to which L.L. Bean had a commitment obligation from 2007 and/or prior years was between $300,000 and $600,000. (Morrill Worcester, Day 1 at 42, 43-45; Scott, Day 8 at 96). What gives the higher figure credence is that Worcester only purchased about $456,000 worth of components in preparation for the 2008 season, meaning that it had a substantial quantity of inventory left from 2007 and prior years, as to which L.L. Bean had made a much broader component commitment than it did for the 2008 season.

68) Worcester's products made for L.L. Bean incorporate components having an average value of $4.00. (Ordway, Day 9 at 158). Components sufficient to make 75,000 to 80,000 units equate to about $300,000 to $320,000 in component inventory.

69) Thus, at the end of the 2007 season Worcester's total inventory of $1,462,326 consisted of up to $600,000 worth of components as to which L.L. Bean had made a commitment in 2007 (including any reserve) or prior years, and an even larger

15

quantity bought in 2007 or prior years on Worcester's "own nickel" to meet what Worcester projected it would need to meet the requirements of L.L. Bean and its other customers.

## THE PARTIES' BAILMENT AND PURCHASE AGREEMENT

70) In early 2008, Worcester took steps to switch its banking relationship from Machias Savings Bank to Chittenden Bank and to the Massachusetts Business and Development Bank. (Bruce, Day 6 at 1489-1494). Machias had provided Worcester with a line of credit to finance Worcester's purchases of inventory, among other things, and the plan was for Chittenden to take over. As a condition of Chittenden's involvement, however, Worcester had to pay off the Machias line.

71) Partly because of the quantities of excess inventory purchased but not used, and partly because of significant other expenses—some of them questionable and outside the ordinary course of business[3]—Worcester found itself without the cash needed to satisfy Chittenden's requirement that the Machias line be paid off before Chittenden made a new source of credit available to Worcester.

72) Worcester approached L.L. Bean for funds sufficient to enable Worcester to pay off the Machias line of credit and thereby induce Chittenden to extend a new line. (Morrill Worcester, Day 1 at 43-45). Once the Chittenden line was in place, Worcester could draw upon it to reimburse L.L. Bean.

---

[3] For example, Worcester Resources paid $441,885.51 to cover the personal tax payments of Morrill Worcester and Karen Worcester and a further $212,574 for another company also controlled by the Worcester family, County Concrete. (Morrill Worcester, Day 1 at 56-58). Hundreds of thousands of dollars were paid in shareholder distributions, the total of which were greater than Worcester's reported income. (Michael Worcester, Day 9 at 91; Dunham, Day 5, 1155). Worcester also paid what L.L. Bean claims to be exorbitant rental amounts to a sibling entity, Worcester Holdings. One Worcester principal acknowledged that the so-called rent payments, which totaled about one million dollars over a period of time, were a "concoction" designed to transfer money from Worcester to another entity. (Karen Worcester, Day 3 at 678-79). Clearly, these expenses, along with Worcester's substantial inventory purchases in 2007 and perhaps earlier, contributed significantly to Worcester's cash-poor position in early 2008.

16

73) For L.L. Bean to provide a vendor with financial assistance of the magnitude requested by Worcester was an "extremely rare" measure. L.L. Bean already held some concerns about Worcester's viability as a vendor due to very large environmental fines assessed against Worcester and what L.L. Bean considered to be dubious hiring practices inconsistent with its expectations for itself and its vendors. (Fessenden, Day 3 at 705-718, 724-738).

74) Nonetheless, Bean decided to accede to Worcester's request, to be sure Worcester could meet Bean's balsam product needs for the forthcoming season. (Fessenden, Day 3 at 735).

75) L.L. Bean and Worcester eventually worked out an agreement whereby L.L. Bean would take title to a certain quantity and value of components purportedly purchased by Worcester for L.L. Bean products and would pay Worcester an amount of money equal to the agreed-upon value of those components until such time as Worcester could obtain financing from a financial institution. When Worcester obtained the necessary financing, Worcester would then repurchase the components from L.L. Bean in the full amount of the price that L.L. Bean had paid for the components as part of the bailment. L.L. Bean and Worcester both anticipated that Worcester would be able to re-pay L.L. Bean for the monies extended by L.L. Bean within a short period of time. (See Joint Stipulations ¶ 13; Ex. 66, 67).

76) The terms of that agreement were set forth in a Bailment and Purchase Agreement that was signed by Worcester and L.L. Bean, as well as Chittenden Bank and Massachusetts Business and Development Corporation, and went into effect on April 29, 2008. (Ex. 66). The Bailment and Purchase Agreement was amended by the

17

parties on May 20, 2008 for the purpose of extending the deadline by which Worcester was to re-pay L.L. Bean. (Ex. 67).

77) The amount of funds involved in the Bailment and Purchase Agreement was about $582,000. (Ex. 66, 67). Inferentially, that was the amount Worcester needed in order to be able to pay off the Machias Savings line of credit and switch its financing to Chittenden Bank.

78) Morrill Worcester, asked Sherry Scott, the Worcester employee primarily responsible for tracking Worcester's component inventory, to confirm that Worcester had sufficient quantities of components on hand to meet the figure that L.L. Bean had agreed to provide to Worcester. (Scott, Day 8 at 11).

79) Pursuant to Morrill Worcester's instructions, Sherry Scott produced a document showing that Worcester had on hand $582,960.76 of component inventory that Worcester had allegedly purchased for L.L. Bean products. (Ex. 153; Scott, Day 8 at 10). That figure did not, nor was it intended to, reflect the actual total of component inventory Worcester had on hand, which was valued far higher at $1,462,326.

80) In April of 2008, Rick Ordway, an L.L. Bean employee with responsibility for inventory management, went to Worcester's facility to verify that Worcester had on hand sufficient components for products that Worcester could use for L.L. Bean products to secure the monetary amount that Worcester and L.L. Bean had agreed upon for the Bailment and Purchase Agreement. (Ordway, Day 9 at 167).

81) Mr. Ordway's assessment focused on total components suitable for use in L.L. Bean products because L.L. Bean was at least temporarily purchasing those components under the bailment agreement. Because the bailment agreement simply covered inventory, regardless of whether it was inventory as to which L.L. Bean had

18

made a commitment, it was not necessary for Mr. Ordway's assessment to distinguish between inventory as to which L.L. Bean was contractually committed and inventory as to which it was not.

82) Rick Ordway visited Worcester's storage facilities and stayed for a part of one day. During his visit, he was able to verify that Worcester had sufficient component inventory on hand to provide security with a value at least the amount involved in the Bailment and Purchase Agreement. (Ordway, Day 9 at 167).

83) In verifying that Worcester's inventory at least met the figure chosen for the Bailment and Purchase Agreement, Mr. Ordway noted that Worcester possessed large amounts of component inventory beyond what he had verified. (Ordway, Day 9 at 142-143, 169).

84) Worcester's component purchases in 2008 totaled about $456,000 worth of inventory. Based on Worcester's testimony that its practice was to use leftover components before using new ones, it seems reasonable to infer that Worcester would not have made additional purchases of $456,000 in 2008 unless it had determined that there were not enough leftover components in its storage facilities to meet L.L. Bean's requirements.

## L.L. BEAN'S CONCERNS ABOUT WORCESTER AND ITS DECISION TO MOVE ITS TARTAN WREATH BUSINESS TO ANOTHER VENDOR IN EARLY 2008

85) Around the same time as the bailment discussions, L.L. Bean advised Worcester that Worcester was not in compliance with L.L. Bean's ethical standards and advised Worcester that Worcester would have to come into compliance in all respects or risk the loss of L.L. Bean's business. (Morrill Worcester, Day 1 at 48).

86) In a letter to Worcester dated February 8, 2008, Rol Fessenden of L.L. Bean noted that Worcester had for years ignored L.L. Bean's very clear directives to

19

address L.L. Bean's required human rights, safety, and other standards. He also informed Worcester, that Worcester's status as a vendor for L.L. Bean was at risk due to this noncompliance, and that there was a zero-tolerance for violations. (Ex. 7).

87) For these and other reasons, L.L. Bean decided that it should not place all of its balsam product business with Worcester and decided to find another vendor for one of the balsam product lines that it had purchased from Worcester, the "Tartan Wreath." (Fessenden, Day 3 at 700-734).

88) Soon after that, L.L. Bean advised Worcester that L.L. Bean would no longer be purchasing the Tartan Wreath product from Worcester, and would instead be buying it from a competitor of Worcester's, Whitney Originals, which was located in Washington County, close to Worcester's operations. (Morrill Worcester, Day 2 at 463-464).

89) Morrill Worcester was upset by the loss of the Tartan Wreath to a competitor and expressed his frustration to Rol Fessenden. (Fessenden, Day 4 at 1010-1011; Morrill Worcester, Day 2 at 465-467).

90) Rol Fessenden told Morrill Worcester that, if Worcester came into compliance with all of L.L. Bean's standards, it was possible Worcester could regain the Tartan Wreath. (Morrill Worcester, Day 2 at 465-467). However, Bean's concerns about Worcester remained and, as discussed later in this decision, influenced Bean's decisions in 2009.

THE PARTIES' NEGOTIATIONS PRECEDING THE FINAL VERSION OF THEIR LETTER AGREEMENT FOR THE 2008 SEASON

91) From approximately 2004 through 2008, Robert Bruce of Oakmont Associates served as a financial and business advisor to the Worcester companies. (Bruce, Day 6 at 1480-1481).

20

92) On March 14, 2008, L.L. Bean sent its proposed letter agreement to Worcester for the upcoming 2008 season. The March 14 letter was in some ways consistent with the terms of the parties' letter agreement governing the 2007 season. (Ex. 433).

93) Among other things, the March 14 letter reserved to L.L. Bean the right to order Worcester to increase or decrease its commitments to forecasts based on L.L. Bean's "customer demand." (Ex. 433).

94) The March 14 letter also required Worcester to purchase or to have on hand sufficient components for programs forecast by L.L. Bean including, as well, as percentages above the forecast, and for L.L. Bean to be responsible for unused components up to and including a reserve if consumer purchases for the season fell short of projections, and L.L. Bean deleted the product from its line (Ex. 433).

95) Thus, as in prior years, L.L. Bean's component commitment, as stated in the March 14 letter, extended to all components purchased by Worcester for L.L. Bean products up to Bean's forecast plus a stated percentage beyond that.

96) This commitment was unacceptable to Worcester's new source of bank financing, Chittenden Bank. After consulting with Chittenden, Robert Bruce advised Rol Fessenden or William Holden that L.L. Bean's March 14 proposal was not acceptable because it did not commit Bean to purchase any specific dollar amount of products from Worcester.

97) To induce Chittenden to establish the line of credit that Worcester needed in order to be able to meet L.L. Bean's requirements, Worcester needed L.L. Bean to commit itself to purchasing at least a minimum number of units by means of

21

purchase order. (Bruce, Day 6 at 1509-10, 1513, 1541-1542; Holden, Day 6 at 1375; Fessenden, Day 4 at 891-893).

98) L.L. Bean was made aware of the nature of Chittenden's objection and of the fact that Worcester needed L.L. Bean to commit itself to purchase orders that could serve as security for a line of credit from Chittenden that Worcester could use to fund at least some of the expenses of the 2008 season. (Holden, Day 6 at 1376).

99) In an effort to meet Worcester's needs, L.L. Bean issued a second proposed letter agreement dated March 25, 2008. (Fessenden, Day 4 at 899-900).

100) The draft March 25, 2008 letter differed from the March 14 letter in that it specifically provided that L.L. Bean would issue purchase orders and pay for finished goods within the purchase order quantities irrespective of customer demand.

101) The March 25, 2008 letter also included L.L. Bean's commitment to pay for purchase order quantities "regardless of customer demand," provided Worcester actually finished the goods within those purchase order quantities. In including this provision, L.L. Bean was acceding to the requirement imposed by Chittenden and conveyed to L.L. Bean by Robert Bruce that Worcester needed L.L. Bean to issue firm purchase orders to Worcester for the 2008 season. (Ex. 435; Fessenden, Day 4 at 900-901; Bruce, Day 6 at 1497-1498).

102) The March 25, 2008 letter included L.L. Bean's commitment to issue purchase orders for 344,725 balsam units from Worcester. L.L. Bean chose this number at its sole discretion. (Ex. 435; Fessenden, Day 4 at 932).

103) The purchase order quantity to which L.L. Bean was willing to commit in its March 25, 2008 letter contrasted with L.L. Bean's forecast of 470,000 in its Letter Agreement of February 13, 2007. (Ex. 654, 435; Holden, Day 5 at 1274).

22

104) The March 25 letter reserved to L.L. Bean the right to increase its purchase order commitment of 344,725 balsam units by any number its chose up to and including its forecast number of 405,559 balsam units and a 10% projection above forecast for a total of 446,115 balsam units, provided that L.L. Bean placed purchase orders for the increased amounts by no later than September 12, 2008. (Ex. 435; Fessenden, Day 4 at 902.).

105) L.L. Bean was under no obligation to increase its purchase order commitment of 344,725 balsam units. (Ex. 435; Fessenden, Day 4 at 903).

106) The March 25, 2008 letter also set forth terms describing L.L. Bean's responsibility for any excess components that are purchased by Worcester but not ultimately incorporated into finished goods. The portion of the letter that addresses this responsibility begins with the phrase "As we have for the past several seasons...." (Ex. 435; Fessenden, Day 4 at 906-907).

107) The March 25, 2008 letter agreement provided that Worcester would purchase or have on hand components that would be necessary to complete all quantities for all Worcester products lines including not only those items for which L.L. Bean was prepared to issue purchase orders—344,725 balsam units—but for L.L. Bean's forecast and its projection above forecast as stated in the March 25 letter. (Ex. 435).

108) The March 25, 2008 letter agreement specifically divided the financial responsibility of L.L. Bean and Worcester for components making up the 10% reserve above forecast, with L.L. Bean assuming the limited financial responsibility for 6% (that is, 60% of the 10%) of the components for the SKUs projected above forecast and Worcester assuming 4% (that is, 40% of the 10%) of the components for the SKUs projected above forecast. (Ex. 435). The March 25, 2008 letter did not specifically say

23

which party would be responsible for unused components up to the amount of the forecast, and that silence later generated a dispute, addressed below.

109) Worcester's explicit assumption of ultimate financial liability for a portion of the reserve components purchased to make products ordered, forecasted, or projected by L.L Bean as proposed in the March 25, 2008 letter had never been included in any previous year's agreement between Worcester and L.L. Bean. (Ex. 654, 435; Holden, Day 6 at 1314-1317).

110) The March 25 letter did not reserve to L.L. Bean the right to order Worcester to stop production. (Ex. 654, 435).

111) The March 25 letter substantially addressed Chittenden Bank's concerns, but it was eventually superseded by yet another letter to Worcester from L.L. Bean, dated May 1, 2008. (Ex. 68, 443; Fessenden, Day 3 at 779-780). This letter governed L.L. Bean's ordering of balsam products from Worcester until it was modified orally in November of 2008, and is referred to in this decision as the May 1, 2008 letter agreement or simply as the 2008 letter agreement.

THE MAY 1, 2008 LETTER AGREEMENT

112) The May 1, 2008 letter agreement was drafted by L.L. Bean with assistance of its counsel, Brann & Isaacson, with substantial input from Worcester after lengthy negotiations with Bob Bruce and others on behalf of Worcester. (Ex. 651; Holden, Day 6 at 1319). Worcester did not draft any part of the May 1 letter agreement, but its terms reflect modifications demanded and approved by Worcester. (Ex. 651; Holden, Day 6 at 1319).

113) In broad terms, the May 1, 2008 letter agreement fundamentally differed from all of the parties' letter agreements in prior years, in that L.L. Bean was issuing

24

purchase orders simultaneously, and Worcester agreed to purchase or otherwise have available sufficient components to fill any and all orders L.L. Bean might place with Worcester up to and including L.L. Bean's forecast and projection-above-forecast without any component commitment on the part of L.L. Bean apart from the percentage of an over-forecast reserve. (Ex. 406, 653, 654, 68, 443).

114) The May 1, 2008 letter agreement repeated many if not all of the material terms of the March 25 letter:

- It stated a forecast of 405,559 units and a reserve of 10%, or an additional 40,556 units, for a total of 446,115 units projected.

- It obligated Bean to issue purchase orders for 344,725 units forthwith.

- It provided for L.L. Bean to have the right—but not the obligation—to supplement its initial purchase orders by any amount up to and including 110% of forecast—446,115 units, provided it did so by no later than September 12, 2008.

- It allotted responsibility for the reserve components of 10% above forecast similarly—6% of the 10% to L.L. Bean and 4% to Worcester.

- It committed L.L. Bean to pay for finished goods up to the total quantity of units covered in purchase orders issued by L.L. Bean, regardless of whether the finished units were sold, but also provided that L.L. Bean was not required to pay for finished but not sold goods beyond the total quantity of units reflected in purchase orders.

115) Like the March 25 letter, the May 1, 2008 letter did not reserve to L.L. Bean the right to direct Worcester to stop production of units being produced pursuant to purchase orders.

116) The May 1, 2008 letter agreement was the last in the series of letters drafted and it proved to be the definitive agreement between the parties for the 2008 season, at least until it was orally modified by agreement in November 2008.

117) L.L. Bean chose the number of Worcester products for which it committed to issue purchase orders—344,725 balsam units—at its sole discretion.

25

This figure was 85% of its forecast of 405,559 and 77% of its 10% projection-above-forecast. (Ex. 443, 68). This figure was more than 130,000 lower than L.L. Bean's sales of Worcester products in the immediately preceding 2007 season. (Ex. 443, 68; Morrill Worcester, Day 8 at 220; Fessenden, Day 4 at 812-814, 819-821).

118) To be sure of meeting its obligations to L.L. Bean, Worcester had to purchase or otherwise have on hand sufficient quantities of components to produce and ship up to 446,115 units—the amount of Bean's forecast plus a 10% reserve.

119) Under the 2008 letter agreement, each party gained something it had not obtained in the letter agreements covering prior years, and each party gave up something it had been granted in the agreements for prior years. Whereas the prior letter agreements had never committed L.L. Bean in advance to ordering any specific quantity of units from Worcester, Worcester gained such a commitment in the 2008 letter agreement, and thereby satisfied its financing bank, Chittenden. On the other hand, whereas L.L. Bean had committed itself in prior years to buying all leftover components, either in the form of finished units in the following year or as components in the case of discontinued products, Worcester agreed to a more limited commitment on L.L. Bean's part in the 2008 letter agreement.

120) The May 1, 2008 letter agreement differed fundamentally from the parties' letter agreements in prior years in that L.L. Bean was issuing purchase orders simultaneously, and Worcester agreed to purchase or otherwise have available sufficient components to fill any and all orders L.L. Bean might place with Worcester up to and including L.L. Bean's forecast and projection-above-forecast with a limited component commitment from L.L. Bean. (Ex. 406, 653, 654, 68, 443).

121) The extent of L.L. Bean's component commitment as set forth in the May

26

1, 2008 letter agreement is the subject of a dispute between the parties.

122) Like the March 25 letter, the May 1, 2008 letter agreement explicitly allotted responsibility for the 10% of units above forecast, but did not explicitly address responsibility for unused units up to the forecast amount.

123) With respect to components, the May 1, 2008 letter agreement provided as follows:

> As we have for the past several seasons, L.L. Bean has identified those items on which we will commit to reserve components. This reserve commitment may be up to 6% of the season's forecast for the item. Per the attached commitment spreadsheet, the total value of the components L.L. Bean is instructing Worcester Resources to purchase over and above our current forecast of 405,559 units is $80,228. These components will be used in 2008 production, or, if there are excess components and the product is to be offered in the 2009 season, Worcester Resources will hold these components at its cost until they are needed for production in 2009. If any unused components are for products that are dropped from L.L. Bean's line, L.L. Bean will pay Worcester Resources the cost of the excess components. Attached is a breakdown of our commitments by item. (Ex. 68, 69).

124) The attachment to the letter contained a list of the SKUs involved in the 10% reserve beyond forecast; the number of units for each SKU, the total dollar value of the units, and a breakdown of the parties' respective six-tenths and four-tenths shares of responsibility for the 10% reserve. L.L. Bean's stated share was $80,228.

125) At trial, Worcester argued that the letter should be interpreted to establish essentially the same component commitment L.L. Bean had made in the 2007 letter agreement and in prior years—namely that L.L. Bean would commit itself to buying all leftover components purchased by Worcester up to the amount of the forecast plus the reserve percentage, either in the form of finished units in the following year, or by paying for the components for any discontinued products.

126) Worcester points to the prefatory phrase, "As we have for the past

several seasons..." to bolster its claim that the 2008 letter agreement essentially restated the same component commitment as L.L. Bean had made in prior years. Worcester also suggests that any ambiguity in L.L. Bean's component commitment as stated in the letter should be resolved against L.L. Bean.

127) There is an ambiguity in the body of the letter itself as to the extent of L.L. Bean's component commitment because the letter does not expressly say whether L.L. Bean's component commitment extends beyond 6% of the 10% reserve and embraces any of the 405,559 units in the forecast, and the "As we have in prior years" reference only deepens the ambiguity rather than resolving it.

128) However, the letter refers to the attachment containing "a breakdown of our commitments by item," and the attachment plainly limits L.L. Bean's component commitment for 2008 to $80,228 worth of reserve components—the value of L.L. Bean's share of the 10% reserve amount.

129) If there were any lingering uncertainty about the extent of L.L. Bean's 2008 component commitment, the extrinsic evidence, in particular the testimony of Robert Bruce, who was Worcester's primary representative in the discussions that culminated in the May 1, 2008 letter agreement, conclusively resolves it. Mr. Bruce confirmed L.L. Bean's position that the parties intended in the 2008 letter agreement that L.L. Bean's component commitment for 2008 be limited to six-tenths of the 10% reserve and that the commitment was valued at $80,228.00. (Bruce, Day 7 at 1728, 1969).

130) Thus, under the 2008 letter agreement, L.L. Bean assumed the risk that the market for Worcester's products might not equal the orders that L.L. Bean placed with Worcester if Worcester actually made the finished products within the purchase

28

quantities ordered by L.L. Bean. Similarly, Worcester assumed risks of production, including, any changes in prices for raw materials, costs of production, costs of operation and all other production-related costs, including the cost of all components needed to produce balsam products ordered by L.L. Bean pursuant to the purchase orders, as well as, amounts up to the reserve quantity and a portion of the amount above the reserve. (Ex. 68, 443).

131) Consistent with the terms of the 2008 letter agreement, L.L. Bean issued purchase orders on May 6, 2008, to Worcester for 344,725 units. (Joint Stipulation, ¶ 14, Ex. 448).

132) Shortly after L.L. Bean issued its May 6, 2008 purchase orders to Worcester, Worcester obtained a line of credit from Chittenden Bank. (Morrill Worcester, Day 2 at 267-268).

L.L. BEAN'S SEPTEMBER 22, 2008 PURCHASE ORDER

133) On September 22, 2008, L.L. Bean issued purchase orders to Worcester for an additional 44,939 items, bringing L.L. Bean's purchase orders for the 2008 season to a total of 389,664 items. (Joint Stipulation, ¶ 14, Ex. 456). The purchase orders followed a telephone conversation that Morrill Worcester made to Lisa Richard of L.L. Bean to see whether L.L. Bean wanted to supplement its May 6, 2008 purchase order with further purchase orders.

134) Under the terms of the May 1, 2008 letter, L.L. Bean had the right, but not the obligation, to supplement its purchase orders of May 6, 2008 with additional purchase orders, provided it did so, if at all, by September 12, 2008. (Ex. 68, 443).

135) After L.L. Bean issued the second set of purchase orders, L.L. Bean made internal changes showing the purchase order cancelled in its records, because its

29

computer system did not allow it to record purchase orders being issued to a direct ship vendor. (Ex. 455).

THE PARTIES' NOVEMBER 26, 2008 ORAL AGREEMENT

136) On or about November 26, 2008, the parties made an oral agreement in the course of a telephone conversation that served to modify the May 1, 2008 letter agreement.

137) The parties' stipulations summarize the modification as follows: "As sales for the fall 2008 balsam progressed, L.L. Bean informed Worcester that market demand appeared slack. Worcester agreed to slow or stop production of balsam products as Bean directed. Worcester also agreed to pass along to L.L. Bean all cost savings from not producing balsam products." (Joint Stipulation, ¶ 15, 16). The following findings summarize the additional evidence leading up to and covering that conversation, to put more flesh on the stipulation.

138) Due to the economic downturn in the late summer and fall of 2008, L.L. Bean saw sales falling below projections in many product areas. It generated significantly less favorable sales forecasts and decided to ask its various vendors to be prepared to cut back production. (Fessenden, Day 4 at 944-945, 950-952).

139) The L.L. Bean employee with day-to-day responsibility for L.L. Bean's relationship with Worcester, William Holden, was thus instructed by his superior, Rol Fessenden, to call Worcester and all other vendors for which Mr. Holden was responsible within L.L. Bean, to tell the vendors to be ready to cut back on production as quickly as possible due to the significant decrease in sales projections as a result of the 2008 economic downturn. (Fessenden, Day 4 at 944-945, 950-952).

140) On November 19, 2008, Mr. Holden called Morrill Worcester. Neither

30

Mr. Holden nor Morrill Worcester recalled the specifics of that telephone call, but consistent with his habit of taking notes of significant conversations, (Holden, Day 4 at 1276), Mr. Holden took notes. Mr. Holden's notes reflect that he reported that L.L. Bean's forecasts had been reduced because sales of Worcester products were much lower than projected and that he asked that Worcester Resources slow production. Morrill Worcester agreed to slow production, and told Holden that "he would work with L.L. Bean to make what we need." (Ex. 73; Holden, Day 6 at 1347-1349, Morrill Worcester, Day 2 at 377).

141) On November 26, 2008, Mr. Holden and Lisa Richard on behalf of L.L. Bean had a further telephone conversation with Morrill Worcester about the status of sales of Worcester products. (Ex. 74, 75; Holden, Day 6 at 1349-1351). Michael Worcester, the vice-president of Worcester, was also present for the telephone conversation. (Morrill Worcester, Day 2 at 376; Michael Worcester, Day 9 at 22-23).

142) Mr. Holden and Ms. Richard took notes of the conversation. (Ex. 74, 75). Neither of the Worcesters took any notes. (Morrill Worcester, Day 2 at 376).

143) Mr. Holden told Morrill Worcester that L.L. Bean's sales of Worcester products were quite a bit below projections and said L.L. Bean needed Worcester to cut back production. (Ex. 74; Morrill Worcester, Day 2 at 377-378; Holden, Day 6 at 1347). Morrill Worcester replied by saying that Worcester could not agree to reduce the purchase orders that L.L Bean had placed with Worcester because Chittenden Bank would not let him, but said that Worcester would not make any products L.L. Bean does not need. (Ex. 74, 75; Michael Worcester, Day 9 at 22-23).

144) Morrill Worcester told Mr. Holden that Worcester would stop production as L.L. Bean directed and that Worcester would pass any and all savings

31

resulting from its cessation of production along to L.L. Bean. (Ex. 74, 75; Morrill Worcester, Day 8 at 206). Mr. Worcester said that the only two examples of the savings that he could think of at the time that would result from a cessation of production were labor costs and the costs that Worcester paid for cutting balsam tips, also known as "brush." (Ex. 74, 75; Michael Worcester, Day 9 at 22). Lisa Richards notes state: "W.W. asking for difference of PO to production – would reduce by labor/balsam overhead – components." (Ex. 75) Her notes are not clear as to whether the references to overhead and components were mentioned by Mr. Worcester or were her own inferences as to what could be saved by cutting back production.

145) Morrill Worcester also told William Holden that Worcester would "save what it can" and "we would do anything we could to save them [L.L. Bean] money" and "if there 's anything else we could save, we certainly would" as a result of ceasing production. (Ex. 74; Morrill Worcester, Day 2 at 378-379, Day 3 at 605).

146) Messrs. Holden and Worcester agreed that the parties would be fair to each other at the end of the season. (Holden, Day 6 at 1350; Morrill Worcester, Day 2 at 383-384). Morrill Worcester took this to mean that Worcester would "do anything we could to help them out" and that "we would do anything we could to save them money." (Morrill Worcester, Day 2 at 378-79, 383).

147) Based on the parties' history of resolving what was owed at their year-end meetings, both Mr. Holden and Morrill Worcester likely contemplated that the parties would meet early in the following year to work out an agreed-upon year-end payment from L.L. Bean to Worcester to close the 2008 season. That plainly was Mr. Worcester's understanding. (Morrill Worcester, Day 8 at 207).

148) Although Worcester clearly promised that it would save what it could by

32

stopping production when and as directed by L.L. Bean, when and how such savings would be passed back to L.L. Bean was not discussed.

149) However, in offering to pass savings along to L.L. Bean, Morrill Worcester was referring to savings arising from production. The examples that he gave of possible areas of savings—labor and brush—were costs associated with the Worcester's production of items for L.L. Bean that could be saved if Worcester actually stopped production. (Morrill Worcester, Day 2 at 379-380.)

150) When he agreed to credit L.L. Bean with savings realized by Worcester in cutting back production, Morrill Worcester reasonably believed that Worcester could do so by giving L.L. Bean discounts on its purchases during the following season in 2009. In fact, the representatives of Worcester and L.L. Bean who participated in the conversation had every reason to expect that the business relationship between the two companies would continue into 2009 and thereafter.

151) In summary, the November 26, 2008 telephone conversation modified the May 1, 2008 letter agreement in this significant respect: although the purchase orders committing L.L. Bean to purchase 389,664 units remained in force, Worcester agreed to subtract from the amounts due on those purchase orders what it could save in production costs by reducing production in compliance with L.L. Bean's request.

152) The fact that the purchase order commitment remained in place after the November 26, 2008 conversation is relevant for several reasons, including that it helps explain and justify, Worcester's decision at the end of 2008 to send L.L. Bean an invoice for the full outstanding amount of the purchase orders. That decision is discussed in detail below.

153) Sometime after the telephone conversation between William Holden and

33

Lisa Richard and Morrill Worcester and Michael Worcester on November 26, 2008, Rol Fessenden saw William Holden in a corridor of L.L. Bean and Mr. Holden confirmed that he had spoken to Worcester and that Worcester had agreed to cease production at L.L. Bean's direction. Mr. Fessenden did not recall if Mr. Holden provided him with any other information about the conversation, but he was aware that Mr. Holden had spoken to Worcester in November as requested. (Fessenden, Day 4 at 949-950). However, Mr. Fessenden was unaware of the details of the November 26, 2008 conversation until he attended the trial of this case in October 2011. (Fessenden, Day 4 at 986).

154) In effect, by refusing to release L.L. Bean from its previously issued purchase orders, Worcester was attempting to reserve its right to the Uniform Commercial Code (UCC) seller's remedy based on an action for the price, instead of the alternate remedy granting the seller the difference between market value and contract price, less expenses saved. *Compare* 11 M.R.S. § 2-708(1) ("the measure of damages for nonacceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in this Article (section 2-710), but less expenses saved in consequence of the buyer's breach") *with* 11 M.R.S. § 2-709(1)(b) ("When the buyer fails to pay the price as it becomes due, the seller may recover, together with any incidental damages under section 2-710, the price [o]f goods identified to the contract if the seller is unable after reasonable effort to resell them at a reasonable price or the circumstances reasonably indicate that such effort will be unavailing.").

155) However, as L.L. Bean points out, when Worcester agreed to stop production, Worcester can be deemed to have surrendered its ability to bring an action

34

for the price under section 2-709, and to have limited its remedy to those available under section 2-708. *See Detroit Power Screwdriver Co. v. Ladney*, 181 N.W.2d 828, 832 (Mich. App. 1970) ("the language of 2709(1) which allows a suit for the price 'when the buyer fails to pay the price as it becomes, due,' implies the completion of contractual conditions precedent to payment before the seller can sue on the price. . . . the seller must complete the machine and tender performance consistent with the contract before it can sue on the price."); *accord E–Z Roll Hardware Mfg. Co., Inc. v. H & H Prods & Finishing Corp.*, 4 U.C.C. Rprt. 1045, 1047–48 (N.Y. Civ. Ct. 1968) ("A seller ... who elects to cease manufacture on repudiation by the buyer does not have an action for the purchase price as such"); *Rowland Meledandi, Inc. v. Kohn*, 7 U.C.C. Rptr. 34 (N.Y. Civ. Ct. 1969) (same).

156) On the other hand, during the November 26, 2008 telephone conversation, L.L. Bean did agree to pay the full face amount of the purchase orders minus whatever Worcester was able to save by stopping production. Thus, what the parties agreed to on November 26, 2008 was different than the section 2-708(1)(b) remedy of contract price plus incidental costs minus market value and expenses saved. What they agreed to was, in substance, a hybrid of the UCC remedies in sections 2-708 and 2-709 and could be characterized as a modified seller's remedy, as allowed by the UCC. *See* 11 M.R.S. § 2-719(1) (parties to a sales contract may agree to "remedies in addition to or in substitution for those provided in this Article and may limit or alter the measure of damages recoverable under this Article").

## L.L. BEAN'S REQUESTS FOR CESSATION OF PRODUCTION AND WORCESTER'S RESPONSE

157) In early December, L.L. Bean requested that Worcester stop production of certain products. On December 9, L.L. Bean told Worcester to stop production of all

products. (Joint Stipulations, ¶¶ 17-18; Ex. 80, 81, 82, 83, 84; Michael Worcester, Day 9 at 26).

158) Morrill Worcester was made aware of the requests and gave orders to stop production of the items L.L. Bean had identified. (Morrill Worcester, Day 8 at 209).

159) Worcester released production workers that Worcester concluded that it could safely release as a result of the cessation of production. (Michael Worcester, Day 9 at 32). By December 10, 2008, however, Worcester's production was essentially completed for the season, having already made 95% of the products it completed that year.

160) After the stop order, Worcester's production on most items was stopped entirely, with some items continuing on skeleton crew levels, with production down to extremely small numbers. In fact, all wreath manufacturing stopped by December 12, with the remainder of production limited to certain centerpieces and a tartan tree. (Ex. 253).

161) Worcester did not release its entire support staff because Worcester was still making some balsam products for L.L. Bean, and Worcester was also concerned that if it released those workers it could not get them back in the event that a need for their services unexpectedly arose. (Michael Worcester, Day 9 at 32-33).

162) Up to and including December 20, 2008, Worcester continued production of only four to five product types (or SKUs) out of the 22 product types Worcester produced in 2008, and only on a very limited basis after L.L. Bean had requested that Worcester stop production. (Michael Worcester, Day 9 at 28, 31; Ex. 253).

163) Worcester continued shipping only a very small amount L.L. Bean products up to and including December 23, 2008. (Michael Worcester, Day 9 at 32).

164) As a cost savings, as a result of stopping production, Worcester did not have to pay Worcester Holdings the $.45 per pound for balsam tips for all of the items reflected in L.L. Bean's purchase orders. (Morrill Worcester, Day 3 at 604-612).

L.L. BEAN DISTRIBUTION OF WORCESTER'S FINISHED GOODS

165) By the end of the 2008 season, Worcester had manufactured 315,580 units, more than 40,000 units beyond what L.L. Bean had been able to sell to customers. (Joint Stipulations ¶¶ 19-21). Worcester shipped 271,554 items to customers and did not ship the rest. Consistent with its obligations under the 2008 letter agreement, L.L. Bean paid Worcester for the 315,580 units and took possession of approximately 20,000 finished units in the form of wreaths and gave them away to L.L. Bean customers and employees. (Ex. 489; Fessenden, Day 4 at 954; Holden, Day 6 at 1365).

166) L.L. Bean left approximately 20,000 finished units on Worcester's premises. (Scott, Day 8 at 31). Worcester did not incur any direct shipping costs on these goods. Although Worcester testified that it disposed of these goods, and that it did not salvage any components from them, it provided no evidence of any expenses incurred in such disposal nor has it made any claim against L.L. Bean for such expenses.

THE END OF THE 2008 SEASON AND WORCESTER'S DECEMBER 31, 2008 INVOICE TO L.L. BEAN

167) By the end of the 2008 season, Morrill Worcester believed that Worcester had met all of L.L. Bean's expectations and requirements for the 2008 season. (Morrill Worcester, Day 2 at 408; Ex. 24). Although L.L. Bean still had serious concerns with Worcester's viability as a vendor, Worcester had made progress over the course of the year in addressing the concerns Rol Fessenden had conveyed to Worcester

early in 2008. (Fessenden, Day 4 at 956-957). At the end of 2008, William Holden, who had primary responsibility for L.L. Bean's relationship with Worcester, assumed that Worcester would be doing business with L.L. Bean in the 2009 season. (Ex. 93, 96; Holden, Day 6 at 1377).

168) "Year-end" was when Worcester customarily sent a final invoice to L.L. Bean for the just-ended season. Morrill and Michael Worcester consulted with Worcester's financial advisor, Robert Bruce, on Worcester's final bill to Bean. (Ex. 85, 86).

169) Robert Bruce advised Worcester to bill L.L. Bean for the full amount of the remaining value on the combined purchase orders L.L. Bean had placed for 389,664 balsam items. (Ex. 87). Worcester was under great pressure from Chittenden, its financing bank, to repay the line of credit, which as of early 2009 stood at more than $1.4 million, according to Morrill Worcester. (Ex. 96).

170) Mr. Bruce's view was that the 2008 letter agreement was a "take-or-pay" contract, under which L.L. Bean was committing itself unconditionally to pay the amount due for all units covered in its purchase orders, whether or not it needed or even took delivery of the units involved.[4] Although the term "take-or-pay contract" may not be a widely used term of art outside the oil and gas industry, it fairly captures the unconditional nature of L.L. Bean's contractual commitment for the 2008 season, at least as it stood before the November 2008 oral modification.

171) Like Mr. Fessenden on L.L. Bean's side of the table, Mr. Bruce was not a

---

[4]  A take-or-pay contract is one in which the purchaser of goods agrees to pay for goods ordered regardless of whether the purchaser takes delivery. "The buyer would be motivated to enter into a take-or-pay contract to be reasonably confident that a minimum quantity of the goods desired would be available on a regular basis. The seller would be motivated by the steady cash flows and assured market for its product." *See* B. Jarnagin, Master GAAP Guide, at 533 (CCH 2008). Take-or-pay contracts are common in the energy industry, if not in the balsam product industry.

party to the November 2008 conversation on behalf of Worcester, and it seems likely that, like Mr. Fessenden, he was not made fully aware of the oral agreement reached in that conversation. Their incomplete grasp of the oral agreement may help explain why the positions that each took on behalf of their respective principals—Mr. Bruce in insisting that L.L. Bean had to pay in full before any consideration of credit for Worcester's savings would be given, and Mr. Fessenden in proposing in his March 2, 2009 communication that Worcester accept a different and potentially less favorable resolution than was discussed between the Worcesters and Mr. Holden and Ms. Richards on November 26, 2008—were deemed unacceptable by the other.

172) Worcester had never before charged L.L. Bean for unfinished products. (Joint Stipulations, ¶ 24). On the other hand, under the parties' 2008 letter agreement, as modified by the November 26, 2008 conversation, Worcester was entitled to be paid for the products reflected in L.L. Bean's purchase orders, whether or not they were needed or finished, less any costs Worcester could save by not continuing to make those products after L.L. Bean directed it to stop production. (Ex. 68).

173) Thus, if a particular unit was only partially finished as of when L.L. Bean directed Worcester to stop production of the SKU for that unit, L.L. Bean would be liable to pay Worcester the purchase order price of that unit, minus any costs Worcester did save or could reasonably have saved by not having to complete the unit.

174) Jill Stevens, the bookkeeper for Worcester prepared an invoice for L.L. Bean dated December 31, 2008 for the balance due from L.L. Bean on the full amount of the purchase orders, plus other charges. (Ex. 88; Stevens, Day 6 at 1415-1419).

175) The December 31, 2008 invoice also included a charge for products that L.L. Bean had ordered and that Worcester had converted into finished goods but for

which L.L. Bean had no customers. (Ex. 87; Stevens, Day 6 at 1415-1419).

176) On January 5, 2009, William Holden asked Morrill Worcester if Worcester would hold its 2009 prices to 2008 levels. Morrill Worcester agreed that Worcester would do so. (Ex. 498; Holden, Day 6 at 1358). Given the 2008 economic downturn, this request was made of all of L.L. Bean's vendors, not just Worcester. (Holden, Day 6, 1357).

177) When Morrill Worcester instructed Jill Stevens to send the December 31, 2008 invoice to L.L. Bean, he expected Worcester and L.L. Bean would have a year-end meeting sometime early in 2009 to wrap up the 2008 season and to make plans for a possible 2009 season. (Stevens, Day 6 at 1415, 1457; Morrill Worcester, Day 2 at 400-402).

178) On January 7, 2009, Jill Stevens forwarded the December 31, 2008 invoice to Kim Best, a contact at L.L. Bean to whom, at the end of the preceding production and sales year, Jill Stevens had sent the year end invoice. Jill Stevens sent the invoice by telefax. (Ex. 65, 89; Stevens, Day 6 at 1412-1413, 1415).

THE PARTIES' DISCUSSIONS SURROUNDING WORCESTER'S YEAR-END INVOICE AND THEIR EFFORTS TO RESOLVE THEIR DIFFERENCES

179) The invoice was forwarded to William Holden, who contacted Morrill Worcester to ask him about it. William Holden spoke to Morrill Worcester and Robert Bruce on January 9 and January 15, 2009. (Ex. 93; Holden, Day 6 at 1370-1373).

180) During those conversations, Messrs. Worcester and Bruce explained that Worcester had to submit an invoice for the full amount remaining on the invoice because Worcester needed L.L. Bean to pay Worcester so Worcester could in turn pay the approximately one million dollars Worcester owed to Chittenden Bank, the bank that had issued the line of credit enabling Worcester to finance L.L. Bean's purchase

40

orders for the 2008 season. (Ex. 93; Holden, Day 6 at 1370-1378).

181) In the course of those conversations, Robert Bruce told William Holden that Worcester had to pay off the balance on its line of credit with Chittenden Bank by March 31, 2009. He also told L.L. Bean that if Worcester paid off the line of credit, Worcester would be able to automatically renew the line of credit for the 2009 season. (Bruce, Day 6 at 1541-1542).

182) When Mr. Holden reminded Morrill Worcester of Worcester's commitment to pass along savings, Mr. Worcester acknowledged the agreement, but he and Mr. Bruce suggested that Worcester could credit L.L. Bean with those savings in the forthcoming season. In the meantime, they said, Worcester needed L.L. Bean to pay Worcester's invoice in full. In response, Mr. Holden said that he was willing to consider Worcester's proposals on how to pass the savings along to L.L. Bean, but he did not agree to Worcester's request to be paid the full price on the final invoice first. (Holden, Day 6 at 1379, 1394).

183) Worcester's position that L.L. Bean should pay the full balance due on the purchase orders before Worcester credited L.L. Bean with the cost savings resulting from the cessation in production was not inconsistent with the parties' November 26, 2008 oral agreement, to which both Mr. Worcester and Mr. Holden had been party, nor was it necessarily consistent with the oral agreement. The parties never discussed on November 26, 2008 how or when L.L. Bean would be credited with Worcester's savings—they only agreed to be "fair" with each other.

184) Thus, based on the firm commitment to purchase orders that Worcester had obtained from L.L. Bean in the 2008 letter agreement and that Worcester had insisted on maintaining in the face of L.L. Bean's request to curtail production, it was

41

not unreasonable for Worcester to assume that it would be paid on those purchase orders and the amount and timing of L.L. Bean's credit for Worcester cost savings would be worked out later. On the other hand, it was also not unreasonable, based on Worcester's oral promise to credit L.L. Bean with Worcester's savings resulting from the curtailment of production, for L.L. Bean to assume that at least some amount in savings would be shown as a deduction on Worcester's final invoice.

185) Had the parties continued the discussion on November 26 to the point of defining how Worcester's savings would be quantified and returned to L.L. Bean, they might have achieved a meeting of the minds on precisely what cost savings Worcester would credit to L.L. Bean and how the credit would be applied in the context of L.L. Bean's payment for the purchase orders. As it was, the parties' failure to resolve the impasse on which would occur first—L.L. Bean's payment or Worcester's reduction of its invoice—and their apparent inability to accept each other's point of view when the issue surfaced in early 2009 brought to light the fundamental absence of a meeting of the minds on those crucial details during the November 26, 2008 conversation.

186) Starting in January, Worcester began to develop a proposal to submit to L.L. Bean regarding how Worcester would return its cost savings to L.L. Bean. Morrill Worcester made some handwritten calculations of what Worcester could return to L.L. Bean in savings, and came up with a savings amount in excess of $600,000. (Ex. 143). With Mr. Bruce's assistance, Worcester generated a spreadsheet toward the end of January showing a "Total 09 Discount" of $646,083.73, consisting of $303,526.29 in what the document calls "Avoided Cost" and $342,557.34 in "Value of Components." The spreadsheet appears to quantify future discounts from Worcester to L.L. Bean rather than Worcester's savings in 2008 as a result of stopping production, although the

42

reference to "Avoided Cost" plainly suggests otherwise.

187) On January 16, 2009, Morrill Worcester forwarded to William Holden via e-mail a proposal for Worcester to pass production savings back to L.L. Bean. (Ex. 93, 95).

188) After reviewing Morrill Worcester's proposal in the January 16 e-mail, Mr. Holden remained receptive to seeing if Worcester and L.L. Bean could work out an agreement which would include Worcester passing production savings along to L.L. Bean in Worcester discounts or other reductions of 2009 business charges. (Holden, Day 6 at 1379,1381-84).

189) On February 11, 2009, Morrill Worcester called William Holden and proposed that Worcester and L.L. Bean agree on an auditor who could assess Worcester's production savings to the satisfaction of Worcester and L.L. Bean. (Ex. 96; Holden, Day 6 at 1384-1387). In that conversation, Mr. Worcester maintained his position that L.L. Bean should pay Worcester the full amount of the invoice before Worcester returned cost savings on to L.L. Bean. (Ex. 96; Holden, Day 6 at 1384-1387). However, Mr. Worcester acknowledged that his legal counsel had advised him that, because Worcester had agreed to cut production and pass along saved costs, Worcester would likely not be able to recover the full amount due under the L.L. Bean purchase orders. (Ex. 96).

190) On February 13, 2009, Morrill Worcester advised William Holden that Worcester was willing to provide guarantees to L.L. Bean that it would pass its production savings on to L.L. Bean, but reiterated that Worcester needed L.L. Bean to make payment on the invoice before Worcester would be in a position to pass back its savings to L.L. Bean. (Ex. 96).

43

191) L.L. Bean considered Morrill Worcester's proposals of February 11 and February 13, 2009, (Holden, Day 6 at 1387), but the impasse on which would occur first—L.L. Bean's payment of Worcester's invoice in full or Worcester's return of savings to L.L. Bean as a credit on the invoice—remained unresolved.

192) On March 2, 2009, Rol Fessenden sent an e-mail to Morrill Worcester proposing terms based on which L.L. Bean and Worcester could close out the 2008 business. (Ex. 100; Fessenden, Day 4 at 985, 987). The e-mail made reference to Worcester's honoring L.L. Bean's stop-production requests and noted that L.L. Bean had paid Worcester for about 315,000 finished units. The e-mail proposed to pay Worcester for its "gross margin—selling price less labor and materials—on the gap between our initial PO of 344,725 units and the [315,580] units we have already paid for." (Ex. 100).

193) Mr. Fessenden's March 2, 2009 e-mail proposed that L.L. Bean and Worcester enter into a bailment agreement covering "the excess components that you are holding . . . similar to the agreement that we executed last year." The new bailment agreement would cover "approximately $450,000 worth of components," and would be "subject to our assessment of [Worcester's] audited financial statements . . ." (Ex. 100).

194) L.L. Bean's March 2, 2009 proposal was inconsistent with the parties' November 26, 2008 modification of the 2008 letter agreement in two significant respects, possibly because Mr. Fessenden was not familiar with the details of the November 26, 2008 agreement. First, L.L. Bean's proposal failed to recognize that Worcester had insisted in the November 26, 2008 conversation on retaining the benefit of all of L.L. Bean's purchase orders, not just the initial set, and it therefore failed to address Worcester's expectancy under the second round of purchase orders issued in

44

September 2008. Second, the November 26, 2008 agreement called for a different equation for calculating Worcester's entitlement—for L.L. Bean to be credited against the total amount due under the purchase orders for Worcester's saved costs, and not, as the March 2 e-mail proposed, for Worcester to be paid its "gross margin."

195) After Worcester received Rol Fessenden's e-mail of March 2, 2009, Michael Worcester forwarded the e-mail to Robert Bruce, asking for Mr. Bruce's reaction to L.L. Bean's proposal. Mr. Bruce responded in an e-mail by saying that the proposal was "not close to helping you" and said he would look for support in the parties' exchanges for the concept that both parties intended L.L. Bean's purchase orders to be "take-or-pay." (Ex. 101).

196) In a lengthy e-mail from Morrill Worcester to Mr. Fessenden dated March 6, 2009, Worcester responded to L.L. Bean's March 2 proposal. Worcester's March 6 response summarized Worcester's understanding of the 2008 letter agreement and the discussions leading up to it; the "take-or-pay" nature of L.L. Bean's purchase orders; the effect of the November 26, 2008 oral agreement; and Worcester's commitment to return savings to L.L. Bean in the form of "discounts" in the 2009 season. The e-mail said that L.L. Bean's failure to pay Worcester's invoice put Bean "in default of its obligations to make timely payment." Worcester pointed out that Worcester had agreed not to increase its prices in 2009, and that the discounts it would offer L.L. Bean for the 2009 season would total about $500,000 for about 77,000 items. The e-mail closed with a reiteration of Worcester's interest in continuing to supply L.L. Bean, but said its ability to secure the financing necessary to enable it to do so was dependent on L.L. Bean satisfying its "take-or-pay obligations from the 2008 season." (Ex. 102).

45

197) In late March or early April of 2009, Robert Bruce contacted Gregory Sanborn of Baker, Newman & Noyes in an effort to move the concept of an audit of Worcester's cost savings forward as a means of resolving the impasse. He sent Mr. Sanborn Morrill Worcester's preliminary cost savings calculations of $646,000 with the request that Mr. Sanborn keep it confidential. (Bruce, Day 6 at 1544-1545; Ex. 143).

198) During March 2009, discussions aimed at resolving the impasse continued—L.L. Bean and Worcester were able to agree on a partial payment by L.L. Bean, but the balance became a sticking point. L.L. Bean wanted Worcester to relinquish any claim to the balance, but Worcester refused, claiming that Chittenden Bank would not permit it to sign a release. (*See* Ex. 553).

199) On March 25, 2009, Rol Fessenden developed a new proposal for resolving the impasse over the December 31, 2008 invoice. (Ex. 113, 549). The terms included a provision for L.L. Bean to purchase and take actual possession of the components that L.L. Bean assumed Worcester had obtained for the 2008 season and retained on hand. (Ex. 549; Fessenden, Day 4 at 1002).

200) Rol Fessenden forwarded his March 25, 2009 settlement proposal to Morrill Worcester with a cover letter dated March 30, 2009. (Ex. 113; Fessenden, Day 4 at 1005). The March 30 cover letter read as follows:

> Bean is prepared to resolve the 2008 invoices consistent with our interpretation of the letter agreement. See attached [the March 25, 2009 letter]. The offer is dependent on you signing a release from potential litigation. Even though you have agreed to payment based on that offer, you will not sign the release from potential litigation. I cannot issue you any payment until the release is signed.
>
> As previously discussed, I cannot issue purchase orders for 2009 to Worcester Wreath until I have received your 2008 audited financial information, in order to confirm your ability to finance the business. We are moving forward with alternative suppliers.

46

(Ex. 113).

201) On the same day, March 30, 2009, with Chittenden's March 31 deadline for paying off the line of credit at hand, Morrill Worcester forwarded a settlement proposal in the form of an e-mail message to L.L. Bean, in which Worcester proposed that L.L. Bean pay Worcester, not the full amount of Worcester's December 31, 2008 invoice, but rather $1,171,749, the balance due to Chittenden on Worcester's line of credit. The March 30 message emphasized that Worcester would lose the line of credit for the 2009 season if it failed to pay the balance due, and therefore that its viability as a business was in jeopardy if the line were not paid. It also said that, although Chittenden would not permit Worcester to sign a release for the lesser amount Worcester and L.L. Bean had previously negotiated, Worcester could give L.L. Bean a release if Bean paid Worcester enough to pay off the line of credit. (Ex. 143, 553; Morrill Worcester, Day 8 at 219).

202) Rol Fessenden testified that he did not believe that he saw Worcester's March 30, 2009 proposal before sending his proposal to Worcester that same day. (Fessenden, Day 4 at 1009).

203) Neither L.L. Bean's proposal to Worcester of March 30 or Worcester's proposal of the same came to fruition, and Worcester missed Chittenden's March 31 deadline for paying off the line of credit. As a result, Worcester lost its right to an automatic renewal of the line of credit to cover expenses for the upcoming 2009 season. (Morrill Worcester, Day 8 at 219, Day 2 at 421).

204) Around the end of March or the beginning of April 2009, William Holden advised Worcester that L.L. Bean had decided to allocate 30 to 40 percent of its balsam products business to Worcester and the balance to other vendors. Morrill

47

Worcester was very upset at the idea of L.L. Bean turning to other vendors to supply it with balsam products, and left a voicemail message with Mr. Holden to the effect that Worcester wanted to have all of L.L. Bean's balsam products business or none of it. (Morrill Worcester, Day 4 at 467-68).

205) When Michael Worcester learned of his father's message, he promptly contacted Mr. Holden to say that his father's message did not reflect Worcester's position, and that Worcester wanted to continue doing business with L.L. Bean. He and Mr. Holden discussed how much of L.L. Bean's balsam products business for 2009 Worcester needed to get in order to survive, and Michael Worcester mentioned a figure of 200,000 units. Mr. Holden seemed receptive to that idea. (Michael Worcester, Day 9 at 34-37).

206) The month of April 2009 saw Worcester trying to salvage what it could of L.L. Bean's business by addressing L.L. Bean's concerns about Worcester's financing. (Michael Worcester, Day 9 at 39). Worcester's default on the credit line had only enhanced L.L. Bean's concerns about Worcester's financial viability with regard to meeting L.L. Bean's balsam product requirements for the 2009 season, and the impasse over payment of the 2008 year-end invoice did not help Worcester in its quest to retain at least some of L.L. Bean's business.

207) During April 2009, Worcester was also trying to convince Chittenden Bank to extend financing for the 2009 season. Moreover, Worcester had begun actively exploring ways of expanding its sales to other customers in March 2009, when the future of its relationship with L.L. Bean fell increasingly into question. (Michael Worcester, Day 9 at 43-45; Ex. 113). As of the 2008 season, its sales to L.L. Bean represented about 90% of Worcester's sales, and Morrill Worcester knew of no other

48

potential customer that sold balsam products on the scale of L.L. Bean. (Morrill Worcester, Day 8 at 230-233).

208) As part of the overture to Chittenden, Morrill Worcester generated sales projections for 2009, based on prospective sales to its existing customers, such as L.L. Bean and 1-800-FLOWERS, as well as sales to potential new customers, including Wal-Mart. (Ex. 134). He sent those projections to Robert Bruce, who turned them into financial projections. (Ex. 136).

209) Eventually, Morrill Worcester's 2009 sales projections, with input by Mr. Bruce, were shared with Chittenden and several other sources of potential financing for Worcester. (Ex. 137, 138, 140). However, at least some of the projections were dramatically overstated to the point of being outright incorrect and misleading. For example, Worcester referred to Wal-Mart as a customer who had made actual commitments, when in fact Worcester's overtures to Wal-Mart had not generated any tangible result in terms of a commitment by Wal-Mart to do business with Worcester. (*Compare* Ex. 140 *with* Morrill Worcester, Day 1 at 134-46, 146-48).

210) In fairness, Worcester did have various discussions with Wal-Mart about a business relationship, so the misstatements may have resulted more from Worcester's overly optimistic view of its prospects with Wal-Mart than an intent to mislead Chittenden or other prospective financing sources. However, the fact remains that Morrill Worcester generated what he had to have known was false information about Worcester's existing customer base that he knew would be circulated by Mr. Bruce to potential sources of financing.

211) In its efforts to persuade L.L. Bean to place orders for the 200,000 units Mr. Holden had said he was willing to consider, Worcester found itself in somewhat of a

49

cleft stick. On the one hand, before providing Worcester with any specific commitments to product lines and quantities, L.L. Bean required Worcester to show that it was financially stable and that it had obtained financing to manufacture the 200,000 units. On the other hand, in order to obtain that financing, Worcester had to show its financing source the very type of specifics L.L. Bean was not prepared to provide. (Michael Worcester, Day 9 at 38).

212) Eventually, L.L. Bean decided to discontinue its long relationship with Worcester, and notified Worcester by means of a May 1, 2009 letter to Morrill Worcester from Rol Fessenden. (Ex. 123; Michael Worcester, Day 9 at 39). Worcester responded the same day, acknowledging the end of the relationship but expressing the hope that L.L. Bean might reconsider. (Ex. 124).

213) During the rest of 2009 and thereafter, Worcester made some efforts to generate new business, mainly by contacting potential customers by e-mail, but also by going to trade shows. (Michael Worcester, Day 9 at 43-44, 55-67).

214) Over the more than two years since losing L.L. Bean's business, Worcester's efforts have resulted in it having more commercial customers for balsam products (although not more volume). (Michael Worcester, Day 9 at 53-54).

215) Michael Worcester estimated Worcester's total volume of sales to commercial customers as of October 2011 at about 60,000 units. (Michael Worcester, Day 9 at 53). In 2010, however, Worcester sold in excess of 250,000 units for well over $2.5 million (Ex. 304). Worcester has also experienced an increase in the volume of its sales to Wreaths Across America. (Michael Worcester, Day 9 at 53).

216) In 2010, based on Worcester's claim that it had substantial excess component inventory that it had not been able to use in products or re-sell, Rick

50

Ordway returned to Worcester's facility to do an assessment of unused component inventory.

217)   During his 2010 visit to Worcester's facility, Mr. Ordway observed "a lot" of inventory that did not appear to be segregated by customer. He also observed in 2010 that there were kits stored with shrink-wrap around the cages, protected in plastic, and he did not observe any deterioration of components. (Ordway, Day 9 at 148). He did not attempt to do a complete inventory of Worcester's components. (Ordway, Day 9 at 170).

218)   Because Worcester does not separate its component inventory by the customer for whom it was purchased, and because components used in L.L. Bean products are quite similar to those used in Worcester's own products sold from its website as well as the products it makes for other customers, a visual inspection would not readily enable one to differentiate between components were attributable to L.L. Bean products and components attributable to other products.

219)   However, based on inventory and other records provided by Worcester, including Worcester's invoices for purchases of components, Mr. Ordway concluded that any component inventory as to which L.L. Bean had made a commitment for the 2007 season or the 2008 season had been used up by Worcester in making the 315,580 units made by Worcester in 2008, and paid for by L.L. Bean. (Ordway, Day 9 at 163-64).

THE RESULTS OF THE 2008 SEASON IN TERMS OF SALES, PAYMENTS AND LEFTOVER COMPONENTS

220)   The parties agree that during the 2008 season Worcester actually finished 315,580 units of balsam products at L.L. Bean's request, all of which were paid for by L.L. Bean. (Joint Stipulations, ¶ 20; Ex. 89, 147, 175, 495, 526). Based on the

51

difference between that number and the 389,664 units ordered, the parties agree that there were 74,085 units reflected in L.L. Bean's purchase orders, but not made by Worcester. (Joint Stipulations, ¶¶ 14, 20).

221) The parties are in agreement that the total amount of goods actually purchased by L.L. Bean customers (and presumably direct shipped to them by Worcester) was 271,554 units. (Joint Stipulation ¶ 21).

222) The parties are in agreement that the total amount of the May 5, 2008 purchase orders and the September 22, 2008, purchase orders is $6,682,915. (Ex. 178, 448, 456). The parties also agree that the amount of payments to Worcester made by L.L. Bean with respect to the 2008 season is $5,497,306. (Ex. 147). The difference between the two numbers is $1,185,609. That figure represents L.L. Bean's outstanding obligation under the 2008 purchase orders reflecting the 74,085 items that L.L. Bean ordered but Worcester did not complete, before any of the adjustments that both parties claim should be made.

223) Worcester's decision to purchase about $456,000 in component inventory is significant and revealing in several respects.

224) The fact that Worcester purchased those additional components in 2008 means that Worcester assessed its inventory of leftover components on hand as of early 2008, and decided that an additional $456,000 worth of components—no more, no less—were needed to meet L.L. Bean's 2008 forecast plus reserve totaling 446,115 units.[5]

---

[5] Some of Worcester's 2008 component purchases may have been for products destined for other customers. However, because L.L. Bean accounted for such a high percentage of Worcester's anticipated business, and because L.L. Bean's commitment to 2008 component purchases was capped at $80,228, the small percentage of the $456,000 component purchases in 2008 that may have reflected products for other customers becomes ultimately irrelevant and unnecessary to factor into the analysis.

225) As noted earlier, Worcester's total leftover component inventory at the end of the 2007 season was listed in its 2007 tax return at $1,462,326. Based on L.L. Bean accounting for 90% of Worcester's business, nearly all of those components were suitable to be used in L.L. Bean's products, although, as noted earlier, not more than $600,000 worth were components that L.L. Bean had committed itself to.

226) At an average of $4 worth of components incorporated into one finished unit for L.L. Bean, the total of 446,115 units reflected in L.L. Bean's forecast plus reserve would require a total of about $1,785,000 in components. Worcester's 2008 component purchase of $456,000 implies that Worcester had the remaining $1,330,000 worth of needed components in leftover component inventory from the 2007 season. The $1,462,326 value assigned to leftover components purchased for L.L. Bean and other customers in Worcester's tax return tends to confirm the accuracy of that conclusion.

227) Worcester's practice was to use leftover components before new components, so in 2008 it would have used the leftover components before the newly purchased ones. Because Worcester finished and received payment for 315,580 units, and because the $1.2 million component cost associated with those units would nearly equal the $1,330,000 cost of the leftover components, Worcester's FIFO practice of using leftover components first means that Worcester used nearly all of its leftover components to make the 315,580 units that it finished. (Ordway, Day 9, pgs. 158–59).

228) Thus, whatever components Worcester had left after finishing 315,580 units must have consisted mainly of the newly purchased components that, unlike leftover components from prior years, were subject to the $80,228 cap negotiated in the 2008 letter agreement.

229) Clearly, the foregoing calculations are not exact. For example, they do not take account of the fact that some SKUs require more than $4 worth of components per unit, and some SKUs call for less. To the extent, L.L. Bean's purchase orders contained a mix of products tilted toward units that use a lesser dollar value or greater dollar value in components than the $4 average, the calculations as to the value of components required to make a given number of units theoretically might be under- or over-estimates.

230) However, the evidence supports a finding that, across the mix of units involved in the 2008 season—both those specified in the forecast and reserve and those actually finished—an average component value of $4 is reasonable and applicable.

231) What this means is that, given that Worcester had on hand $1,785,000 in inventory to make up to 446,115 units, and given that Worcester finished 315,580 units incorporating about $1.2 million worth of components, there remained about $585,000 worth of components on hand after the 2008 season that were not incorporated into the finished units.

232) Because of Worcester's FIFO practice of using older components first, most of the $585,000 in components left over after the 2008 season necessarily had to consist of the $456,000 worth of components purchased in 2008 as to which L.L. Bean had made a commitment capped at $80,228. The rest consisted of components left over from the 2007 season.

233) At this point, the analysis shifts to the merits of the parties' claims and defenses. As a threshold matter, L.L. Bean's defense of intentional breach must be addressed, because L.L. Bean contends that the alleged willful breach precludes Worcester from recovering any damages, at least on a contract theory, and perhaps at

54

all.

## II. L.L. Bean's Affirmative Defense of Intentional Breach

234)     L.L. Bean claims that, in issuing its year-end invoice for the full amount claimed due with no reduction for savings achieved by reducing production, Worcester intentionally breached its promise in the November 26, 2008 conversation to credit L.L. Bean with such savings. Because Worcester's breach was willful, L.L. Bean argues, it is not entitled to any damages for breach of contract. L.L. Bean also relies on Worcester's Article 2 duty of good faith in the performance of its contract. *See* 11 M.R.S. § 1-1304.

235)     Maine law affords legal support for L.L. Bean's position that a party's willful breach of contract may preclude the party's recovery of any damages for breach of the contract. *See Carvel Co. v. Spencer Press, Inc.*, 1998 ME 74 ¶ 8 n.2, 708 A.2d 1033 (recovery barred by "willful breach of the contract"); *Levine v. Reynolds*, 54 A.2d 514, 519 (Me. 1947); *Veazie v. City of Bangor*, 51 Me. 509, 512 (1863).

236)     However, the facts simply do not support L.L. Bean's position.

237)     Nothing in the November 26, 2008 conversation specifically addressed when or how Worcester would credit L.L. Bean with savings resulted from cutting back production. In other words, Worcester's repeated demand for payment in full of the invoice before savings were returned to L.L. Bean was not explicitly contrary to anything that the parties discussed on November 26, 2008.

238)     L.L. Bean may have assumed that Worcester would be deducting savings from its invoice, just as Worcester in fact assumed that L.L. Bean would receive credit for the savings in the form of discounts during the following season. Neither assumption is contrary to the letter or spirit of what was discussed.

239)     Another reason for the court's view is that from the outset, Worcester

55

acknowledged its obligation to return savings resulting from the production cutback to L.L. Bean in some fashion. Had it denied any such obligation, L.L. Bean's breach argument might be better founded. However, at least up to the beginning of May 2009, when Worcester learned that it would not be getting business again from L.L. Bean, Worcester was actively trying to get L.L. Bean to pay the invoice on the basis that Worcester would return savings later. The parties' dispute in early 2009 was as to when and by how much, not as to whether, Worcester would honor its oral agreement to credit L.L. Bean with savings.

240) Worcester insisted on purchase orders as part of the parties' 2008 agreement because of their contractually binding nature, in order to satisfy its financing bank. Based on Worcester's view of the purchase orders as being "take-or-pay" obligations—meaning that L.L. Bean had to pay the amount of the purchase orders whether or not it took delivery of all items ordered—and based also on Worcester's assumption that it could return savings later through future discounts, Worcester took the position that L.L. Bean was required to pay the full amount of the purchase orders immediately, with the amount to be credited back to L.L. Bean a separate matter to be worked out later, and therefore that L.L. Bean's failure to pay was a default in its contractual obligations.

241) Given the nature of purchase orders in general and given Worcester's insistence in the November 26, 2008 conversation that L.L. Bean honor the purchase orders, Worcester's position was not without legal justification.

242) It is also significant that at the time L.L. Bean did not interpret the invoice as a breach of contract. Rather, given that it had asked, and Worcester had agreed, for production to be reduced and for Worcester's savings to be credited, L.L.

56

Bean simply did not think it should have to pay the full amount of the invoice. L.L. Bean's position was also not without justification.

243)  The reason why both parties' positions in the impasse over the invoice were justified is that in their November 2008 oral agreement there was no meeting of the minds on the material term of what savings would actually be credited to L.L. Bean, by what means and when.

244)  Finally, at least under L.L. Bean's current view of the savings, Worcester could not possibly have shown all of its savings as a deduction in the year-end invoice, because some of those savings would not be realized until the 2009 season began or later. In that regard, Worcester's concept of returning the savings to L.L. Bean in the form of a discount in 2009 made sense.

245)  Because Worcester's submittal of the year-end invoice for 2008 was not a breach of any contractual agreement between the parties, the doctrine of intentional breach is irrelevant and of no merit. The analysis proceeds to the elements of Worcester's claim and the deductions that should be made from it.

### III. Worcester's Entitlement, Before Any Deductions, for the 2008 Season

246)  The starting point for valuing Worcester's claim is the $6,682,915 in purchase orders issued by L.L. Bean. However, Worcester claims to be entitled to several different amounts above and beyond the purchase order total.[6] These additional amounts are:

- $173,794.56 in what Worcester characterizes as unpaid direct ship fees on the 271,554 units actually shipped to L.L. Bean customers.

---

[6]  In its complaint, Worcester claimed damages due to extra interest costs incurred on a line of credit. This court has previously ruled that such costs are recoverable, *see* Order on Plaintiff's Motion for Partial Summary Judgment at 16 (Feb. 16, 2011), but Worcester did not pursue the claim at trial and the issue is thus not considered further.

- $94,564.73 for units sold to L.L. Bean above the quantities of those types of units called for in the L.L. Bean purchase orders.

- a further amount reflecting L.L. Bean's commitment in 2008 and prior seasons to reimburse Worcester for the cost of components that could not be used in L.L. Bean products in a future season.

## WORCESTER'S CLAIM FOR DIRECT SHIP FEES

247) The parties agree that Worcester shipped some 271,554 units to L.L. Bean customers, and that L.L. Bean was supposed to pay Worcester a fee of $0.64 per item shipped (known as a "fulfillment cost" or a "direct ship fee"). Worcester asserts that it is entitled to $173,794.56 in direct ship fees for shipping those units, above and beyond the purchase order amounts.

248) L.L. Bean objects, claiming that the evidence indicates L.L. Bean has already paid direct ship fees because Worcester has apparently included those fees in the unit cost of products paid by L.L. Bean. (Ex. 175, 180; Holden, Day 5, at 1219–20). In addition to contesting Worcester's claim for $173,794.56 in direct ship fees for the items that Worcester actually shipped to customers, L.L. Bean claims it is entitled to a $0.64 refund on all of the items for which it has paid that were not shipped.

249) The basis for L.L. Bean's contention lies in Worcester's responses to L.L. Bean's discovery requests regarding Worcester's costs. *See* Worcester's Second Supplemental Answers to Plaintiff's First Set of Interrogatories, Worcester's Supplemental Answers to Plaintiff's First Set of Interrogatories (Ex. 237, 238; Dunham, Day 9 at 184). Worcester's discovery responses show a $0.64 shipping fee built into Worcester's cost per item. Thus, L.L. Bean claims Worcester's shipping fee claim amounts to a double charge to L.L. Bean, and should therefore not be recognized. (Holden, Day 5 at 1220-22; Dunham, Day 4 at 1064-68, Day 9 at 183-84).

250) Michael Worcester testified that this was a mistake, but was unable to

58

explain or resolve the mistake during his testimony. (Michael Worcester, Day 9 at 72–73).

251) For several reasons, the court concludes that Worcester is entitled to an award of $173,794.56 for direct ship fees on the 271,544 items shipped to L.L. Bean customers in 2008.

252) Worcester had been a direct ship vendor to L.L. Bean for five or six years. (Holden, Day 6 at 1400). During that time, L.L. Bean had obtained data from Worcester about Worcester's costs included in the product price, and no direct ship fee had ever been shown in that data breaking down item costs. (Holden, Day 6 at 1400-02)

253) Although the record did not elaborate on how L.L. Bean and Worcester agreed on the unit prices for Worcester's products that L.L. Bean paid over the years, there is no reason to think that they were anything other than negotiated periodically on an arms' length basis. It also seems reasonable to infer that Worcester may well have shared its cost data with L.L. Bean on previous occasions to support Worcester's pricing.

254) If Worcester had suddenly inserted a $0.64 shipping cost into its prices charged to L.L. Bean, one would expect to have seen an across-the-board increase of $0.64 in L.L. Bean's price, and the record does not suggest that anything of the kind occurred. In fact, there is nothing in the record outside Worcester's discovery responses to suggest that L.L. Bean has in fact been double charged for shipping—nothing else, in other words, to suggest that L.L. Bean has paid, or is expected to pay, any more than the negotiated unit price it agreed to pay for each product, not including shipping.

255)    Ultimately whether the discovery responses are erroneous or not makes no difference, because whatever Worcester calculates its costs of production to be does not excuse L.L. Bean from paying the unit prices it has agreed to pay. Thus, even if Worcester had in fact incorporated a shipping cost in its cost assumptions, nothing prevents Worcester from taking advantage of L.L. Bean's willingness to pay a shipping fee over and above the cost of the product itself.

256)    Because L.L. Bean had agreed to pay a given price per item and also a $0.64 fee per item shipped over and above the item price, and because Worcester in fact shipped the 271,554 items in reliance on L.L. Bean's agreement to those terms, Worcester is entitled to the fee both as a matter of contract and in the alternative on a theory of unjust enrichment.

257)    Certainly, it was a careless error for Worcester to create this issue by including a $0.64 cent shipping fee in its sworn responses to discovery requests, to repeat the error in a later response, and not to discover the errors and correct the responses before trial. However, in light of the foregoing, Worcester's reference to a $0.64 shipping fee in its discovery responses is more likely a mistake, as Worcester claims, than chicanery, as L.L. Bean sees it. *See* J.W. von Goethe, *Die Leiden des jungen Werthers*, Erstes Buch, Am. 4 Mai 1771 (1774) (" . . . Und ich habe, mein Lieber, wieder bei diesem kleinen Geschäft gefunden, dass Missverständnisse und Trägheit vielleicht mehr Irrungen in der Welt machen als List und Bosheit. Wenigstens sind die beiden letzteren gewiss seltener").

258)    The court concludes that Worcester is entitled to the $173,794.56 charge for shipping fees. For the same reason, L.L. Bean is not entitled to a refund of $0.64 per item for the 44,026 items that L.L. Bean paid for but that were not shipped, nor a

60

reduction of $0.64 in the price of the 74,085 unfinished items. At the same time, L.L.

Bean cannot be faulted for raising the issue, given Worcester's discovery responses.

## WORCESTER'S CLAIM FOR $94,564.73 FOR UNITS SOLD BEYOND PURCHASE ORDER QUANTITIES

259) Worcester claims to be entitled to an additional $94,564.73 for items sold

to L.L. Bean beyond the quantities reflected in the L.L. Bean purchase orders. L.L. Bean

objects on the ground the entitlement was not established in the evidence.

260) For several reasons, the court agrees with L.L. Bean's position:

- The parties have stipulated that L.L. Bean has paid Worcester for all of the 315,580 units that Worcester finished for L.L. Bean. The stipulation does not say whether or not the 315,580 units were all within the scope of the purchase orders, but the court assumes the stipulation covers any and all finished units.

- The 2008 letter agreement says that Worcester is not entitled to be paid for unfinished units beyond those specified in the purchase orders.

- Therefore, if Worcester's $94,564.73 claim is for finished units outside the purchase order quantities, L.L. Bean has already paid for them. If the claim is for finished but unsold units or for unfinished units, Worcester is not entitled to be paid for them under the 2008 letter agreement because they are outside the scope of the purchase orders.

- Finally and in any case, as L.L. Bean suggests, the evidence is insufficient to justify a finding that Worcester is entitled to this amount.

261) For these reasons, the court concludes Worcester has not proved its

claim of $94,564.73, for goods produced beyond purchase order quantities.

## WORCESTER'S COMPONENT CLAIM

262) As a threshold matter it should be noted that Worcester's component

claim, at least in the form it was pursued at trial, was not specifically pled in

Worcester's amended counterclaim. Because both parties have requested declaratory

relief on essentially all aspects of this case, the components issue is discussed in depth in

this Decision and Judgment. However, in practical terms, the variance between

61

pleading and evidence makes no difference, for reasons that will be clear later.

263) As noted above, because Worcester had enough components on hand to make up to 446,115 units for L.L. Bean in 2008, and because it used enough of those to make 315,580 finished units, Worcester likely had about $585,000 in components left at the end of the 2008 season, consisting mostly of components purchased that year, plus some components left over from the 2007 season and again not used in 2008.

264) Many of the components not incorporated into finished products in 2008 likely were incorporated into pre-assembled units that were waiting for balsam to be added just before shipping, but that were not finished in 2008 as a result of L.L. Bean's directives to stop production.

265) L.L. Bean's obligation to Worcester covers three categories of components:

- As to the components leftover from the 2007 season, some of them probably were components within the scope of L.L. Bean's commitment, and others were purchased on Worcester's "own nickel." The evidence is simply insufficient to enable the court to determine how much of the component inventory left over after the 2007 season and again not used in the 2008 season consisted of inventory within the scope of L.L. Bean's commitment for the 2007 season or earlier seasons.

- L.L. Bean is also responsible for the components that would have been incorporated in the 74,085 units that L.L. Bean bought through its purchase orders but that were not finished as a result of the production stoppage. At an average of $4 in components per unit, the value of components associated with the 74,085 units that were ordered but not finished is $296,340.

- Finally, L.L. Bean's commitment to reserve components for the 2008 season was, as noted above, limited to $80,228 of the $456,000 in components that Worcester purchased in 2008. L.L. Bean's proof did not indicate that very many if any, of the items listed in the attachment to the 2008 letter agreement were incorporated into the 315,580 finished units L.L. Bean has paid for, so the court concludes that essentially all of that commitment remained outstanding at the end of the 2008 season.

266) Thus, of the $585,000 in leftover components designated for L.L. Bean products, the evidence shows that L.L. Bean was committed to pay Worcester for

62

$376,568 ($296,340 + $80,228) worth, unless the components could be incorporated in products in future seasons. L.L. Bean's termination of the relationship after the 2008 season obviously precluded Worcester from thereafter using the components in L.L. Bean products, but Worcester remained obligated to mitigate its damages by attempting to recoup its investment in the components by other means.

267) L.L. Bean claims Worcester has recouped, or at least could reasonably have recouped, the cost of all of its leftover L.L. Bean components, either to another balsam product company or in the form of products sold to other customers. Worcester denies that contention on several grounds, including that some components have deteriorated and that some cannot be resold, or at least have not yet been resold. The mitigation issue is addressed in the next section.

268) Because L.L. Bean's component commitment covers $376,568 in leftover components, that amount is added to Worcester's total entitlement for the 2008 season, before deductions are made for savings, mitigation of damages or any other reason.

269) To recapitulate, Worcester's contractual entitlement for the 2008 season, before consideration of any deductions for payments made, savings or other reasons, consists of:

| | |
|---|---|
| Total amount of purchase orders: | $6,682,915 |
| Direct ship fee for items shipped | $173,794.56 |
| L.L. Bean's total component commitment | $376,568 |

270) The total of these amounts is $7,233,277.56. From this figure must be deducted the stipulated amount of L.L. Bean's payments totaling $5,497,306. The difference between the two is $1,735,971.56. This amount is somewhat higher than the amount of Worcester's year-end invoice to L.L. Bean for 2008, but only because the

63

invoice does not reflect any charge for Worcester's leftover L.L. Bean components. At the time the invoice was sent Worcester believed, and had reason to believe, that it would be able to use most if not all of the leftover components in the 2009 season, so it had no reason to bill L.L. Bean for them.

271)   The analysis now turns to what amounts should be deducted from the $1,735,971.56 figure to reflect what Worcester did save, and could reasonably have saved, as a result of cutting production, selling components and mitigating its damages in other ways.

## IV.  Deductions From Worcester's Claim

272)   L.L. Bean argues that there should be five types of deductions from Worcester's claim[7]:

- brush deduction:  L.L. Bean and Worcester agree there should be a deduction from Worcester's claim for balsam brush not used in the 74,085 units that were included in L.L. Bean's purchase orders but never finished, but disagree as to the amount of the deduction.

- component deduction:  L.L. Bean asserts that Worcester's entire component claim (calculated above to be $376,568) should be disallowed and therefore deducted because Worcester has, or reasonably could have, recouped its entire investment in the components either by incorporating them in products sold to other customers or by selling them to another balsam products vendor.  Worcester disagrees.

- labor deduction:  again, the parties agree that there should be a deduction to reflect saved labor costs resulting from the production cutback, but disagree as to the amount

- overhead:  similarly, both parties agree to certain deductions but disagree on others

- deduction for "saved returns and allowances":  L.L. Bean asserts that there should be a deduction for returns and quality problems on the 271,554 items Worcester shipped to L.L. Bean customers, and a further deduction for what likely would have been the returns and quality problems on the 74,085 unfinished items. Worcester disagrees.

---

[7]  An additional deduction urged by L.L. Bean—for a refund of $0.64 per item paid for but not shipped—associated with a "direct ship fee" supposedly included in the cost per item has already been addressed in section IV, Worcester's Claim for Direct Ship Fees, *supra*.

273) Some general discussion of mitigation of damages is in order before the inquiry turns to each of the five listed areas in which L.L. Bean argues for a reduction in Worcester's claim.

274) Initially, it should be noted that the duty to mitigate arises by operation of law, independent of any contractual or other undertakings of the parties. Thus, the fact that the savings Morrill Worcester had in mind during the November 26, 2008 telephone conversation were limited to savings in production of items does not limit Worcester's duty to mitigate. Even had the November 26 conversation never taken place, Worcester would still have a duty to mitigate its loss, although it would have had the option of finishing the remaining units and attempting to resell them, instead of stopping production as it agreed to do.

275) As the Maine Law Court has observed, "[t]he common law duty to mitigate damages survives Maine's enactment of the Uniform Commercial Code in 1963. While the U.C.C. does not explicitly require the mitigation of damages, it does provide that 'principles of law and equity' not displaced shall supplement the Code's provisions. 11 M.R.S.A. § 1-103 (1964). The duty to mitigate is also implicit in the Code's broad requirements of good faith, commercial reasonableness and fair dealing." *Schiavi Mobile Homes, Inc. v. Gironda*, 463 A.2d 722, 724-25 (Me. 1983).

276) In the same case, the court noted, "The touchstone of the duty to mitigate is reasonableness. The nonbreaching party need only take reasonable steps to minimize his losses; he is not required to unreasonably expose himself to risk, humiliation or expense." *Id.* at 725.

277) "[T]he duty to mitigate is properly characterized as a limitation on damages and simply prevents a plaintiff from recovering damages that it could

65

reasonably have prevented without incurring additional cost, risk, or burden."
*Kanawha-Gauley Coal & Coke Co. v. Pittston Minerals Group, Inc.*, 2011 U.S. Dist. LEXIS
80411, at *44-45 (S.D. W.Va. July 22, 2011).

278)     In the present case, the limitations on the duty to mitigate mean that not
all of the savings that L.L. Bean posits should be deducted.

279)     Moreover, L.L. Bean as the party opposing Worcester's damages claim
has the burden to prove that Worcester failed to mitigate its damages. *See Lee v. Scotia
Prince Cruises Ltd.*, 2003 ME 78, ¶22, 828 A.2d 210, 216.

280)     One aspect of the case that sets it apart from other instances in which
mitigation of a seller's damages are analyzed is that Worcester is what the law
sometimes refers to as a "lost volume seller," meaning a seller that has sufficient
capacity to meet foreseeable demand, and therefore is not necessarily made whole by
reselling the item for the contract price, for the reason that the seller could have and
would have made both sales.

281)     The Law Court has defined the concept as follows:

Stated generally, the concept of lost-volume sales posits that a seller of goods
who conducts a resale following a breach will not be "made whole" if only
allowed to recover the difference between the contract price and resale price
when the resale is made to a second customer, at the expense of a second sale.
The concept presupposes a situation in which supply outstrips demand and in
which the second customer would have been successfully solicited by the seller
had the original breach not occurred. Assuming these conditions, the seller is
awarded lost profits as compensation for his "loss" of a sale to one customer.

*Schiavi Mobile Homes, Inc.*, 463 A.2d at 726.

282)     The Maine UCC recognizes the "lost volume seller" concept: "If the
measure of damages [of the difference between market price and contract price, plus
incidentals and less expenses saved] is inadequate to put the seller in as good a position
as performance would have done, then the measure of damages is the profit (including

66

reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in this Article (section 2-710), due allowance for costs reasonably incurred and due credit for payments or proceeds of resale." 11 M.R.S. § 2-708(2).

283) The relevance of the "lost volume seller" concept to this case is that for Worcester to resell the 74,085 units for which L.L. Bean has not paid, even at the contract price, does not make Worcester entirely whole. "[B]y definition, a lost volume seller cannot mitigate damages through resale. Resale does not reduce a lost volume seller's damages because the breach has still resulted in its losing one sale and a corresponding profit." *R.E. Davis v. Diasonics, Inc.*, 826 F.2d 678, 682 (7th Cir. 1987).

284) Because Worcester had the capacity to sell the 74,085 items to L.L. Bean in 2008 and an additional 74,085 items in later years, Worcester would need to have received its expectancy on both sets of sales to be made whole.

285) As a practical matter, Worcester's lost volume seller status may not make much difference in the analysis, because L.L. Bean acknowledges that Worcester is, in effect, entitled to a profit on all 389,664 units reflected in the purchase orders, including the 74,085 units that L.L. Bean ordered but Worcester did not finish. However, in keeping with the approach the parties agreed to take in their November 26, 2008 telephone conversation, as explicated in court's summary judgment ruling, Worcester's entitlement on the unfinished units is reduced by subtracting what it saved and could have saved.

286) The analysis turns to each of the claimed deductions, in the order stated above.

DEDUCTION FOR BRUSH SAVINGS

67

287)    Plaintiff Worcester (that is, Worcester Resources) purchased fresh balsam (or brush, as it is sometimes called in the wreath trade) for Worcester's balsam products from an affiliated family-owned entity called Worcester Holdings, which held title to the land from which Worcester obtained balsam for its products.  As of 2008, Worcester Resources paid Worcester Holdings $0.45 per pound for brush.  (Morrill Worcester, Day 9 at 171, Day 3 at 604-612).

288)    Worcester has calculated savings for brush of about $65,000.  L.L. Bean's calculation is that Worcester saved a total of $150,000.

289)    Worcester's calculation appears to focus on what Worcester Holdings, the affiliate of Plaintiff Worcester Resources that owns and operates the forestlands from which the brush is obtained, was able to save by not cutting brush.  As a result of the production cutbacks, Worcester Holdings did not have to harvest as much brush for sale to Worcester Resources.

290)    Worcester's rationale for including Worcester Resources in the brush equation is that the reason Worcester Wreath acquired forestlands that later were transferred to Worcester Holdings was to meet L.L. Bean's requirement that Worcester's products incorporate "Maine balsam," by assuring itself of a sufficient supply of balsam in Maine.  (Morrill Worcester, Day 1 at 176,78, 182-183).

291)    L.L. Bean's expert witness, Randall Dunham, focused instead on the amount that Worcester Resources saved by not having to purchase brush for the 74,085 units from Worcester Holdings.  He assumed that Worcester's products use about four and a half pounds of brush on average.  Mr. Dunham calculated that Worcester saved about $150,000 by not having to purchase the 300,000 pounds of brush needed to finish 74,085 units at $0.45 per pound.  His calculations are based on Worcester's own

purchasing records and discovery responses.

292) L.L. Bean also notes that its production cutbacks were all issued by December 9, with two weeks remaining in the production season. Because brush is affixed to items as close as possible to the time the items are shipped, so as to optimize freshness, L.L. Bean suggests that Worcester had ample time to avoid purchasing unnecessary brush for the 74,085 units that L.L. Bean ordered but that Worcester did not finish.

293) Ultimately, the court agrees with L.L. Bean that it is Worcester Resources's savings that must be the focus. Worcester Holdings is not a party to the case, nor a party to any contract with L.L. Bean as far as the record shows. The record does not support disregarding the corporate form in the manner that Worcester's calculation would require.

294) The court deducts from Worcester's claim the sum of $150,000 to reflect savings for brush.

DEDUCTION FOR RE-USE OF COMPONENTS

295) For the reasons previously noted, the court finds that, at the end of the 2008 season, Worcester had on hand about $585,000 in leftover components designated for L.L. Bean products. Of that quantity, L.L. Bean was contractually committed, by virtue of the March 2008 commitment letter and the subsequent purchase orders, to purchase or pay for $376,568 worth, unless those components could be incorporated in products in future seasons.

296) L.L. Bean contends that Worcester's own inventory records and records of sales since the end of 2008 demonstrate that it has used essentially all of these components. Exhibits 156, 166 and 168 do, as L.L. Bean suggests, indicate that

69

Worcester has used most of the leftover components.

297) Worcester contends that some of the components designated for L.L. Bean products have deteriorated to the point of being unusable. That may well be, but as noted above, some of those components were items L.L. Bean had committed to purchasing and others were not.

298) The court finds persuasive L.L. Bean's evidence that Worcester has incorporated hundreds of thousands of dollars in leftover components into products sold in 2009 and thereafter.[8] On the other hand, the court also finds that due to deterioration, not all of the components to which L.L. Bean had committed itself could be re-used. The deterioration was observed in 2011 but likely began in prior years. (Scott, Day 8 at 28, 36, 43, 45, 48, 68-69, 78, 84, 85).

299) Because deterioration was observed in partially completed items in storage from prior years, the court infers that those items likely were among the 74,085 units that L.L. Bean had ordered but Worcester never completed.

300) Moreover, it is undisputed that at least some components—anything with the L.L. Bean name or logo on it at least—could not be reused.

301) L.L. Bean has proved that Worcester has or could reasonably have recouped 90% of the value of the components to which L.L. Bean was contractually committed by using them in products sold to other buyers in 2009 and thereafter.

302) The remaining $37,657—one-tenth of the total value of the components that L.L. Bean had committed to purchase—fairly reflects the value of deteriorated components that L.L. Bean had committed to buy and that cannot be reused, and

---

[8] L.L. Bean also suggests that Worcester also could have and should have sold any components it could not use to another wreath company, such as its competitor, Whitney Wreath. Such a drastic step—tantamount to a partial liquidation of assets—goes beyond Worcester's express oral agreement to pass along savings and its UCC duty to mitigate damages.

70

components that by their nature cannot be sold in products to other customers.

303) The ninety percent of L.L. Bean's outstanding component commitment that the evidence shows Worcester was able to re-use has a value of $338,911, and that amount will be deducted from Worcester's claim.

## DEDUCTION FOR SAVINGS OF DIRECT COSTS OF LABOR

304) The parties agree that there should be a deduction from the amount due to Worcester for the amount that Worcester saved in labor costs as a result of the production cutback, but they have a disagreement amounting to about $21,000 regarding the amount of the deduction.

305) Worcester calculated the total labor savings from ceasing production at $128,164.77. (Morrill Worcester, Day 8 at 235). However, its calculation appears to focus on only one of the three labor components associated with completing an item. The three components are the cost of assembling the item, the cost of decorating it with balsam, and what the parties refer to as "support labor." Worcester's estimate appears to cover only the first factor, which admittedly accounts for most of the labor cost.

306) L.L. Bean, through its witness, Randall Dunham, calculates Worcester's labor savings to be $149,158, based primarily on Worcester's own documents, including discovery responses, a figure that covers all three of the just-mentioned components of the labor cost of an item that is actually completed. By not having to complete 74,085 of the units covered in L.L. Bean's purchase orders, Worcester saved the cost to it of the labor associated with completing the units. That savings clearly falls within both Worcester's express promise to credit L.L. Bean with savings and its UCC duty to mitigate.

307) The evidence supports Mr. Dunham's analysis and therefore the court

71

deducts an additional $149,158 from Worcester's entitlement.

DEDUCTION FOR VARIABLE OVERHEAD

308)    L.L. Bean asserts that an additional $189,816 should be deducted from Worcester's claim to reflect "variable overhead" expenses that Worcester would have incurred had it completed the entire quantities specified in L.L. Bean's purchase orders, but did not incur with respect to the 74,085 items that Worcester did not complete.

309)    L.L. Bean's expert witness, Randall Dunham, testified that he calculated Worcester's variable overhead by analyzing Worcester's internal books and records, including its QuickBooks detail income and expense, and Worcester's internal profit and loss statements. (Dunham, Day 4, at 1068–69; Day 9, at 175–78). Mr. Dunham testified that through this analysis he was able to determine which of Worcester's expenses are properly characterized as fixed overhead, and those that should be characterized as variable overhead.

310)    Fixed overhead includes expenses such as rent and office compensation, that do not vary according to volume of production. (Dunham, Day 4 at 1069). Variable overhead, on the other hand, includes expenses that do vary with the volume of production, such as workers' compensation premiums and payroll taxes, both of which are a function of labor costs, and other items such as repairs, maintenance to equipment, utilities, small tools, and fuel costs for equipment used in production. (Dunham, Day 4 at 1069, 1074–75).

311)    Mr. Dunham's analysis of Worcester's savings as a result of the production cutback focuses on variable overhead only, because fixed overhead costs by definition would not be affected by the cutback.

312)    Mr. Dunham calculated Worcester's total overhead (fixed and variable)

72

for the 74,084 unfinished items to be $518,589, based on Worcester's own total overhead figures of between $7.00 and $7.72 per item. (Dunham, Day 4 at 1068–71; Ex. 141, 237 (Ex. A)). Based on the costs assigned in Worcester's books and records to fixed overhead items and variable overhead items, Mr. Dunham calculated that variable overhead items average 16.01% of total sales. That percentage of the $1,185,609 price of the 74,085 items is $189,816. (Dunham, Day 4 at 1068–71).

313) According to Mr. Dunham, Worcester's "variable overhead" saved as a result of not having to finish the 74,085 items falls into three categories:

- payroll taxes and workers compensation premiums that vary as a function of payroll (Dunham, Day 4 at 1074).

- royalties that L.L. Bean claims Worcester would have been obligated to pay if the remaining 74,084 units had been completed and sold, but did not have to pay as a result of the production cutbacks. (Dunham, Day 4 at 1072–74; Day 9 at 174).

- miscellaneous variable expenses, such as repairs, maintenance to equipment, utilities, small tools, and fuel costs for fork lifts.

314) Of the three areas, only the first mentioned can be said to have been within the contemplation of the parties to the November 26, 2008 telephone conversation because such costs are a direct function of Worcester's level of production. In other words, there is nothing to indicate that Morrill Worcester or the L.L. Bean representatives had royalties or fuel costs, for example, in mind. However, if Worcester did save royalties or the miscellaneous expenses, or could reasonably have saved them, Worcester's duty to mitigate requires that such savings be deducted from Worcester's entitlement. As on any issue involving mitigation of damages, L.L. Bean bears the burden of persuasion.

315) Worcester plainly would have incurred additional payroll tax and workers compensation costs had it completed the 74,085 items. Mr. Dunham's

73

calculation of savings at $33,000 is justified and the court adopts it.

316)    The other two items, however, were not proved.

317)    The evidence indicated that Worcester has paid royalties, or at least reflected payment on its books of royalties, to a related Worcester company for Morrill Worcester's "knowledge of the wreath making business." (Worcester 30(b)(6) depo. (Morrill Worcester) at 299; Bruce, Day 7 at 1770; Michael Worcester, Day 9 at 20; Ex. 203, Ex. 212; Dunham, Day 4 at 1073-74, Day 9 at 174). Mr. Dunham assumed that royalties were paid on a per item basis, and calculated savings attributable to the 74,085 items accordingly. However, Worcester's royalty cost was not shown to be tied directly to the volume of sales or production in the sense that labor costs or payroll taxes are.

318)    For similar reasons, the miscellaneous savings were not shown to be sufficiently tied to the volume of production or sales to support a finding that Worcester actually saved those costs by not having to finish the 74,085 items. At least some of the included costs—the cost of purchasing tools, for example—would be incurred with any level of production. Equipment maintenance, too, is necessary to support any level of production and is not necessarily a direct function of how many items are produced.

319)    Moreover, the evidence did not suggest that Worcester closed down production entirely as a result of the cutback,[9] so its utility costs would not necessarily be any lower as a result of not having to finish 74,085 items.

320)    With regard to variable overhead, $33,000 will be deducted from Worcester's entitlement to reflect saved payroll taxes and workers compensation premiums.

---

[9] As noted in paragraph 160), *supra*, production continued after the stop order, albeit as to just a few product lines.

74

## DEDUCTION FOR RETURNS AND ALLOWANCES

321)    L.L. Bean also asserts that there should be a deduction from Worcester's entitlement to reflect chargebacks against Worcester for returned items and quality problems. This proposed deduction has two components: one relates to the 271,554 items that Worcester actually shipped to customers, and the other relates to the 74,085 items that Worcester did not complete but would have shipped had the items been completed.

322)    L.L. Bean asserts there should be a deduction of $81,538 to reflect returns and allowances for the 271,554 shipped items. Worcester's main objection is that, because L.L. Bean terminated the relationship, Worcester was deprived of the ability to negotiate L.L. Bean's figure downward. Michael Worcester testified that Morrill Worcester, "being who he is . . . likes to negotiate anything". (Michael Worcester, Day 9 at 17, 11–12).

323)    In the court's view, Worcester's point is irrelevant. This is fundamentally an action for accounting. The parties could have settled accounts in their usual manner through the year-end meeting, but the fact that the meeting never happened does not mean the issue cannot be raised here, and Worcester had an opportunity in this case to show that L.L. Bean's proposed chargeback figure should be reduced.

324)    L.L. Bean's proposed deduction of $81,538 for the 271,554 shipped items is supported in the evidence. Consistent with the methodology employed at the end of previous seasons, L.L. Bean calculated the amount of returned or defective orders for which Worcester was responsible in the 2008 season at $81,538. (Ex. 176; Holden, Day 5 1196–1202).

325) As to the 74,085 unfinished items, L.L. Bean asserts that there should be a deduction of $17,884, based on the assumption that the total chargeback would equal at least 1.5% of the price of the items. Worcester's primary objection to this deduction is that it is based on speculation. However, L.L. Bean's position has a solid foundation in the historical data—just as a profits history provides a basis for awarding future lost profits, so the historical chargeback data supports L.L. Bean's position on this issue.

326) The chargeback percentages for the previous five years was as follows: 2003 1.9%, 2004 1.5%, 2005 2.7%, 2006, 3.1%, and 2007 1.88%. (Ex. 40, 50, 48, 52, 423; Holden, Day 5 at 1203–04). This data indicates that a 1.5% figure is reasonable, even modest. Moreover, although Worcester maintains the entire calculation is speculative, Morrill Worcester did not dispute the reasonableness of the 1.5% figure. (Morrill Worcester, Day 2 at 468).

327) For all of these reasons, the court finds that a further deduction of $17,884 to reflect the probable amount of the chargeback on the 74,085 unfinished items, had they been finished and shipped, is appropriate.

328) It should be noted that, unlike prior deductions, this does not fall under the mitigation of damages heading. Rather, it reflects the historical reality that Worcester netted something less than the nominal purchase price as a result of chargebacks. Thus, the $17,884 deduction conceptually should be considered an adjustment to Worcester's entitlement rather than a savings to Worcester.

## V. Summary and Conclusion

WORCESTER'S NET ENTITLEMENT

329) As noted in paragraph 270), Worcester's entitlement before any deductions is $1,735,971.56.

330)    From this figure are deducted the following:

- $150,000 for brush savings

- $338,911 in savings through re-use of components to which L.L. Bean was contractually committed

- $149,158 in saved labor costs

- $33,000 in saved payroll taxes and workers compensation premiums

- $85,538 in chargebacks for the 271,554 items shipped in 2008

- $17,554 in probable chargebacks on the 74,085 unfinished items

331)    The total of these deductions is $774,161, higher than Morrill Worcester's rough calculation of $646,000 in "avoided costs," (Ex. 143), presumably because it includes items that he did not include, but still less than L.L. Bean suggests.

332)    Deducting $774,161 from $1,735,971.56 yields $961,810.56. Judgment shall be entered for Worcester in that net amount.

333)    Applied to the parties' pleadings, the foregoing analysis results in the following:

- The sole count of L.L. Bean's complaint is for a declaratory judgment. The findings of fact and conclusions of law contained in this Decision and Judgment represent the court's grant of declaratory relief, as requested. Worcester's answer joins in the request.

- Count I, II, III and IV of Worcester's amended counterclaim are all claims for breach of contract.

- Count I relates to the 344,725 units in the initial purchase orders. Count II relates to the 44,939 items that were the subject of the September 22, 2008 purchase orders. Count III is for the entire purchase order quantity of 389,664 items. Worcester is entitled to judgment on Count III in the amount of $750,359 (the face amount of the purchase orders, plus the "direct ship fee" on items actually shipped,[10] minus L.L.

[10]    None of Worcester's four breach of contract counts alludes specifically to the "direct ship fee" claim, or for that matter to components. However, the combination of the fact that L.L. Bean requested declaratory relief on all issues and that the "direct ship fee" was in contention, both as an addition to Worcester's claim for the purchase order amounts

Bean's payments, and minus the deductions for actual savings and/or mitigation of damages, regarding brush, saved labor, saved variable overhead and the chargeback amount for both finished and unfinished items). Worcester is entitled to judgment on both Count I and II, but, because they are surplusage in light of Count III, not for any additional damages.

- Count IV is a claim for breach of contract, based on L.L. Bean's oral promise of November 26, 2008 to remain "responsible for the full value of the purchase orders minus savings." L.L. Bean is entitled to judgment on this count, because L.L. Bean never disputed its obligation to pay the full value of the purchase orders less savings—the issue has been as to what should be deducted to reflect savings.

- Count V, captioned Unconscionable Term, appears to be a request for the court to invalidate the November 26, 2008 agreement. Because the agreement is enforceable, judgment is granted to L.L. Bean on this count.

- Count VI of Worcester's amended counterclaim is for breach of contract, specifically with regard to L.L. Bean's position regarding chargebacks for the finished items. Judgment is granted to L.L. Bean on this count.

- Counts VII (fraud/misrepresentation) and VIII (negligent misrepresentation) of Worcester's amended counterclaim were address in the court's grant of partial summary judgment by virtue of the February 16, 2011 order on L.L. Bean's motion for partial summary judgment. Final judgment is entered for L.L. Bean on counts VII and VIII.

## COSTS

334) By rule, "costs shall be allowed as of course to the prevailing party, as provided by statute and by these rules, unless the court otherwise specifically directs." M.R. Civ. P. 54(d). Considering both the summary judgment phase of this case as well as the trial phase, each party prevailed on significant issues, to the extent that it cannot be said that either party prevailed overall. Accordingly, the court declines to award

---

and as a deduction from the purchase order amounts from L.L. Bean's viewpoint put it firmly among the central contested issues from both parties' perspectives. Also, the components in the 74,085 unfinished units were included in the purchase orders amounts that were specifically pleaded in Counts I-IV of Worcester's amended complaint. So both direct ship fees and components were clearly significant issues tried by consent in the case, as elements of damages from Worcester's perspective and as offsets against damages from L.L. Bean's standpoint.

costs to either party, and specifically directs that each party bear its own costs. There is no contractual, statutory or other basis in the various claims or defenses for awarding attorney fees, nor has either party made such a claim.

INTEREST

335) The evidence did not reveal any contractual rate of interest, so the statutory pre- and post-judgment rates apply. Pre-judgment interest runs from the date of filing to the date of entry of judgment at the annual rate of 3.40 percent. Post-judgment interest shall run from the date of entry of judgment at the rate of 6.12 percent.

## Judgment

Plaintiff L.L. Bean is hereby granted judgment on its complaint for declaratory judgment, to the extent of the findings of fact and conclusions of law herein.

Defendant Worcester is hereby granted judgment on its counterclaim in the amount of $961,810.56, with pre- and post-judgment interest as allowed by law.

Pursuant to M.R. Civ. P. 79(a), the clerk is hereby directed to incorporate this Order by reference in the docket.

Dated 17 February 2012

A. M. Horton
Justice, Business and Consumer Court

STATE OF MAINE
CUMBERLAND, ss.

BUSINESS AND CONSUMER DOCKET
Location:    Portland

L.L. BEAN, INC
      Plaintiff/Counterclaim Defendant

v.

DOCKET NO. BCD-CV-2009-39

WORCESTER RESOURCES, INC.
      Defendant/Counterclaim Plaintiff

## COUNSEL OF RECORD

| **Party Name:** | **Attorney Name:** |
| --- | --- |
| L.L. Bean, Inc. | Daniel Nuzzi, Esq. |
| | David Bertoni, Esq. |
| | |
| Worcester Resources, Inc. | Timothy Woodcock, Esq. |
| | Ryan Dumais, Esq. |

STATE OF MAINE                         BUSINESS AND CONSUMER DOCKET
Cumberland, ss.                        Docket No. BCD-WB-CV-09-39

L.L. BEAN, INC.                        )
                                       )
    Plaintiff/Counterclaim Defendant  )
                                       )
                                       )
                                       )
              v.  )
                                       )
                                       )
                                       )
WORCESTER RESOURCES, INC.              )
                                       )
    Defendant/ Counterclaim Plaintiff  )

## CORRECTION TO ORDER

On its own motion pursuant to M.R. Civ. P. 60(a), the court hereby issues a corrected page 77 to the February 17, 2012 Decision and Order. The correction is to the dollar amount and description in the last bulleted paragraph and footnote—the dollar figure in the original Decision and Order mistakenly omits the awards to Worcester for direct ship fees and components, and therefore is corrected to reflect the full amount of the judgment granted to Worcester on Count III of $961,810.56, exclusive of interest.

Pursuant to M.R. Civ. P. 79(a), the clerk is hereby directed to incorporate this order by reference in the docket.

Dated 21 February 2012

_____
A. M. Horton
Justice, Business and Consumer Court

Entered on the Docket: 2.21.12
Copies sent via Mail ___ Electronically ✓

1

330)	From this figure are deducted the following:

- $150,000 for brush savings

- $338,911 in savings through re-use of components to which L.L. Bean was contractually committed

- $149,158 in saved labor costs

- $33,000 in saved payroll taxes and workers compensation premiums

- $85,538 in chargebacks for the 271,554 items shipped in 2008

- $17,554 in probable chargebacks on the 74,085 unfinished items

331)	The total of these deductions is $774,161, higher than Morrill

Worcester's rough calculation of $646,000 in "avoided costs," (Ex. 143), presumably

because it includes items that he did not include, but still less than L.L. Bean suggests.

332)	Deducting $774,161 from $1,735,971.56 yields $961,810.56. Judgment

shall be entered for Worcester in that net amount.

333)	Applied to the parties' pleadings, the foregoing analysis results in the

following:

- The sole count of L.L. Bean's complaint is for a declaratory judgment. The findings of fact and conclusions of law contained in this Decision and Judgment represent the court's grant of declaratory relief, as requested. Worcester's answer joins in the request.

- Count I, II, III and IV of Worcester's amended counterclaim are all claims for breach of contract.

- Count I relates to the 344,725 units in the initial purchase orders. Count II relates to the 44,939 items that were the subject of the September 22, 2008 purchase orders. Count III is for the entire purchase order quantity of 389,664 items. Worcester is entitled to judgment on Count III in the amount of $961,810.56 (the balance on the purchase orders, plus the award for components and "direct ship fees",[10] minus L.L.

[10]	None of Worcester's four breach of contract counts alludes specifically to the "direct ship fee" claim or to components. However, the combination of L.L. Bean's request for declaratory relief on all issues and the fact that the "direct ship fee" and components were in contention, as an addition to Worcester's claim for purchase order amounts

77

STATE OF MAINE

Cumberland, ss.

BUSINESS AND CONSUMER COURT

AMH -CUM- 4/6/2012.

L.L. BEAN, INC.                        )
                                       )
    Plaintiff/Counterclaim Defendant   )
                                       )
    v.                                 )        Docket No. BCD-CV-09-39
                                       )
WORCESTER RESOURCES, INC.              )
                                       )
    Defendant/Counterclaim Plaintiff   )

AMENDED DECISION AND JUDGMENT

This civil action involves a claim for declaratory judgment by Plaintiff L.L. Bean, Inc. ("L.L. Bean" or "Bean") against Defendant Worcester Resources, Inc. ("Worcester") regarding the parties' contract for the 2008 holiday season, and a counterclaim by Worcester seeking payment.

The case came to trial on a jury-waived basis over the course of nine days in October 2011. The evidentiary record includes the testimony and exhibits presented by both parties during the trial, and also a number of Joint Stipulations presented by the parties and adopted by the court. Those Joint Stipulations are hereby incorporated by reference in their entirety in these Findings and Conclusions. After trial, the parties filed proposed findings of fact and conclusions of law and presented oral argument.

After the oral argument, the parties were given leave to submit demonstrative exhibits and written argument related thereto, all admitted solely as aids to the court and not for any evidentiary purpose. After the court issued judgment initially, L.L. Bean filed a timely Motion to Alter or Amend the Judgment pursuant to Rules 52 and 59 of the Maine Rules of Civil Procedure. As a result of that motion, the court has

1

modified the initial judgment. Based on the entire record, the court makes and adopts the following findings of fact and conclusions of law, and directs the entry of judgment accordingly.

This decision is structured as follows:

- The first section contains what are referred to as "General Findings of Fact," focusing mainly on the history of the parties' business relationships; the events and documents culminating in their contract for the 2008 season ("the 2008 letter agreement"); their dealings during the 2008 season; their disagreement in early 2009 about payment by L.L. Bean to Worcester for the 2008 season; their efforts to resolve it, and the eventual termination of their relationship.

- The second section addresses L.L. Bean's affirmative defense to the effect that Worcester has forfeited any entitlement to damages against L.L. Bean as a result of what L.L. Bean characterizes as Worcester's intentional breach of contract. For the reasons set forth in that section, the court concludes that L.L. Bean has failed to show that Worcester intentionally or willfully breached the contract between the parties.

- The third section calculates Worcester's total entitlement *before* any deductions for savings or other reasons are applied. Worcester's total entitlement is calculated based on (1) the face amount of the purchase orders, (2) direct ship fees for the items actually shipped, and (3) the value of L.L. Bean's commitment to reimburse Worcester for the cost of components, less the amount paid to Worcester by L.L. Bean for the 2008 balsam product season.

- The fourth section addresses each of the deductions that L.L. Bean claims should be made from Worcester's claim—deductions for what Worcester saved or could have saved in stopping production; a deduction from L.L. Bean's component liability for what Worcester has or should have done to recoup its investment in components by selling the components or using them in products for sale to other customers. L.L. Bean's claim that it is entitled to a credit for being double-charged for shipping fees is addressed in the previous section.

- The final section nets deductions against what would otherwise be due to Worcester and addresses costs and interest.

## I. General Findings Of Fact

THE HISTORY AND NATURE OF THE WORCESTER-L.L. BEAN
RELATIONSHIP AND THE GOODS AND THE MARKET INVOLVED

1) The long-standing relationship between Worcester and Bean is described

2

in the Court's prior orders on motions for partial summary judgment and also in the parties' Joint Stipulations and therefore need not be set forth here, at least in detail.

2)      In summary, L.L. Bean is a retailer of outdoor, clothing and home products through stores and catalogs based in Freeport, Maine, and Worcester Resources (formerly Worcester Wreath) is a manufacturer and retailer of balsam products based in Harrington, Maine.

3)      L.L. Bean and Worcester had a business relationship that began in 1983 and that continued without interruption through 2008. (Joint Stipulations, ¶5). There was no continuing contract between L.L. Bean and Worcester, and each year required the negotiation of a new contract. (Joint Stipulations, ¶ 7).

4)      That arrangement meant that Worcester had no enforceable expectation or claim regarding L.L. Bean's business, and that either party was free to terminate their relationship prospectively.

5)      Throughout their relationship, Worcester produced balsam products that L.L. Bean purchased and sold to its customers. (Joint Stipulations, ¶5).

6)      Each of Worcester's balsam products—whether sold to L.L. Bean or elsewhere—was created according to particular specifications, somewhat akin to, and in fact sometimes referred to as, a "recipe." (Ex. 449, 450; Scott, Day 7 at 1801).[1]

7)      L.L. Bean's specifications for its balsam products were based in part on input from Worcester. (Ex. 449, 450; Morrill Worcester, Day 2 at 463). Worcester was required to manufacture finished products for L.L. Bean in accordance with L.L. Bean's specifications. (Ex. 449, 450; Scott, Day 7 at 1801).

---

[1]  This and similar citations to witness testimony through this document include the witness's

3

8)     These balsam products were composed of perishable balsam and, non-perishable decorative items, such as bells and artificial berries, and in certain products metal frames as well.   The non-perishable ingredients of the products Worcester sold to L.L. Bean—the decorations, metal frames and the like—are called "components." (Joint Stipulations, ¶9).

9)     Because Worcester's products contained perishable balsam, they could not be fully assembled too early in the season or the balsam elements would deteriorate before or shortly after reaching the L.L. Bean customer.  Worcester's practice was to assemble the non-perishable parts of a product well ahead of time, and add the perishable balsam shortly before the product was actually shipped.  (Morrill Worcester, Day 1 at 166, 217-22).  Worcester assembled some of the durable parts of some of its products after the components arrived, sometimes in the summer time.  (Morrill Worcester, Day 1 at 219-225, Scott, Day 7 at 1782).

10)     During most if not all of the parties' long relationship, Worcester was a "direct ship" vendor, meaning that it shipped the balsam products directly to L.L. Bean customers, instead of shipping the items to L.L. Bean for re-shipment to the customers.  Under that arrangement, after receiving an order for a balsam product from a customer, L.L. Bean relayed the order to Worcester, and Worcester shipped the product directly to the L.L. Bean customer.  (Joint Stipulations, ¶ 6).

11)     At some point before 2008, L.L. Bean began to pay Worcester and other direct ship vendors a charge to compensate those vendors for the  costs associated with L.L. Bean's "direct ship" program.  L.L. Bean paid this cost for items actually shipped by its direct ship vendor to L.L. Bean's customers.   Direct ship vendors billed L.L. Bean

4

for this cost on a per-item-shipped basis. L.L. Bean referred to this charge as a "direct ship fee" or "fulfillment" cost. (Holden, Day 5 at 1229-1233, Day 6 at 1397-1398).

12) The direct ship fee was $0.25 per unit when Mr. Holden first started dealing with Worcester and increased over time. (Holden, Day 6 at 1398).

13) Worcester cooperated with L.L. Bean in converting its shipping systems to become one of the direct ship vendors in L.L. Bean's system. (Michael Worcester, Day 9 at 14; Holden, Day 5 at 1231).

14) In 2008, the direct ship fee for Worcester shipments to L.L. Bean customers was $0.64 per item shipped. (Holden, Day 6 at 1398; Michael Worcester, Day 9 at 19-21).

15) The market for Worcester's balsam products with L.L. Bean customers was limited to the holiday period from around Thanksgiving to Christmas. There was no market of any significance for Worcester's balsam products with L.L. Bean customers any other time of year. (Morrill Worcester, Day 4 at 166).

16) Because Worcester's products included perishable balsam elements, if they were not sold in the year in which the product was fully assembled, they could not be preserved in fully assembled form until sold in the next season. (Scott, Day 8 at 31-33; Philip, Day 3 at 538, 566).

17) In most years from 1983 through 2007, demand for Worcester products from L.L. Bean customers increased over the prior year. (Morrill Worcester, Day 1 at 170-171, 185-186; Day 2 at 381). There were significant increases from 1994 forward. (Philip, Day 3 at 542-544).

18) At no point in their 26-year relationship did Worcester fail to meet any order that L.L. Bean placed with them. (Morrill Worcester, Day 8 at 220). At no point

5

from 2002 forward, did Worcester fail to fill any order that L.L. Bean customers placed for Worcester products. (Holden, Day 6 at 1343; Philip, Day 3 at 561).

19)    Worcester has numerous facilities in the Washington County area. As of 2008, centerpieces were manufactured at the Topsfield facility; tabletop trees were manufactured at the Baileyville (also known as the Woodland) facility and in the Columbia facility. There are three facilities in Harrington. Wreaths are manufactured at Worcester's main facilities in Harrington. (Scott, Day 7 at 1786-88, 1822).

20)    In 2007, L.L. Bean sold approximately 478,000 units of Worcester's balsam products to its customers. (Morrill Worcester, Day 8 at 220).

21)    Worcester took steps to ensure that its production and shipping capabilities could meet the increase in demand from L.L. Bean's customers including erecting buildings for product assembly, product and component storage, and shipping of L.L. Bean products. (Morrill Worcester, Day 8 at 232; Philip, Day 3 at 533-537). Worcester's expansion resulted from a combination of a steady increase in L.L. Bean's annual requirements and Worcester's eagerness to grow its business. (Philip, Day 3 at 544-45).

22)    L.L. Bean asked Worcester to "make an effort to get Maine balsam" for its products, in keeping with the L.L. Bean's "Maine made" marketing approach, so that L.L. Bean could market its products as "Maine balsam." (Morrill Worcester, Day 1 at 176-177, 180-83).

23)    By acquiring forestland and preparing it for the growth of a balsam forest, Worcester was able to meet L.L. Bean's "Maine balsam" requirements. (Morrill Worcester, Day 1 at 182-183). However, this land was not purchased by and is not owned by Worcester Resources, but by a different entity owned by members of the

6

Worcester family. (*Id.* at 184). Worcester Resources itself did not make any investment in balsam forestland, and instead it purchased cut balsam from its sister entity.

WORCESTER'S OTHER BUSINESS DURING ITS RELATIONSHIP WITH L.L. BEAN

24) During the 1980s and 1990s, L.L. Bean had a policy of discouraging its vendors from soliciting business or doing business with L.L. Bean's competitors in the catalog business. (Fessenden, Day 4 at 811-812; Morrill Worcester, Day 1 at 171-174).

25) Worcester abided by L.L. Bean's restriction not to solicit business from L.L. Bean's competitors. (Morrill Worcester, Day 1 at 171-174). However, Worcester for many years did sell balsam product to other retailers who competed with L.L. Bean, if at all, only in narrow areas such as balsam products, including internet sellers such as 1-800-FLOWERS. (Holden, Day 5 at 1188-1196). Worcester also made mail order sales directly to customers through Worcester's own website, without objection by L.L. Bean. (*Id*).

26) At some point in the 1990s, Rol Fessenden of L.L. Bean changed L.L. Bean's position and permitted L.L. Bean vendors, such as Worcester, to solicit business from L.L. Bean's competitors. (Fessenden, Day 4 at 811-812).

27) Neither Rol Fessenden nor anyone else at L.L. Bean advised Morrill Worcester or anyone else at Worcester that L.L. Bean had changed this position and that Worcester was free to solicit business from L.L. Bean's competitors. (Fessenden Day 4 at 812; Morrill Worcester, Day 2 at 470-471).

28) In 2008, L.L. Bean orders constituted approximately 90% of Worcester's business. (Morrill Worcester, Day 2 at 264, 471; Fessenden, Day 3 at 756).

7

## WORCESTER'S COMPONENT PURCHASING PRACTICES BASED ON L.L. BEAN FORECASTS

29) L.L. Bean's requirements varied from year to year, but by mid-February of each year, L.L. Bean would issue its initial forecasts for particular balsam items produced by Worcester. Those forecasts would project L.L. Bean's estimate of customer demand for each Worcester item. (Ex. 406, 653, 654, 68, 443; Morrill Worcester, Day 1 at 188-189).

30) L.L. Bean's forecasts of customer demand were set forth in terms of each product type, referred to as Stock Keeping Units (SKUs). The SKUs were sometimes identified by letter-number designations used commonly by Worcester and L.L. Bean. (Joint Stipulations, ¶ 8; Morrill Worcester, Day 1 at 188-189, 198-199).

31) In 2005 through 2007, and prior to the 2008 season, L.L. Bean sent letters to Worcester setting forth L.L. Bean's initial forecast of expected customer demand for Worcester products for the coming fall season. (Ex. 406, 653, 654, 68, 443; Morrill Worcester, Day 1 at 188-189; Holden, Day 6 at 1325; Fessenden, Day 4 at 814, 819-820).

32) Such letters were typically drafted by L.L. Bean and issued by L.L. Bean to Worcester, sometimes with input from Worcester through a negotiated process. Such letters were sometimes referred to as letter agreements. (Fessenden, Day 4, at 812-814, 819-821).

33) L.L. Bean's forecasts were stated in terms of the types and quantities of particular products that L.L. Bean projected it would be purchasing from Worcester. (Joint Stipulations, ¶ 11)

34) In the letter agreements before the one in 2008, L.L. Bean would not fully commit to Worcester for the season's production until a date specified in L.L.

8

Bean's letter agreement. (Ex. 406, 433, 435, 653, 654, 68, 443). On the other hand, L.L. Bean expected Worcester to have an adequate supply of components on hand to meet L.L. Bean's requirements in timely fashion.

35) To assure that it could meet L.L. Bean's needs in a timely way, Worcester made efforts to have ready a sufficient quantity of components to meet L.L. Bean's forecast for each item as well as a percentage above forecast for each item ranging from 10 per cent to 20 per cent depending on the item. (Ex. 653, 654, 68, 443; Morrill Worcester, Day 1 at 205-206). In the letter agreements for the years before 2008, Bean had required Worcester to purchase an additional percentage of components beyond forecasts, to assure that Worcester would be able to produce and ship items ordered above forecast amounts in a timely way. (Ex. 406, 433, 435, 653, 654, 68, 443).

36) Worcester would arrange for a sufficient supply of components by first determining what components it already had that were left over from the previous season and that could be used in the upcoming season, and then purchasing what else was needed to meet L.L. Bean's forecasts (with additional percentages as noted above) for the upcoming season. (Scott, Day 8 at 94-95).

37) This was consistent with what might be called Worcester's FIFO (first in, first out) practice regarding drawing upon its inventory of components for incorporation into products for L.L. Bean. Worcester used components left over from prior seasons before using newly purchased inventory. (Scott, Day 7 at 1805, Day 8 at 16, 18-19, 113-14).

38) To assure timely delivery of components sufficient to meet L.L. Bean's requirements, Worcester had to make its purchases for the upcoming season by no later

9

than April to meet L.L. Bean's annual forecast as well as any amount above that forecast. (Scott, Day 7 at 1789-1791, 1795).

39) Until 2008, if Worcester purchased any components for L.L. Bean products beyond what was necessary to fill L.L. Bean's orders, Worcester would retain the components for use in the next year's season. If any such components were not usable in the following year as a result of L.L. Bean discontinuing a product line, L.L. Bean would pay Worcester for them; otherwise, Worcester would be paid when it made and shipped a product in the following season incorporating the leftover components. (Ex. 406, 653, 654; Fessenden, Day 4 at 881-883; Scott, Day 8 at 19-20; Dunham, Day 5, 1106-09).

40) Worcester's inventory controls were by no means exact. Instead of tracking inventory continuously via computer or by hand counts of every item, Worcester relied on visual estimates of what quantities of different component items were on hand in Worcester's several component storage facilities.

41) The products that Worcester made for sale to L.L. Bean were "very similar," and in some cases "identical," in terms of appearance and components used, to products Worcester made for sale to other customers. (Michael Worcester, Day 9 at 49, 104-09). That fact, and the fact that components designated for Bean products were not necessarily stored separately from components designated for non-Bean products, created the potential for commingling of inventory. (Scott, Day 8 at 72-73, 111-112).

THE PARTIES' PRACTICES REGARDING YEAR-END INVOICES AND MEETINGS

42) At the end of each season from 2002 to 2008, L.L. Bean and Worcester would typically meet to review the immediately past season. (Holden, Day 5 at 1279-80).

10

43) From 2002 to 2008, the meetings between Worcester and L.L. Bean typically took place very early in the year following the sales year that had just concluded. (Holden, Day 5 at 1279-1281).

44) Before the year-end meeting, Worcester would submit an invoice to L.L. Bean in the amount that Worcester calculated was due for purchase orders, shipping fees and other items, with a credit to L.L. Bean for amounts already paid. L.L. Bean did not pay the invoice in full, however, because there were usually further deductions from the invoice to be discussed. That discussion took place at the annual post-season meeting.

45) Discussion at post-season meetings covered, among other things, the experience in the year just passed, including, among other things, customer charge-backs. (Holden, Day 5 at 1279-1281; Fessenden, Day 4 at 845-847).

46) L.L. Bean would track customer complaints leading L.L. Bean to issue refunds or to send replacement products to its customers. L.L. Bean's refunds and replacement products were referred to as "charge-backs." (Holden, Day 5 at 1196-1198).

47) L.L. Bean would typically withhold an amount from its final year-end payment to Worcester primarily to account for charge-backs that L.L. Bean assessed against Worcester. (Holden, Day 5 at 1294-1295).

48) L.L. Bean tracked customer complaints through 14-16 different reason codes. Depending on the reason given by the customer for the complaint, responsibility for the cost of a charge-back could be on Worcester, on the shipper involved, or on L.L. Bean. (Philip, Day 3 at 564-569; Holden, Day 5 at 1198-99).

11

49) At the year-end meetings, L.L. Bean shared with Worcester the reasons given for charge-backs relating to Worcester's products. For example, in advance of a meeting in late January 2008 to discuss the 2007 season, L.L. Bean generated a "post-mortem" agenda and a memorandum summarizing its perspective on Worcester's performance during the 2007 season. (Ex. 425).

50) Through a process of give-and-take, Worcester and L.L. Bean would reach agreement on an appropriate dollar amount to be subtracted from the amount due from Bean to Worcester. Sometimes that dollar figure was lower than the charge-back figure that L.L. Bean had initially identified as being Worcester's responsibility. (Morrill Worcester, Day 1 at 237-238, Day 9 at 16; Michael Worcester, Day 9 at 86).

51) Ultimately, although the amount deducted by agreement from Worcester's year-end invoice was influenced by each party's position on the amount and reason for chargebacks and other issues, it was a negotiated figure, not a mathematically derived figure.

52) The practice before the 2008 season of L.L. Bean holding back a portion of the amount otherwise due to Worcester pending discussion of charge-backs at the year-end meetings is plainly relevant to Worcester's understanding of how it and L.L. Bean would reach agreement on the amount due to Worcester for the 2008 season.

THE TERMS OF THE PARTIES' FEBRUARY 13, 2007 LETTER AGREEMENT

53) As was the case in prior years, the essential terms of the parties' contract for the 2007 season were memorialized in a letter agreement signed by the parties and dated February 13, 2007. The parties' respective rights and obligations for the 2007 season are not directly at issue in this case, but the terms of their 2007 letter agreement

12

are relevant, chiefly for how they compare to the terms of the 2008 letter agreement that does govern the issues in this case.

54) The parties' letter agreement of February 13, 2007 was representative of such agreements for preceding years in most respects.

55) L.L. Bean's February 13, 2007 letter agreement set the initial forecast for the 2007 season at 470,000 units, but it also permitted L.L. Bean to revise its forecast upward or downward "based on customer demand" until January 2, 2008. (Ex. 406, 653). It also provided that Worcester should be capable of producing more units at a rate of as much as 20% above the forecast for certain items, if requested and agreed upon by the parties. (Ex. 654).

56) The term "customer demand" was a term used by L.L. Bean in the regular course of its business and, as it appeared in L.L. Bean's letter agreements to Worcester "customer demand" meant "actual sales" or projected sales of Worcester-produced items to customers of L.L. Bean. (Ex. 406, 653, 654, 68, 443; Fessenden, Day 3 at 769).

57) By allowing L.L. Bean to "revise" its forecasts upward or downward "based on customer demand" the 2007 letter agreement permitted L.L. Bean, at least in theory, to direct Worcester to increase or decrease production as late as early January, or to request Worcester to stop production if L.L. Bean concluded that its customer demand warranted an order to stop production. (Ex. 406, 409,653, 45, 654; Fessenden, Day 3 at 768-772, 783-784).

58) The February 13, 2007 letter agreement also did not obligate L.L. Bean to pay Worcester for any products it ordered from Worcester other than those products

13

L.L. Bean actually sold to its customers or which became "finished goods," provided the goods were not produced above L.L. Bean's commitment quantity. (Ex. 45, 654).

59) L.L. Bean's obligation to pay for "finished goods" arose in the event that L.L. Bean ordered or requested Worcester to stop production of any or all items in L.L. Bean's forecast and before Worcester could bring production to halt, some additional items were completed and became "finished goods" for which there was no concomitant "customer demand." (Fessenden, Day 4 at 855).

60) Under the 2007 letter agreement, L.L. Bean's commitment to pay for "finished goods" did not extend to finished goods that Worcester might produce that exceeded L.L. Bean's commitments for the particular item or items in question. (Ex. 45, 654).

61) In order to be capable of meeting both the February 13, 2007 forecast and the projection above that forecast, Worcester had to purchase or have on hand sufficient quantities of components to meet L.L. Bean's requirements, in order avoid a potential breach of contract claim. (Ex. 45, 654; Morrill Worcester, Day 1 at 205-206).

62) In issuing its letter agreements, L.L. Bean expected that Worcester would purchase or have on hand sufficient quantities of components to meet L.L. Bean's forecast and L.L. Bean's projection above forecast. (Ex. 406, 653, 654, 68, 443; Morrill Worcester, Day 1 at 205-206; Fessenden, Day 3 at 778).

63) By the end of the 2007 season, L.L. Bean had sold more Worcester products than in any previous year, with more than 478,000 balsam items having been sold. (Morrill Worcester, Day 1 at 170).

14

## WORCESTER'S COMPONENT INVENTORY AFTER THE 2007 SEASON

64) At the end of the 2007 season, Worcester had significant quantities of components left over and not incorporated in any finished products. Some of the leftover components were purchased for the products L.L. Bean had ordered from it and which L.L. Bean had included in its projection above forecast, and an additional quantity reflected purchases made by Worcester beyond Bean's forecasts, to assure it would be able to fill L.L. Bean's orders. (Morrill Worcester, Day 1 at 37). Still other leftover components were undoubtedly purchased for products to be sold to other customers.

65) Total numbers for Worcester's year-end inventories do appear, however, in its tax returns that were entered as exhibits at trial. According to those returns, Worcester's total inventory at the end of 2006 was $293,180. (Ex. 202) and Worcester's total inventory at the end of 2007 was $1,462,326. (Ex. 202, 203).

66) In early 2008, Morrill Worcester told Bill Holden that he had in excess of $1,000,000 worth of inventory left over after the 2007 season. When asked why he had so much left over inventory, Mr. Worcester explained to Mr. Holden that he should not worry, that not all of it was L.L. Bean's, and that he purchased the rest "on his own nickel." (Holden, Day 5, pgs. 1208–09).

67) The portion of Worcester's leftover inventory as to which L.L. Bean had a commitment obligation from 2007 and/or prior years was between $300,000 and $600,000. (Morrill Worcester, Day 1 at 42, 43-45; Scott, Day 8 at 96). What gives the higher figure credence is that Worcester only purchased about $456,000 worth of components in preparation for the 2008 season, meaning that it had a substantial quantity of inventory left from 2007 and prior years, as to which L.L. Bean had made a much broader component commitment than it did for the 2008 season.

15

68)    Worcester's products made for L.L. Bean incorporate components having an average value of $4.00. (Ordway, Day 9 at 158). Components sufficient to make 75,000 to 80,000 units equate to about $300,000 to $320,000 in component inventory.

69)    Thus, at the end of the 2007 season Worcester's total inventory of $1,462,326 consisted of up to $600,000 worth of components as to which L.L. Bean had made a commitment in 2007 (including any reserve) or prior years, and an even larger quantity bought in 2007 or prior years on Worcester's "own nickel" to meet what Worcester projected it would need to meet the requirements of L.L. Bean and its other customers.

THE PARTIES' BAILMENT AND PURCHASE AGREEMENT

70)    In early 2008, Worcester took steps to switch its banking relationship from Machias Savings Bank to Chittenden Bank and to the Massachusetts Business and Development Bank. (Bruce, Day 6 at 1489-1494). Machias had provided Worcester with a line of credit to finance Worcester's purchases of inventory, among other things, and the plan was for Chittenden to take over. As a condition of Chittenden's involvement, however, Worcester had to pay off the Machias line.

71)    Partly because of the quantities of excess inventory purchased but not used, and partly because of significant other expenses—some of them questionable and outside the ordinary course of business[3]—Worcester found itself without the cash

_____

[3]  For example, Worcester Resources paid $441,885.51 to cover the personal tax payments of Morrill Worcester and Karen Worcester and a further $212,574 for another company also controlled by the Worcester family, County Concrete. (Morrill Worcester, Day 1 at 56-58). Hundreds of thousands of dollars were paid in shareholder distributions, the total of which were greater than Worcester's reported income. (Michael Worcester, Day 9 at 91; Dunham, Day 5, 1155). Worcester also paid what L.L. Bean claims to be exorbitant rental amounts to a sibling entity, Worcester Holdings. One Worcester principal acknowledged that the so-called rent payments, which totaled about one million dollars over a period of time, were a "concoction" designed to transfer money from Worcester to another entity. (Karen Worcester, Day 3 at 678-

16

needed to satisfy Chittenden's requirement that the Machias line be paid off before Chittenden made a new source of credit available to Worcester.

72) Worcester approached L.L. Bean for funds sufficient to enable Worcester to pay off the Machias line of credit and thereby induce Chittenden to extend a new line. (Morrill Worcester, Day 1 at 43-45). Once the Chittenden line was in place, Worcester could draw upon it to reimburse L.L. Bean.

73) For L.L. Bean to provide a vendor with financial assistance of the magnitude requested by Worcester was an "extremely rare" measure. L.L. Bean already held some concerns about Worcester's viability as a vendor due to very large environmental fines assessed against Worcester and what L.L. Bean considered to be dubious hiring practices inconsistent with its expectations for itself and its vendors. (Fessenden, Day 3 at 705-718, 724-738).

74) Nonetheless, Bean decided to accede to Worcester's request, to be sure Worcester could meet Bean's balsam product needs for the forthcoming season. (Fessenden, Day 3 at 735).

75) L.L. Bean and Worcester eventually worked out an agreement whereby L.L. Bean would take title to a certain quantity and value of components purportedly purchased by Worcester for L.L. Bean products and would pay Worcester an amount of money equal to the agreed-upon value of those components until such time as Worcester could obtain financing from a financial institution. When Worcester obtained the necessary financing, Worcester would then repurchase the components from L.L. Bean in the full amount of the price that L.L. Bean had paid for the components as part of the bailment. L.L. Bean and Worcester both anticipated that

---

79). Clearly, these expenses, along with Worcester's substantial inventory purchases in 2007 and perhaps earlier, contributed significantly to Worcester's cash-poor position in early 2008.

17

Worcester would be able to re-pay L.L. Bean for the monies extended by L.L. Bean within a short period of time. (See Joint Stipulations ¶ 13; Ex. 66, 67).

76) The terms of that agreement were set forth in a Bailment and Purchase Agreement that was signed by Worcester and L.L. Bean, as well as Chittenden Bank and Massachusetts Business and Development Corporation, and went into effect on April 29, 2008. (Ex. 66). The Bailment and Purchase Agreement was amended by the parties on May 20, 2008 for the purpose of extending the deadline by which Worcester was to re-pay L.L. Bean. (Ex. 67).

77) The amount of funds involved in the Bailment and Purchase Agreement was about $582,000. (Ex. 66, 67). Inferentially, that was the amount Worcester needed in order to be able to pay off the Machias Savings line of credit and switch its financing to Chittenden Bank.

78) Morrill Worcester, asked Sherry Scott, the Worcester employee primarily responsible for tracking Worcester's component inventory, to confirm that Worcester had sufficient quantities of components on hand to meet the figure that L.L. Bean had agreed to provide to Worcester. (Scott, Day 8 at 11).

79) Pursuant to Morrill Worcester's instructions, Sherry Scott produced a document showing that Worcester had on hand $582,960.76 of component inventory that Worcester had allegedly purchased for L.L. Bean products. (Ex. 153; Scott, Day 8 at 10). That figure did not, nor was it intended to, reflect the actual total of component inventory Worcester had on hand, which was valued far higher at $1,462,326.

80) In April of 2008, Rick Ordway, an L.L. Bean employee with responsibility for inventory management, went to Worcester's facility to verify that Worcester had on hand sufficient components for products that Worcester could use for

18

L.L. Bean products to secure the monetary amount that Worcester and L.L. Bean had agreed upon for the Bailment and Purchase Agreement. (Ordway, Day 9 at 167).

81) Mr. Ordway's assessment focused on total components suitable for use in L.L. Bean products because L.L. Bean was at least temporarily purchasing those components under the bailment agreement. Because the bailment agreement simply covered inventory, regardless of whether it was inventory as to which L.L. Bean had made a commitment, it was not necessary for Mr. Ordway's assessment to distinguish between inventory as to which L.L. Bean was contractually committed and inventory as to which it was not.

82) Rick Ordway visited Worcester's storage facilities and stayed for a part of one day. During his visit, he was able to verify that Worcester had sufficient component inventory on hand to provide security with a value at least the amount involved in the Bailment and Purchase Agreement. (Ordway, Day 9 at 167).

83) In verifying that Worcester's inventory at least met the figure chosen for the Bailment and Purchase Agreement, Mr. Ordway noted that Worcester possessed large amounts of component inventory beyond what he had verified. (Ordway, Day 9 at 142-143, 169).

84) Worcester's component purchases in 2008 totaled about $456,000 worth of inventory. Based on Worcester's testimony that its practice was to use leftover components before using new ones, it seems reasonable to infer that Worcester would not have made additional purchases of $456,000 in 2008 unless it had determined that there were not enough leftover components in its storage facilities to meet L.L. Bean's requirements.

19

## L.L. BEAN'S CONCERNS ABOUT WORCESTER AND ITS DECISION TO MOVE ITS TARTAN WREATH BUSINESS TO ANOTHER VENDOR IN EARLY 2008

85) Around the same time as the bailment discussions, L.L. Bean advised Worcester that Worcester was not in compliance with L.L. Bean's ethical standards and advised Worcester that Worcester would have to come into compliance in all respects or risk the loss of L.L. Bean's business. (Morrill Worcester, Day 1 at 48).

86) In a letter to Worcester dated February 8, 2008, Rol Fessenden of L.L. Bean noted that Worcester had for years ignored L.L. Bean's very clear directives to address L.L. Bean's required human rights, safety, and other standards. He also informed Worcester, that Worcester's status as a vendor for L.L. Bean was at risk due to this noncompliance, and that there was a zero-tolerance for violations. (Ex. 7).

87) For these and other reasons, L.L. Bean decided that it should not place all of its balsam product business with Worcester and decided to find another vendor for one of the balsam product lines that it had purchased from Worcester, the "Tartan Wreath." (Fessenden, Day 3 at 700-734).

88) Soon after that, L.L. Bean advised Worcester that L.L. Bean would no longer be purchasing the Tartan Wreath product from Worcester, and would instead be buying it from a competitor of Worcester's, Whitney Originals, which was located in Washington County, close to Worcester's operations. (Morrill Worcester, Day 2 at 463-464).

89) Morrill Worcester was upset by the loss of the Tartan Wreath to a competitor and expressed his frustration to Rol Fessenden. (Fessenden, Day 4 at 1010-1011; Morrill Worcester, Day 2 at 465-467).

90) Rol Fessenden told Morrill Worcester that, if Worcester came into compliance with all of L.L. Bean's standards, it was possible Worcester could regain the

Tartan Wreath. (Morrill Worcester, Day 2 at 465-467). However, Bean's concerns about Worcester remained and, as discussed later in this decision, influenced Bean's decisions in 2009.

## THE PARTIES' NEGOTIATIONS PRECEDING THE FINAL VERSION OF THEIR LETTER AGREEMENT FOR THE 2008 SEASON

91) From approximately 2004 through 2008, Robert Bruce of Oakmont Associates served as a financial and business advisor to the Worcester companies. (Bruce, Day 6 at 1480-1481).

92) On March 14, 2008, L.L. Bean sent its proposed letter agreement to Worcester for the upcoming 2008 season. The March 14 letter was in some ways consistent with the terms of the parties' letter agreement governing the 2007 season. (Ex. 433).

93) Among other things, the March 14 letter reserved to L.L. Bean the right to order Worcester to increase or decrease its commitments to forecasts based on L.L. Bean's "customer demand." (Ex. 433).

94) The March 14 letter also required Worcester to purchase or to have on hand sufficient components for programs forecast by L.L. Bean including, as well, as percentages above the forecast, and for L.L. Bean to be responsible for unused components up to and including a reserve if consumer purchases for the season fell short of projections, and L.L. Bean deleted the product from its line (Ex. 433).

95) Thus, as in prior years, L.L. Bean's component commitment, as stated in the March 14 letter, extended to all components purchased by Worcester for L.L. Bean products up to Bean's forecast plus a stated percentage beyond that.

96) This commitment was unacceptable to Worcester's new source of bank financing, Chittenden Bank. After consulting with Chittenden, Robert Bruce advised

21

Rol Fessenden or William Holden that L.L. Bean's March 14 proposal was not acceptable because it did not commit Bean to purchase any specific dollar amount of products from Worcester.

97) To induce Chittenden to establish the line of credit that Worcester needed in order to be able to meet L.L. Bean's requirements, Worcester needed L.L. Bean to commit itself to purchasing at least a minimum number of units by means of purchase order. (Bruce, Day 6 at 1509-10, 1513, 1541-1542; Holden, Day 6 at 1375; Fessenden, Day 4 at 891-893).

98) L.L. Bean was made aware of the nature of Chittenden's objection and of the fact that Worcester needed L.L. Bean to commit itself to purchase orders that could serve as security for a line of credit from Chittenden that Worcester could use to fund at least some of the expenses of the 2008 season. (Holden, Day 6 at 1376).

99) In an effort to meet Worcester's needs, L.L. Bean issued a second proposed letter agreement dated March 25, 2008. (Fessenden, Day 4 at 899-900).

100) The draft March 25, 2008 letter differed from the March 14 letter in that it specifically provided that L.L. Bean would issue purchase orders and pay for finished goods within the purchase order quantities irrespective of customer demand.

101) The March 25, 2008 letter also included L.L. Bean's commitment to pay for purchase order quantities "regardless of customer demand," provided Worcester actually finished the goods within those purchase order quantities. In including this provision, L.L. Bean was acceding to the requirement imposed by Chittenden and conveyed to L.L. Bean by Robert Bruce that Worcester needed L.L. Bean to issue firm purchase orders to Worcester for the 2008 season. (Ex. 435; Fessenden, Day 4 at 900-901; Bruce, Day 6 at 1497-1498).

22

102) The March 25, 2008 letter included L.L. Bean's commitment to issue purchase orders for 344,725 balsam units from Worcester. L.L. Bean chose this number at its sole discretion. (Ex. 435; Fessenden, Day 4 at 932).

103) The purchase order quantity to which L.L. Bean was willing to commit in its March 25, 2008 letter contrasted with L.L. Bean's forecast of 470,000 in its Letter Agreement of February 13, 2007. (Ex. 654, 435; Holden, Day 5 at 1274).

104) The March 25 letter reserved to L.L. Bean the right to increase its purchase order commitment of 344,725 balsam units by any number its chose up to and including its forecast number of 405,559 balsam units and a 10% projection above forecast for a total of 446,115 balsam units, provided that L.L. Bean placed purchase orders for the increased amounts by no later than September 12, 2008. (Ex. 435; Fessenden, Day 4 at 902.).

105) L.L. Bean was under no obligation to increase its purchase order commitment of 344,725 balsam units. (Ex. 435; Fessenden, Day 4 at 903).

106) The March 25, 2008 letter also set forth terms describing L.L. Bean's responsibility for any excess components that are purchased by Worcester but not ultimately incorporated into finished goods. The portion of the letter that addresses this responsibility begins with the phrase "As we have for the past several seasons...." (Ex. 435; Fessenden, Day 4 at 906-907).

107) The March 25, 2008 letter agreement provided that Worcester would purchase or have on hand components that would be necessary to complete all quantities for all Worcester products lines including not only those items for which L.L. Bean was prepared to issue purchase orders—344,725 balsam units—but for L.L. Bean's forecast and its projection above forecast as stated in the March 25 letter. (Ex. 435).

23

108) The March 25, 2008 letter agreement specifically divided the financial responsibility of L.L. Bean and Worcester for components making up the 10% reserve above forecast, with L.L. Bean assuming the limited financial responsibility for 6% (that is, 60% of the 10%) of the components for the SKUs projected above forecast and Worcester assuming 4% (that is, 40% of the 10%) of the components for the SKUs projected above forecast. (Ex. 435). The March 25, 2008 letter did not specifically say which party would be responsible for unused components up to the amount of the forecast, and that silence later generated a dispute, addressed below.

109) Worcester's explicit assumption of ultimate financial liability for a portion of the reserve components purchased to make products ordered, forecasted, or projected by L.L Bean as proposed in the March 25, 2008 letter had never been included in any previous year's agreement between Worcester and L.L. Bean. (Ex. 654, 435; Holden, Day 6 at 1314-1317).

110) The March 25 letter did not reserve to L.L. Bean the right to order Worcester to stop production. (Ex. 654, 435).

111) The March 25 letter substantially addressed Chittenden Bank's concerns, but it was eventually superseded by yet another letter to Worcester from L.L. Bean, dated May 1, 2008. (Ex. 68, 443; Fessenden, Day 3 at 779-780). This letter governed L.L. Bean's ordering of balsam products from Worcester until it was modified orally in November of 2008, and is referred to in this decision as the May 1, 2008 letter agreement or simply as the 2008 letter agreement.

THE MAY 1, 2008 LETTER AGREEMENT

112) The May 1, 2008 letter agreement was drafted by L.L. Bean with assistance of its counsel, Brann & Isaacson, with substantial input from Worcester after

24

lengthy negotiations with Bob Bruce and others on behalf of Worcester. (Ex. 651; Holden, Day 6 at 1319). Worcester did not draft any part of the May 1 letter agreement, but its terms reflect modifications demanded and approved by Worcester. (Ex. 651; Holden, Day 6 at 1319).

113) In broad terms, the May 1, 2008 letter agreement fundamentally differed from all of the parties' letter agreements in prior years, in that L.L. Bean was issuing purchase orders simultaneously, and Worcester agreed to purchase or otherwise have available sufficient components to fill any and all orders L.L. Bean might place with Worcester up to and including L.L. Bean's forecast and projection-above-forecast without any component commitment on the part of L.L. Bean apart from the percentage of an over-forecast reserve. (Ex. 406, 653, 654, 68, 443).

114) The May 1, 2008 letter agreement repeated many if not all of the material terms of the March 25 letter:

- It stated a forecast of 405,559 units and a reserve of 10%, or an additional 40,556 units, for a total of 446,115 units projected.

- It obligated Bean to issue purchase orders for 344,725 units forthwith.

- It provided for L.L. Bean to have the right—but not the obligation—to supplement its initial purchase orders by any amount up to and including 110% of forecast--446,115 units, provided it did so by no later than September 12, 2008.

- It allotted responsibility for the reserve components of 10% above forecast similarly—6% of the 10% to L.L. Bean and 4% to Worcester.

- It committed L.L. Bean to pay for finished goods up to the total quantity of units covered in purchase orders issued by L.L. Bean, regardless of whether the finished units were sold, but also provided that L.L. Bean was not required to pay for finished but not sold goods beyond the total quantity of units reflected in purchase orders.

25

115) Like the March 25 letter, the May 1, 2008 letter did not reserve to L.L. Bean the right to direct Worcester to stop production of units being produced pursuant to purchase orders.

116) The May 1, 2008 letter agreement was the last in the series of letters drafted and it proved to be the definitive agreement between the parties for the 2008 season, at least until it was orally modified by agreement in November 2008.

117) L.L. Bean chose the number of Worcester products for which it committed to issue purchase orders—344,725 balsam units—at its sole discretion. This figure was 85% of its forecast of 405,559 and 77% of its 10% projection-above-forecast. (Ex. 443, 68). This figure was more than 130,000 lower than L.L. Bean's sales of Worcester products in the immediately preceding 2007 season. (Ex. 443, 68; Morrill Worcester, Day 8 at 220; Fessenden, Day 4 at 812-814, 819-821).

118) To be sure of meeting its obligations to L.L. Bean, Worcester had to purchase or otherwise have on hand sufficient quantities of components to produce and ship up to 446,115 units—the amount of Bean's forecast plus a 10% reserve.

119) Under the 2008 letter agreement, each party gained something it had not obtained in the letter agreements covering prior years, and each party gave up something it had been granted in the agreements for prior years. Whereas the prior letter agreements had never committed L.L. Bean in advance to ordering any specific quantity of units from Worcester, Worcester gained such a commitment in the 2008 letter agreement, and thereby satisfied its financing bank, Chittenden. On the other hand, whereas L.L. Bean had committed itself in prior years to buying all leftover components, either in the form of finished units in the following year or as components in the case of discontinued products, Worcester agreed to a more limited commitment

26

on L.L. Bean's part in the 2008 letter agreement.

120) The May 1, 2008 letter agreement differed fundamentally from the parties' letter agreements in prior years in that L.L. Bean was issuing purchase orders simultaneously, and Worcester agreed to purchase or otherwise have available sufficient components to fill any and all orders L.L. Bean might place with Worcester up to and including L.L. Bean's forecast and projection-above-forecast with a limited component commitment from L.L. Bean. (Ex. 406, 653, 654, 68, 443).

121) The extent of L.L. Bean's component commitment as set forth in the May 1, 2008 letter agreement is the subject of a dispute between the parties.

122) Like the March 25 letter, the May 1, 2008 letter agreement explicitly allotted responsibility for the 10% of units above forecast, but did not explicitly address responsibility for unused units up to the forecast amount.

123) With respect to components, the May 1, 2008 letter agreement provided as follows:

> As we have for the past several seasons, L.L. Bean has identified those items on which we will commit to reserve components. This reserve commitment may be up to 6% of the season's forecast for the item. Per the attached commitment spreadsheet, the total value of the components L.L. Bean is instructing Worcester Resources to purchase over and above our current forecast of 405,559 units is $80,228. These components will be used in 2008 production, or, if there are excess components and the product is to be offered in the 2009 season, Worcester Resources will hold these components at its cost until they are needed for production in 2009. If any unused components are for products that are dropped from L.L. Bean's line, L.L. Bean will pay Worcester Resources the cost of the excess components. Attached is a breakdown of our commitments by item. (Ex. 68, 69).

124) The attachment to the letter contained a list of the SKUs involved in the 10% reserve beyond forecast; the number of units for each SKU, the total dollar value of the units, and a breakdown of the parties' respective six-tenths and four-tenths shares of

27

responsibility for the 10% reserve. L.L. Bean's stated share was $80,228.

125) At trial, Worcester argued that the letter should be interpreted to establish essentially the same component commitment L.L. Bean had made in the 2007 letter agreement and in prior years—namely that L.L. Bean would commit itself to buying all leftover components purchased by Worcester up to the amount of the forecast plus the reserve percentage, either in the form of finished units in the following year, or by paying for the components for any discontinued products.

126) Worcester points to the prefatory phrase, "As we have for the past several seasons…" to bolster its claim that the 2008 letter agreement essentially restated the same component commitment as L.L. Bean had made in prior years. Worcester also suggests that any ambiguity in L.L. Bean's component commitment as stated in the letter should be resolved against L.L. Bean.

127) There is an ambiguity in the body of the letter itself as to the extent of L.L. Bean's component commitment because the letter does not expressly say whether L.L. Bean's component commitment extends beyond 6% of the 10% reserve and embraces any of the 405,559 units in the forecast, and the "As we have in prior years" reference only deepens the ambiguity rather than resolving it.

128) However, the letter refers to the attachment containing "a breakdown of our commitments by item," and the attachment plainly limits L.L. Bean's component commitment for 2008 to $80,228 worth of reserve components—the value of L.L. Bean's share of the 10% reserve amount.

129) If there were any lingering uncertainty about the extent of L.L. Bean's 2008 component commitment, the extrinsic evidence, in particular the testimony of Robert Bruce, who was Worcester's primary representative in the discussions that

28

culminated in the May 1, 2008 letter agreement, conclusively resolves it. Mr. Bruce confirmed L.L. Bean's position that the parties intended in the 2008 letter agreement that L.L. Bean's component commitment for 2008 be limited to six-tenths of the 10% reserve and that the commitment was valued at $80,228.00. (Bruce, Day 7 at 1728, 1969).

130) Thus, under the 2008 letter agreement, L.L. Bean assumed the risk that the market for Worcester's products might not equal the orders that L.L. Bean placed with Worcester if Worcester actually made the finished products within the purchase quantities ordered by L.L. Bean. Similarly, Worcester assumed risks of production, including, any changes in prices for raw materials, costs of production, costs of operation and all other production-related costs, including the cost of all components needed to produce balsam products ordered by L.L. Bean pursuant to the purchase orders, as well as, amounts up to the reserve quantity and a portion of the amount above the reserve. (Ex. 68, 443).

131) Consistent with the terms of the 2008 letter agreement, L.L. Bean issued purchase orders on May 6, 2008, to Worcester for 344,725 units. (Joint Stipulation, ¶ 14, Ex. 448).

132) Shortly after L.L. Bean issued its May 6, 2008 purchase orders to Worcester, Worcester obtained a line of credit from Chittenden Bank. (Morrill Worcester, Day 2 at 267-268).

L.L. BEAN'S SEPTEMBER 22, 2008 PURCHASE ORDER

133) On September 22, 2008, L.L. Bean issued purchase orders to Worcester for an additional 44,939 items, bringing L.L. Bean's purchase orders for the 2008 season to a total of 389,664 items. (Joint Stipulation, ¶ 14, Ex. 456). The purchase orders

29

followed a telephone conversation that Morrill Worcester made to Lisa Richard of L.L. Bean to see whether L.L. Bean wanted to supplement its May 6, 2008 purchase order with further purchase orders.

134) Under the terms of the May 1, 2008 letter, L.L. Bean had the right, but not the obligation, to supplement its purchase orders of May 6, 2008 with additional purchase orders, provided it did so, if at all, by September 12, 2008. (Ex. 68, 443).

135) After L.L. Bean issued the second set of purchase orders, L.L. Bean made internal changes showing the purchase order cancelled in its records, because its computer system did not allow it to record purchase orders being issued to a direct ship vendor. (Ex. 455).

THE PARTIES' NOVEMBER 26, 2008 ORAL AGREEMENT

136) On or about November 26, 2008, the parties made an oral agreement in the course of a telephone conversation that served to modify the May 1, 2008 letter agreement.

137) The parties' stipulations summarize the modification as follows: "As sales for the fall 2008 balsam progressed, L.L. Bean informed Worcester that market demand appeared slack. Worcester agreed to slow or stop production of balsam products as Bean directed. Worcester also agreed to pass along to L.L. Bean all cost savings from not producing balsam products." (Joint Stipulation, ¶ 15, 16). The following findings summarize the additional evidence leading up to and covering that conversation, to put more flesh on the stipulation.

138) Due to the economic downturn in the late summer and fall of 2008, L.L. Bean saw sales falling below projections in many product areas. It generated significantly less favorable sales forecasts and decided to ask its various vendors to be

30

prepared to cut back production. (Fessenden, Day 4 at 944-945, 950-952).

139) The L.L. Bean employee with day-to-day responsibility for L.L. Bean's relationship with Worcester, William Holden, was thus instructed by his superior, Rol Fessenden, to call Worcester and all other vendors for which Mr. Holden was responsible within L.L. Bean, to tell the vendors to be ready to cut back on production as quickly as possible due to the significant decrease in sales projections as a result of the 2008 economic downturn. (Fessenden, Day 4 at 944-945, 950-952).

140) On November 19, 2008, Mr. Holden called Morrill Worcester. Neither Mr. Holden nor Morrill Worcester recalled the specifics of that telephone call, but consistent with his habit of taking notes of significant conversations, (Holden, Day 4 at 1276), Mr. Holden took notes. Mr. Holden's notes reflect that he reported that L.L. Bean's forecasts had been reduced because sales of Worcester products were much lower than projected and that he asked that Worcester Resources slow production. Morrill Worcester agreed to slow production, and told Holden that "he would work with L.L. Bean to make what we need." (Ex. 73; Holden, Day 6 at 1347-1349, Morrill Worcester, Day 2 at 377).

141) On November 26, 2008, Mr. Holden and Lisa Richard on behalf of L.L. Bean had a further telephone conversation with Morrill Worcester about the status of sales of Worcester products. (Ex. 74, 75; Holden, Day 6 at 1349-1351). Michael Worcester, the vice-president of Worcester, was also present for the telephone conversation. (Morrill Worcester, Day 2 at 376; Michael Worcester, Day 9 at 22-23).

142) Mr. Holden and Ms. Richard took notes of the conversation. (Ex. 74, 75). Neither of the Worcesters took any notes. (Morrill Worcester, Day 2 at 376).

143) Mr. Holden told Morrill Worcester that L.L. Bean's sales of Worcester

31

products were quite a bit below projections and said L.L. Bean needed Worcester to cut back production. (Ex. 74; Morrill Worcester, Day 2 at 377-378; Holden, Day 6 at 1347). Morrill Worcester replied by saying that Worcester could not agree to reduce the purchase orders that L.L Bean had placed with Worcester because Chittenden Bank would not let him, but said that Worcester would not make any products L.L. Bean does not need. (Ex. 74, 75; Michael Worcester, Day 9 at 22-23).

144) Morrill Worcester told Mr. Holden that Worcester would stop production as L.L. Bean directed and that Worcester would pass any and all savings resulting from its cessation of production along to L.L. Bean. (Ex. 74, 75; Morrill Worcester, Day 8 at 206). Mr. Worcester said that the only two examples of the savings that he could think of at the time that would result from a cessation of production were labor costs and the costs that Worcester paid for cutting balsam tips, also known as "brush." (Ex. 74, 75; Michael Worcester, Day 9 at 22). Lisa Richards notes state: "W.W. asking for difference of PO to production – would reduce by labor/balsam overhead – components." (Ex. 75) Her notes are not clear as to whether the references to overhead and components were mentioned by Mr. Worcester or were her own inferences as to what could be saved by cutting back production.

145) Morrill Worcester also told William Holden that Worcester would "save what it can" and "we would do anything we could to save them [L.L. Bean] money" and "if there 's anything else we could save, we certainly would" as a result of ceasing production. (Ex. 74; Morrill Worcester, Day 2 at 378-379, Day 3 at 605).

146) Messrs. Holden and Worcester agreed that the parties would be fair to each other at the end of the season. (Holden, Day 6 at 1350; Morrill Worcester, Day 2 at 383-384). Morrill Worcester took this to mean that Worcester would "do anything

32

we could to help them out" and that "we would do anything we could to save them money." (Morrill Worcester, Day 2 at 378-79, 383).

147) Based on the parties' history of resolving what was owed at their year-end meetings, both Mr. Holden and Morrill Worcester likely contemplated that the parties would meet early in the following year to work out an agreed-upon year-end payment from L.L. Bean to Worcester to close the 2008 season. That plainly was Mr. Worcester's understanding. (Morrill Worcester, Day 8 at 207).

148) Although Worcester clearly promised that it would save what it could by stopping production when and as directed by L.L. Bean, when and how such savings would be passed back to L.L. Bean was not discussed.

149) However, in offering to pass savings along to L.L. Bean, Morrill Worcester was referring to savings arising from production. The examples that he gave of possible areas of savings—labor and brush—were costs associated with the Worcester's production of items for L.L. Bean that could be saved if Worcester actually stopped production. (Morrill Worcester, Day 2 at 379-380.)

150) When he agreed to credit L.L. Bean with savings realized by Worcester in cutting back production, Morrill Worcester reasonably believed that Worcester could do so by giving L.L. Bean discounts on its purchases during the following season in 2009. In fact, the representatives of Worcester and L.L. Bean who participated in the conversation had every reason to expect that the business relationship between the two companies would continue into 2009 and thereafter.

151) In summary, the November 26, 2008 telephone conversation modified the May 1, 2008 letter agreement in this significant respect: although the purchase orders committing L.L. Bean to purchase 389,664 units remained in force, Worcester agreed to

33

subtract from the amounts due on those purchase orders what it could save in production costs by reducing production in compliance with L.L. Bean's request.

152) The fact that the purchase order commitment remained in place after the November 26, 2008 conversation is relevant for several reasons, including that it helps explain and justify, Worcester's decision at the end of 2008 to send L.L. Bean an invoice for the full outstanding amount of the purchase orders. That decision is discussed in detail below.

153) Sometime after the telephone conversation between William Holden and Lisa Richard and Morrill Worcester and Michael Worcester on November 26, 2008, Rol Fessenden saw William Holden in a corridor of L.L. Bean and Mr. Holden confirmed that he had spoken to Worcester and that Worcester had agreed to cease production at L.L. Bean's direction. Mr. Fessenden did not recall if Mr. Holden provided him with any other information about the conversation, but he was aware that Mr. Holden had spoken to Worcester in November as requested. (Fessenden, Day 4 at 949-950). However, Mr. Fessenden was unaware of the details of the November 26, 2008 conversation until he attended the trial of this case in October 2011. (Fessenden, Day 4 at 986).

154) In effect, by refusing to release L.L. Bean from its previously issued purchase orders, Worcester was attempting to reserve its right to the Uniform Commercial Code (UCC) seller's remedy based on an action for the price, instead of the alternate remedy granting the seller the difference between market value and contract price, less expenses saved. *Compare* 11 M.R.S. § 2-708(1) ("the measure of damages for nonacceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental

34

damages provided in this Article (section 2-710), but less expenses saved in consequence of the buyer's breach") *with* 11 M.R.S. § 2-709(1)(b) ("When the buyer fails to pay the price as it becomes due, the seller may recover, together with any incidental damages under section 2-710, the price [o]f goods identified to the contract if the seller is unable after reasonable effort to resell them at a reasonable price or the circumstances reasonably indicate that such effort will be unavailing.").

155)     However, as L.L. Bean points out, when Worcester agreed to stop production, Worcester can be deemed to have surrendered its ability to bring an action for the price under section 2-709, and to have limited its remedy to those available under section 2-708. *See Detroit Power Screwdriver Co. v. Ladney*, 181 N.W.2d 828, 832 (Mich. App. 1970) ("the language of 2709(1) which allows a suit for the price 'when the buyer fails to pay the price as it becomes, due,' implies the completion of contractual conditions precedent to payment before the seller can sue on the price. . . . the seller must complete the machine and tender performance consistent with the contract before it can sue on the price."); *accord E–Z Roll Hardware Mfg. Co., Inc. v. H & H Prods & Finishing Corp.*, 4 U.C.C. Rprt. 1045, 1047–48 (N.Y. Civ. Ct. 1968) ("A seller … who elects to cease manufacture on repudiation by the buyer does not have an action for the purchase price as such"); *Rowland Meledandi, Inc. v. Kohn*, 7 U.C.C. Rptr. 34 (N.Y. Civ. Ct. 1969) (same).

156)     On the other hand, during the November 26, 2008 telephone conversation, L.L. Bean did agree to pay the full face amount of the purchase orders minus whatever Worcester was able to save by stopping production.  Thus, what the parties agreed to on November 26, 2008 was different than the section 2-708(1)(b) remedy of contract price plus incidental costs minus market value and expenses saved.

What they agreed to was, in substance, a hybrid of the UCC remedies in sections 2-708 and 2-709 and could be characterized as a modified seller's remedy, as allowed by the UCC. *See* 11 M.R.S. § 2-719(1) (parties to a sales contract may agree to "remedies in addition to or in substitution for those provided in this Article and may limit or alter the measure of damages recoverable under this Article").

## L.L. BEAN'S REQUESTS FOR CESSATION OF PRODUCTION AND WORCESTER'S RESPONSE

157) In early December, L.L. Bean requested that Worcester stop production of certain products. On December 9, L.L. Bean told Worcester to stop production of all products. (Joint Stipulations, ¶¶ 17-18; Ex. 80, 81, 82, 83, 84; Michael Worcester, Day 9 at 26).

158) Morrill Worcester was made aware of the requests and gave orders to stop production of the items L.L. Bean had identified. (Morrill Worcester, Day 8 at 209).

159) Worcester released production workers that Worcester concluded that it could safely release as a result of the cessation of production. (Michael Worcester, Day 9 at 32). By December 10, 2008, however, Worcester's production was essentially completed for the season, having already made 95% of the products it completed that year.

160) After the stop order, Worcester's production on most items was stopped entirely, with some items continuing on skeleton crew levels, with production down to extremely small numbers. In fact, all wreath manufacturing stopped by December 12, with the remainder of production limited to certain centerpieces and a tartan tree. (Ex. 253).

161) Worcester did not release its entire support staff because Worcester was

36

still making some balsam products for L.L. Bean, and Worcester was also concerned that if it released those workers it could not get them back in the event that a need for their services unexpectedly arose. (Michael Worcester, Day 9 at 32-33).

162) Up to and including December 20, 2008, Worcester continued production of only four to five product types (or SKUs) out of the 22 product types Worcester produced in 2008, and only on a very limited basis after L.L. Bean had requested that Worcester stop production. (Michael Worcester, Day 9 at 28, 31; Ex. 253).

163) Worcester continued shipping only a very small amount L.L. Bean products up to and including December 23, 2008. (Michael Worcester, Day 9 at 32).

164) As a cost savings, as a result of stopping production, Worcester did not have to pay Worcester Holdings the $.45 per pound for balsam tips for all of the items reflected in L.L. Bean's purchase orders. (Morrill Worcester, Day 3 at 604-612).

L.L. BEAN DISTRIBUTION OF WORCESTER'S FINISHED GOODS

165) By the end of the 2008 season, Worcester had manufactured 315,580 units, more than 40,000 units beyond what L.L. Bean had been able to sell to customers. (Joint Stipulations ¶¶ 19-21). Worcester shipped 271,554 items to customers and did not ship the rest. Consistent with its obligations under the 2008 letter agreement, L.L. Bean paid Worcester for the 315,580 units and took possession of approximately 20,000 finished units in the form of wreaths and gave them away to L.L. Bean customers and employees. (Ex. 489; Fessenden, Day 4 at 954; Holden, Day 6 at 1365).

166) L.L. Bean left approximately 20,000 finished units on Worcester's premises. (Scott, Day 8 at 31). Worcester did not incur any direct shipping costs on these goods. Although Worcester testified that it disposed of these goods, and that it

37

did not salvage any components from them, it provided no evidence of any expenses incurred in such disposal nor has it made any claim against L.L. Bean for such expenses.

### THE END OF THE 2008 SEASON AND WORCESTER'S DECEMBER 31, 2008 INVOICE TO L.L. BEAN

167) By the end of the 2008 season, Morrill Worcester believed that Worcester had met all of L.L. Bean's expectations and requirements for the 2008 season. (Morrill Worcester, Day 2 at 408; Ex. 24). Although L.L. Bean still had serious concerns with Worcester's viability as a vendor, Worcester had made progress over the course of the year in addressing the concerns Rol Fessenden had conveyed to Worcester early in 2008. (Fessenden, Day 4 at 956-957). At the end of 2008, William Holden, who had primary responsibility for L.L. Bean's relationship with Worcester, assumed that Worcester would be doing business with L.L. Bean in the 2009 season. (Ex. 93, 96; Holden, Day 6 at 1377).

168) "Year-end" was when Worcester customarily sent a final invoice to L.L. Bean for the just-ended season. Morrill and Michael Worcester consulted with Worcester's financial advisor, Robert Bruce, on Worcester's final bill to Bean. (Ex. 85, 86).

169) Robert Bruce advised Worcester to bill L.L. Bean for the full amount of the remaining value on the combined purchase orders L.L. Bean had placed for 389,664 balsam items. (Ex. 87). Worcester was under great pressure from Chittenden, its financing bank, to repay the line of credit, which as of early 2009 stood at more than $1.4 million, according to Morrill Worcester. (Ex. 96).

170) Mr. Bruce's view was that the 2008 letter agreement was a "take-or-pay" contract, under which L.L. Bean was committing itself unconditionally to pay the amount due for all units covered in its purchase orders, whether or not it needed or even

38

took delivery of the units involved.[+] Although the term "take-or-pay contract" may not be a widely used term of art outside the oil and gas industry, it fairly captures the unconditional nature of L.L. Bean's contractual commitment for the 2008 season, at least as it stood before the November 2008 oral modification.

171) Like Mr. Fessenden on L.L. Bean's side of the table, Mr. Bruce was not a party to the November 2008 conversation on behalf of Worcester, and it seems likely that, like Mr. Fessenden, he was not made fully aware of the oral agreement reached in that conversation. Their incomplete grasp of the oral agreement may help explain why the positions that each took on behalf of their respective principals—Mr. Bruce in insisting that L.L. Bean had to pay in full before any consideration of credit for Worcester's savings would be given, and Mr. Fessenden in proposing in his March 2, 2009 communication that Worcester accept a different and potentially less favorable resolution than was discussed between the Worcesters and Mr. Holden and Ms. Richards on November 26, 2008—were deemed unacceptable by the other.

172) Worcester had never before charged L.L. Bean for unfinished products. (Joint Stipulations, ¶ 24). On the other hand, under the parties' 2008 letter agreement, as modified by the November 26, 2008 conversation, Worcester was entitled to be paid for the products reflected in L.L. Bean's purchase orders, whether or not they were needed or finished, less any costs Worcester could save by not continuing to make those products after L.L. Bean directed it to stop production. (Ex. 68).

173) Thus, if a particular unit was only partially finished as of when L.L. Bean

---

[+] A take-or-pay contract is one in which the purchaser of goods agrees to pay for goods ordered regardless of whether the purchaser takes delivery. "The buyer would be motivated to enter into a take-or-pay contract to be reasonably confident that a minimum quantity of the goods desired would be available on a regular basis. The seller would be motivated by the steady cash flows and assured market for its product." *See* B. Jarnagin, Master GAAP Guide, at 533 (CCH 2008). Take-or-pay contracts are common in the energy industry, if not in the balsam product industry.

directed Worcester to stop production of the SKU for that unit, L.L. Bean would be liable to pay Worcester the purchase order price of that unit, minus any costs Worcester did save or could reasonably have saved by not having to complete the unit.

174) Jill Stevens, the bookkeeper for Worcester prepared an invoice for L.L. Bean dated December 31, 2008 for the balance due from L.L. Bean on the full amount of the purchase orders, plus other charges. (Ex. 88; Stevens, Day 6 at 1415-1419).

175) The December 31, 2008 invoice also included a charge for products that L.L. Bean had ordered and that Worcester had converted into finished goods but for which L.L. Bean had no customers. (Ex. 87; Stevens, Day 6 at 1415-1419).

176) On January 5, 2009, William Holden asked Morrill Worcester if Worcester would hold its 2009 prices to 2008 levels. Morrill Worcester agreed that Worcester would do so. (Ex. 498; Holden, Day 6 at 1358). Given the 2008 economic downturn, this request was made of all of L.L. Bean's vendors, not just Worcester. (Holden, Day 6, 1357).

177) When Morrill Worcester instructed Jill Stevens to send the December 31, 2008 invoice to L.L. Bean, he expected Worcester and L.L. Bean would have a year-end meeting sometime early in 2009 to wrap up the 2008 season and to make plans for a possible 2009 season. (Stevens, Day 6 at 1415, 1457; Morrill Worcester, Day 2 at 400-402).

178) On January 7, 2009, Jill Stevens forwarded the December 31, 2008 invoice to Kim Best, a contact at L.L. Bean to whom, at the end of the preceding production and sales year, Jill Stevens had sent the year end invoice. Jill Stevens sent the invoice by telefax. (Ex. 65, 89; Stevens, Day 6 at 1412-1413, 1415).

THE PARTIES' DISCUSSIONS SURROUNDING WORCESTER'S YEAR-END INVOICE AND THEIR EFFORTS TO RESOLVE THEIR DIFFERENCES

40

179) The invoice was forwarded to William Holden, who contacted Morrill Worcester to ask him about it. William Holden spoke to Morrill Worcester and Robert Bruce on January 9 and January 15, 2009. (Ex. 93; Holden, Day 6 at 1370-1373).

180) During those conversations, Messrs. Worcester and Bruce explained that Worcester had to submit an invoice for the full amount remaining on the invoice because Worcester needed L.L. Bean to pay Worcester so Worcester could in turn pay the approximately one million dollars Worcester owed to Chittenden Bank, the bank that had issued the line of credit enabling Worcester to finance L.L. Bean's purchase orders for the 2008 season. (Ex. 93; Holden, Day 6 at 1370-1378).

181) In the course of those conversations, Robert Bruce told William Holden that Worcester had to pay off the balance on its line of credit with Chittenden Bank by March 31, 2009. He also told L.L. Bean that if Worcester paid off the line of credit, Worcester would be able to automatically renew the line of credit for the 2009 season. (Bruce, Day 6 at 1541-1542).

182) When Mr. Holden reminded Morrill Worcester of Worcester's commitment to pass along savings, Mr. Worcester acknowledged the agreement, but he and Mr. Bruce suggested that Worcester could credit L.L. Bean with those savings in the forthcoming season. In the meantime, they said, Worcester needed L.L. Bean to pay Worcester's invoice in full. In response, Mr. Holden said that he was willing to consider Worcester's proposals on how to pass the savings along to L.L. Bean, but he did not agree to Worcester's request to be paid the full price on the final invoice first. (Holden, Day 6 at 1379, 1394).

183) Worcester's position that L.L. Bean should pay the full balance due on the purchase orders before Worcester credited L.L. Bean with the cost savings resulting

41

from the cessation in production was not inconsistent with the parties' November 26, 2008 oral agreement, to which both Mr. Worcester and Mr. Holden had been party, nor was it necessarily consistent with the oral agreement. The parties never discussed on November 26, 2008 how or when L.L. Bean would be credited with Worcester's savings—they only agreed to be "fair" with each other.

184) Thus, based on the firm commitment to purchase orders that Worcester had obtained from L.L. Bean in the 2008 letter agreement and that Worcester had insisted on maintaining in the face of L.L. Bean's request to curtail production, it was not unreasonable for Worcester to assume that it would be paid on those purchase orders and the amount and timing of L.L. Bean's credit for Worcester cost savings would be worked out later. On the other hand, it was also not unreasonable, based on Worcester's oral promise to credit L.L. Bean with Worcester's savings resulting from the curtailment of production, for L.L. Bean to assume that at least some amount in savings would be shown as a deduction on Worcester's final invoice.

185) Had the parties continued the discussion on November 26 to the point of defining how Worcester's savings would be quantified and returned to L.L. Bean, they might have achieved a meeting of the minds on precisely what cost savings Worcester would credit to L.L. Bean and how the credit would be applied in the context of L.L. Bean's payment for the purchase orders. As it was, the parties' failure to resolve the impasse on which would occur first—L.L. Bean's payment or Worcester's reduction of its invoice—and their apparent inability to accept each other's point of view when the issue surfaced in early 2009 brought to light the fundamental absence of a meeting of the minds on those crucial details during the November 26, 2008 conversation.

186) Starting in January, Worcester began to develop a proposal to submit to

42

L.L. Bean regarding how Worcester would return its cost savings to L.L. Bean. Morrill Worcester made some handwritten calculations of what Worcester could return to L.L. Bean in savings, and came up with a savings amount in excess of $600,000. (Ex. 143). With Mr. Bruce's assistance, Worcester generated a spreadsheet toward the end of January showing a "Total 09 Discount" of $646,083.73, consisting of $303,526.29 in what the document calls "Avoided Cost" and $342,557.34 in "Value of Components." The spreadsheet appears to quantify future discounts from Worcester to L.L. Bean rather than Worcester's savings in 2008 as a result of stopping production, although the reference to "Avoided Cost" plainly suggests otherwise.

187) On January 16, 2009, Morrill Worcester forwarded to William Holden via e-mail a proposal for Worcester to pass production savings back to L.L. Bean. (Ex. 93, 95).

188) After reviewing Morrill Worcester's proposal in the January 16 e-mail, Mr. Holden remained receptive to seeing if Worcester and L.L. Bean could work out an agreement which would include Worcester passing production savings along to L.L. Bean in Worcester discounts or other reductions of 2009 business charges. (Holden, Day 6 at 1379,1381-84).

189) On February 11, 2009, Morrill Worcester called William Holden and proposed that Worcester and L.L. Bean agree on an auditor who could assess Worcester's production savings to the satisfaction of Worcester and L.L. Bean. (Ex. 96; Holden, Day 6 at 1384-1387). In that conversation, Mr. Worcester maintained his position that L.L. Bean should pay Worcester the full amount of the invoice before Worcester returned cost savings on to L.L. Bean. (Ex. 96; Holden, Day 6 at 1384-1387). However, Mr. Worcester acknowledged that his legal counsel had advised him

43

that, because Worcester had agreed to cut production and pass along saved costs, Worcester would likely not be able to recover the full amount due under the L.L. Bean purchase orders. (Ex. 96).

190)    On February 13, 2009, Morrill Worcester advised William Holden that Worcester was willing to provide guarantees to L.L. Bean that it would pass its production savings on to L.L. Bean, but reiterated that Worcester needed L.L. Bean to make payment on the invoice before Worcester would be in a position to pass back its savings to L.L. Bean. (Ex. 96).

191)    L.L. Bean considered Morrill Worcester's proposals of February 11 and February 13, 2009, (Holden, Day 6 at 1387), but the impasse on which would occur first—L.L. Bean's payment of Worcester's invoice in full or Worcester's return of savings to L.L. Bean as a credit on the invoice—remained unresolved.

192)    On March 2, 2009, Rol Fessenden sent an e-mail to Morrill Worcester proposing terms based on which L.L. Bean and Worcester could close out the 2008 business. (Ex. 100; Fessenden, Day 4 at 985, 987). The e-mail made reference to Worcester's honoring L.L. Bean's stop-production requests and noted that L.L. Bean had paid Worcester for about 315,000 finished units. The e-mail proposed to pay Worcester for its "gross margin—selling price less labor and materials—on the gap between our initial PO of 344,725 units and the [315,580] units we have already paid for." (Ex. 100).

193)    Mr. Fessenden's March 2, 2009 e-mail proposed that L.L. Bean and Worcester enter into a bailment agreement covering "the excess components that you are holding . . . similar to the agreement that we executed last year." The new bailment agreement would cover "approximately $450,000 worth of components," and would be

44

"subject to our assessment of [Worcester's] audited financial statements . . ." (Ex. 100).

194) L.L. Bean's March 2, 2009 proposal was inconsistent with the parties' November 26, 2008 modification of the 2008 letter agreement in two significant respects, possibly because Mr. Fessenden was not familiar with the details of the November 26, 2008 agreement. First, L.L. Bean's proposal failed to recognize that Worcester had insisted in the November 26, 2008 conversation on retaining the benefit of all of L.L. Bean's purchase orders, not just the initial set, and it therefore failed to address Worcester's expectancy under the second round of purchase orders issued in September 2008. Second, the November 26, 2008 agreement called for a different equation for calculating Worcester's entitlement—for L.L. Bean to be credited against the total amount due under the purchase orders for Worcester's saved costs, and not, as the March 2 e-mail proposed, for Worcester to be paid its "gross margin."

195) After Worcester received Rol Fessenden's e-mail of March 2, 2009, Michael Worcester forwarded the e-mail to Robert Bruce, asking for Mr. Bruce's reaction to L.L. Bean's proposal. Mr. Bruce responded in an e-mail by saying that the proposal was "not close to helping you" and said he would look for support in the parties' exchanges for the concept that both parties intended L.L. Bean's purchase orders to be "take-or-pay." (Ex. 101).

196) In a lengthy e-mail from Morrill Worcester to Mr. Fessenden dated March 6, 2009, Worcester responded to L.L. Bean's March 2 proposal. Worcester's March 6 response summarized Worcester's understanding of the 2008 letter agreement and the discussions leading up to it; the "take-or-pay" nature of L.L. Bean's purchase orders; the effect of the November 26, 2008 oral agreement; and Worcester's commitment to return savings to L.L. Bean in the form of "discounts" in the 2009

45

season. The e-mail said that L.L. Bean's failure to pay Worcester's invoice put Bean "in default of its obligations to make timely payment." Worcester pointed out that Worcester had agreed not to increase its prices in 2009, and that the discounts it would offer L.L. Bean for the 2009 season would total about $500,000 for about 77,000 items. The e-mail closed with a reiteration of Worcester's interest in continuing to supply L.L. Bean, but said its ability to secure the financing necessary to enable it to do so was dependent on L.L. Bean satisfying its "take-or-pay obligations from the 2008 season." (Ex. 102).

197) In late March or early April of 2009, Robert Bruce contacted Gregory Sanborn of Baker, Newman & Noyes in an effort to move the concept of an audit of Worcester's cost savings forward as a means of resolving the impasse. He sent Mr. Sanborn Morrill Worcester's preliminary cost savings calculations of $646,000 with the request that Mr. Sanborn keep it confidential. (Bruce, Day 6 at 1544-1545; Ex. 143).

198) During March 2009, discussions aimed at resolving the impasse continued—L.L. Bean and Worcester were able to agree on a partial payment by L.L. Bean, but the balance became a sticking point. L.L. Bean wanted Worcester to relinquish any claim to the balance, but Worcester refused, claiming that Chittenden Bank would not permit it to sign a release. (*See* Ex. 553).

199) On March 25, 2009, Rol Fessenden developed a new proposal for resolving the impasse over the December 31, 2008 invoice. (Ex. 113, 549). The terms included a provision for L.L. Bean to purchase and take actual possession of the components that L.L. Bean assumed Worcester had obtained for the 2008 season and retained on hand. (Ex. 549; Fessenden, Day 4 at 1002).

200) Rol Fessenden forwarded his March 25, 2009 settlement proposal to

46

Morrill Worcester with a cover letter dated March 30, 2009. (Ex. 113; Fessenden, Day

4 at 1005). The March 30 cover letter read as follows:

> Bean is prepared to resolve the 2008 invoices consistent with our interpretation of the letter agreement. See attached [the March 25, 2009 letter]. The offer is dependent on you signing a release from potential litigation. Even though you have agreed to payment based on that offer, you will not sign the release from potential litigation. I cannot issue you any payment until the release is signed.
>
> As previously discussed, I cannot issue purchase orders for 2009 to Worcester Wreath until I have received your 2008 audited financial information, in order to confirm your ability to finance the business. We are moving forward with alternative suppliers.

(Ex. 113).

201)    On the same day, March 30, 2009, with Chittenden's March 31 deadline for paying off the line of credit at hand, Morrill Worcester forwarded a settlement proposal in the form of an e-mail message to L.L. Bean, in which Worcester proposed that L.L. Bean pay Worcester, not the full amount of Worcester's December 31, 2008 invoice, but rather $1,171,749, the balance due to Chittenden on Worcester's line of credit. The March 30 message emphasized that Worcester would lose the line of credit for the 2009 season if it failed to pay the balance due, and therefore that its viability as a business was in jeopardy if the line were not paid. It also said that, although Chittenden would not permit Worcester to sign a release for the lesser amount Worcester and L.L. Bean had previously negotiated, Worcester could give L.L. Bean a release if Bean paid Worcester enough to pay off the line of credit.  (Ex. 143, 553; Morrill Worcester, Day 8 at 219).

202)    Rol Fessenden testified that he did not believe that he saw Worcester's March 30, 2009 proposal before sending his proposal to Worcester that same day. (Fessenden, Day 4 at 1009).

203)    Neither L.L. Bean's proposal to Worcester of March 30 or Worcester's proposal of the same came to fruition, and Worcester missed Chittenden's March 31 deadline for paying off the line of credit. As a result, Worcester lost its right to an automatic renewal of the line of credit to cover expenses for the upcoming 2009 season. (Morrill Worcester, Day 8 at 219, Day 2 at 421).

204)    Around the end of March or the beginning of April 2009, William Holden advised Worcester that L.L. Bean had decided to allocate 30 to 40 percent of its balsam products business to Worcester and the balance to other vendors. Morrill Worcester was very upset at the idea of L.L. Bean turning to other vendors to supply it

48

with balsam products, and left a voicemail message with Mr. Holden to the effect that Worcester wanted to have all of L.L. Bean's balsam products business or none of it. (Morrill Worcester, Day 4 at 467-68).

205) When Michael Worcester learned of his father's message, he promptly contacted Mr. Holden to say that his father's message did not reflect Worcester's position, and that Worcester wanted to continue doing business with L.L. Bean. He and Mr. Holden discussed how much of L.L. Bean's balsam products business for 2009 Worcester needed to get in order to survive, and Michael Worcester mentioned a figure of 200,000 units. Mr. Holden seemed receptive to that idea. (Michael Worcester, Day 9 at 34-37).

206) The month of April 2009 saw Worcester trying to salvage what it could of L.L. Bean's business by addressing L.L. Bean's concerns about Worcester's financing. (Michael Worcester, Day 9 at 39). Worcester's default on the credit line had only enhanced L.L. Bean's concerns about Worcester's financial viability with regard to meeting L.L. Bean's balsam product requirements for the 2009 season, and the impasse over payment of the 2008 year-end invoice did not help Worcester in its quest to retain at least some of L.L. Bean's business.

207) During April 2009, Worcester was also trying to convince Chittenden Bank to extend financing for the 2009 season. Moreover, Worcester had begun actively exploring ways of expanding its sales to other customers in March 2009, when the future of its relationship with L.L. Bean fell increasingly into question. (Michael Worcester, Day 9 at 43-45; Ex. 113). As of the 2008 season, its sales to L.L. Bean represented about 90% of Worcester's sales, and Morrill Worcester knew of no other potential customer that sold balsam products on the scale of L.L. Bean. (Morrill

49

Worcester, Day 8 at 230-233).

208)    As part of the overture to Chittenden, Morrill Worcester generated sales projections for 2009, based on prospective sales to its existing customers, such as L.L. Bean and 1-800-FLOWERS, as well as sales to potential new customers, including Wal-Mart. (Ex. 134). He sent those projections to Robert Bruce, who turned them into financial projections. (Ex. 136).

209)    Eventually, Morrill Worcester's 2009 sales projections, with input by Mr. Bruce, were shared with Chittenden and several other sources of potential financing for Worcester. (Ex. 137, 138, 140). However, at least some of the projections were dramatically overstated to the point of being outright incorrect and misleading. For example, Worcester referred to Wal-Mart as a customer who had made actual commitments, when in fact Worcester's overtures to Wal-Mart had not generated any tangible result in terms of a commitment by Wal-Mart to do business with Worcester. (*Compare* Ex. 140 *with* Morrill Worcester, Day 1 at 134-46, 146-48).

210)    In fairness, Worcester did have various discussions with Wal-Mart about a business relationship, so the misstatements may have resulted more from Worcester's overly optimistic view of its prospects with Wal-Mart than an intent to mislead Chittenden or other prospective financing sources. However, the fact remains that Morrill Worcester generated what he had to have known was false information about Worcester's existing customer base that he knew would be circulated by Mr. Bruce to potential sources of financing.

211)    In its efforts to persuade L.L. Bean to place orders for the 200,000 units Mr. Holden had said he was willing to consider, Worcester found itself in somewhat of a cleft stick. On the one hand, before providing Worcester with any specific

50

commitments to product lines and quantities, L.L. Bean required Worcester to show that it was financially stable and that it had obtained financing to manufacture the 200,000 units. On the other hand, in order to obtain that financing, Worcester had to show its financing source the very type of specifics L.L. Bean was not prepared to provide. (Michael Worcester, Day 9 at 38).

212)   Eventually, L.L. Bean decided to discontinue its long relationship with Worcester, and notified Worcester by means of a May 1, 2009 letter to Morrill Worcester from Rol Fessenden. (Ex. 123; Michael Worcester, Day 9 at 39). Worcester responded the same day, acknowledging the end of the relationship but expressing the hope that L.L. Bean might reconsider. (Ex. 124).

213)   During the rest of 2009 and thereafter, Worcester made some efforts to generate new business, mainly by contacting potential customers by e-mail, but also by going to trade shows. (Michael Worcester, Day 9 at 43-44, 55-67).

214)   Over the more than two years since losing L.L. Bean's business, Worcester's efforts have resulted in it having more commercial customers for balsam products (although not more volume). (Michael Worcester, Day 9 at 53-54).

215)   Michael Worcester estimated Worcester's total volume of sales to commercial customers as of October 2011 at about 60,000 units. (Michael Worcester, Day 9 at 53). In 2010, however, Worcester sold in excess of 250,000 units for well over $2.5 million (Ex. 304). Worcester has also experienced an increase in the volume of its sales to Wreaths Across America. (Michael Worcester, Day 9 at 53).

216)   In 2010, based on Worcester's claim that it had substantial excess component inventory that it had not been able to use in products or re-sell, Rick Ordway returned to Worcester's facility to do an assessment of unused component

51

inventory.

217)    During his 2010 visit to Worcester's facility, Mr. Ordway observed "a lot" of inventory that did not appear to be segregated by customer. He also observed in 2010 that there were kits stored with shrink-wrap around the cages, protected in plastic, and he did not observe any deterioration of components. (Ordway, Day 9 at 148). He did not attempt to do a complete inventory of Worcester's components. (Ordway, Day 9 at 170).

218)    Because Worcester does not separate its component inventory by the customer for whom it was purchased, and because components used in L.L. Bean products are quite similar to those used in Worcester's own products sold from its website as well as the products it makes for other customers, a visual inspection would not readily enable one to differentiate between components were attributable to L.L. Bean products and components attributable to other products.

219)    However, based on inventory and other records provided by Worcester, including Worcester's invoices for purchases of components, Mr. Ordway concluded that any component inventory as to which L.L. Bean had made a commitment for the 2007 season or the 2008 season had been used up by Worcester in making the 315,580 units made by Worcester in 2008, and paid for by L.L. Bean. (Ordway, Day 9 at 163-64).

THE RESULTS OF THE 2008 SEASON IN TERMS OF SALES, PAYMENTS AND LEFTOVER COMPONENTS

220)    The parties agree that during the 2008 season Worcester actually finished 315,580 units of balsam products at L.L. Bean's request, all of which were paid for by L.L. Bean. (Joint Stipulations, ¶ 20; Ex. 89, 147, 175, 495, 526). Based on the difference between that number and the 389,664 units ordered, the parties agree that

52

there were 74,085 units reflected in L.L. Bean's purchase orders, but not made by Worcester. (Joint Stipulations, ¶¶ 14, 20).

221) The parties are in agreement that the total amount of goods actually purchased by L.L. Bean customers (and presumably direct shipped to them by Worcester) was 271,554 units. (Joint Stipulation ¶ 21).

222) The parties are in agreement that the total amount of the May 5, 2008 purchase orders and the September 22, 2008, purchase orders is $6,682,915. (Ex. 178, 448, 456). The parties also agree that the amount of payments to Worcester made by L.L. Bean with respect to the 2008 season is $5,497,306. (Ex. 147). The difference between the two numbers is $1,185,609. That figure represents L.L. Bean's outstanding obligation under the 2008 purchase orders reflecting the 74,085 items that L.L. Bean ordered but Worcester did not complete, before any of the adjustments that both parties claim should be made.

223) Worcester's decision to purchase about $456,000 in component inventory is significant and revealing in several respects.

224) The fact that Worcester purchased those additional components in 2008 means that Worcester assessed its inventory of leftover components on hand as of early 2008, and decided that an additional $456,000 worth of components—no more, no less—were needed to meet L.L. Bean's 2008 forecast plus reserve totaling 446,115 units.[5]

225) As noted earlier, Worcester's total leftover component inventory at the

_____

[5] Some of Worcester's 2008 component purchases may have been for products destined for other customers. However, because L.L. Bean accounted for such a high percentage of Worcester's anticipated business, and because L.L. Bean's commitment to 2008 component purchases was capped at $80,228, the small percentage of the $456,000 component purchases in 2008 that may have reflected products for other customers becomes ultimately irrelevant and unnecessary to factor into the analysis.

53

end of the 2007 season was listed in its 2007 tax return at $1,462,326. Based on L.L. Bean accounting for 90% of Worcester's business, nearly all of those components were suitable to be used in L.L. Bean's products, although, as noted earlier, not more than $600,000 worth were components that L.L. Bean had committed itself to.

226) At an average of $4 worth of components incorporated into one finished unit for L.L. Bean, the total of 446,115 units reflected in L.L. Bean's forecast plus reserve would require a total of about $1,785,000 in components. Worcester's 2008 component purchase of $456,000 implies that Worcester had the remaining $1,330,000 worth of needed components in leftover component inventory from the 2007 season. The $1,462,326 value assigned to leftover components purchased for L.L. Bean and other customers in Worcester's tax return tends to confirm the accuracy of that conclusion.

227) Worcester's practice was to use leftover components before new components, so in 2008 it would have used the leftover components before the newly purchased ones. Because Worcester finished and received payment for 315,580 units, and because the $1.2 million component cost associated with those units would nearly equal the $1,330,000 cost of the leftover components, Worcester's FIFO practice of using leftover components first means that Worcester used nearly all of its leftover components to make the 315,580 units that it finished. (Ordway, Day 9, pgs. 158–59).

228) Thus, whatever components Worcester had left after finishing 315,580 units must have consisted mainly of the newly purchased components that, unlike leftover components from prior years, were subject to the $80,228 cap negotiated in the 2008 letter agreement.

229) Clearly, the foregoing calculations are not exact. For example, they do

54

not take account of the fact that some SKUs require more than $4 worth of components per unit, and some SKUs call for less. To the extent, L.L. Bean's purchase orders contained a mix of products tilted toward units that use a lesser dollar value or greater dollar value in components than the $4 average, the calculations as to the value of components required to make a given number of units theoretically might be under- or over-estimates.

230) However, the evidence supports a finding that, across the mix of units involved in the 2008 season—both those specified in the forecast and reserve and those actually finished—an average component value of $4 is reasonable and applicable.

231) What this means is that, given that Worcester had on hand $1,785,000 in inventory to make up to 446,115 units, and given that Worcester finished 315,580 units incorporating about $1.2 million worth of components, there remained about $585,000 worth of components on hand after the 2008 season that were not incorporated into the finished units.

232) Because of Worcester's FIFO practice of using older components first, most of the $585,000 in components left over after the 2008 season necessarily had to consist of the $456,000 worth of components purchased in 2008 as to which L.L. Bean had made a commitment capped at $80,228. The rest consisted of components left over from the 2007 season.

233) At this point, the analysis shifts to the merits of the parties' claims and defenses. As a threshold matter, L.L. Bean's defense of intentional breach must be addressed, because L.L. Bean contends that the alleged willful breach precludes Worcester from recovering any damages, at least on a contract theory, and perhaps at all.

## II. L.L. Bean's Affirmative Defense of Intentional Breach

234) L.L. Bean claims that, in issuing its year-end invoice for the full amount claimed due with no reduction for savings achieved by reducing production, Worcester intentionally breached its promise in the November 26, 2008 conversation to credit L.L. Bean with such savings. Because Worcester's breach was willful, L.L. Bean argues, it is not entitled to any damages for breach of contract. L.L. Bean also relies on Worcester's Article 2 duty of good faith in the performance of its contract. *See* 11 M.R.S. § 1-1304.

235) Maine law affords legal support for L.L. Bean's position that a party's willful breach of contract may preclude the party's recovery of any damages for breach of the contract. *See Carvel Co. v. Spencer Press, Inc.*, 1998 ME 74 ¶ 8 n.2, 708 A.2d 1033 (recovery barred by "willful breach of the contract"); *Levine v. Reynolds*, 54 A.2d 514, 519 (Me. 1947); *Veazie v. City of Bangor*, 51 Me. 509, 512 (1863).

236) However, the facts simply do not support L.L. Bean's position.

237) Nothing in the November 26, 2008 conversation specifically addressed when or how Worcester would credit L.L. Bean with savings resulted from cutting back production. In other words, Worcester's repeated demand for payment in full of the invoice before savings were returned to L.L. Bean was not explicitly contrary to anything that the parties discussed on November 26, 2008.

238) L.L. Bean may have assumed that Worcester would be deducting savings from its invoice, just as Worcester in fact assumed that L.L. Bean would receive credit for the savings in the form of discounts during the following season. Neither assumption is contrary to the letter or spirit of what was discussed.

239) Another reason for the court's view is that from the outset, Worcester acknowledged its obligation to return savings resulting from the production cutback to

56

L.L. Bean in some fashion. Had it denied any such obligation, L.L. Bean's breach argument might be better founded. However, at least up to the beginning of May 2009, when Worcester learned that it would not be getting business again from L.L. Bean, Worcester was actively trying to get L.L. Bean to pay the invoice on the basis that Worcester would return savings later. The parties' dispute in early 2009 was as to when and by how much, not as to whether, Worcester would honor its oral agreement to credit L.L. Bean with savings.

240) Worcester insisted on purchase orders as part of the parties' 2008 agreement because of their contractually binding nature, in order to satisfy its financing bank. Based on Worcester's view of the purchase orders as being "take-or-pay" obligations—meaning that L.L. Bean had to pay the amount of the purchase orders whether or not it took delivery of all items ordered—and based also on Worcester's assumption that it could return savings later through future discounts, Worcester took the position that L.L. Bean was required to pay the full amount of the purchase orders immediately, with the amount to be credited back to L.L. Bean a separate matter to be worked out later, and therefore that L.L. Bean's failure to pay was a default in its contractual obligations.

241) Given the nature of purchase orders in general and given Worcester's insistence in the November 26, 2008 conversation that L.L. Bean honor the purchase orders, Worcester's position was not without legal justification.

242) It is also significant that at the time L.L. Bean did not interpret the invoice as a breach of contract. Rather, given that it had asked, and Worcester had agreed, for production to be reduced and for Worcester's savings to be credited, L.L. Bean simply did not think it should have to pay the full amount of the invoice. L.L.

57

Bean's position was also not without justification.

243) The reason why both parties' positions in the impasse over the invoice were justified is that in their November 2008 oral agreement there was no meeting of the minds on the material term of what savings would actually be credited to L.L. Bean, by what means and when.

244) Finally, at least under L.L. Bean's current view of the savings, Worcester could not possibly have shown all of its savings as a deduction in the year-end invoice, because some of those savings would not be realized until the 2009 season began or later. In that regard, Worcester's concept of returning the savings to L.L. Bean in the form of a discount in 2009 made sense.

245) Because Worcester's submittal of the year-end invoice for 2008 was not a breach of any contractual agreement between the parties, the doctrine of intentional breach is irrelevant and of no merit. The analysis proceeds to the elements of Worcester's claim and the deductions that should be made from it.

### III. Worcester's Entitlement, Before Any Deductions, for the 2008 Season

246) The starting point for valuing Worcester's claim is the $6,682,915 in purchase orders issued by L.L. Bean. However, Worcester claims to be entitled to several different amounts above and beyond the purchase order total.[6] These additional amounts are:

- $173,794.56 in what Worcester characterizes as unpaid direct ship fees on the 271,554 units actually shipped to L.L. Bean customers.

- $94,564.73 for units sold to L.L. Bean above the quantities of those types of units called for in the L.L. Bean purchase orders.

---

[6] In its complaint, Worcester claimed damages due to extra interest costs incurred on a line of credit. This court has previously ruled that such costs are recoverable, *see* Order on Plaintiff's Motion for Partial Summary Judgment at 16 (Feb. 16, 2011), but Worcester did not pursue the claim at trial and the issue is thus not considered further.

- a further amount reflecting L.L. Bean's commitment in 2008 and prior seasons to reimburse Worcester for the cost of components that could not be used in L.L. Bean products in a future season.

WORCESTER'S CLAIM FOR DIRECT SHIP FEES

247) The parties agree that Worcester shipped some 271,554 units to L.L. Bean customers, and that L.L. Bean was supposed to pay Worcester a fee of $0.64 per item shipped (known as a "fulfillment cost" or a "direct ship fee"). Worcester asserts that it is entitled to $173,794.56 in direct ship fees for shipping those units, above and beyond the purchase order amounts.

248) L.L. Bean objects, claiming that the evidence indicates L.L. Bean has already paid direct ship fees because Worcester has apparently included those fees in the unit cost of products paid by L.L. Bean. (Ex. 175, 180; Holden, Day 5, at 1219–20). In addition to contesting Worcester's claim for $173,794.56 in direct ship fees for the items that Worcester actually shipped to customers, L.L. Bean claims it is entitled to a $0.64 refund on all of the items for which it has paid that were not shipped.

249) The basis for L.L. Bean's contention lies in Worcester's responses to L.L. Bean's discovery requests regarding Worcester's costs. *See* Worcester's Second Supplemental Answers to Plaintiff's First Set of Interrogatories, Worcester's Supplemental Answers to Plaintiff's First Set of Interrogatories (Ex. 237, 238; Dunham, Day 9 at 184). Worcester's discovery responses show a $0.64 shipping fee built into Worcester's cost per item. Thus, L.L. Bean claims Worcester's shipping fee claim amounts to a double charge to L.L. Bean, and should therefore not be recognized. (Holden, Day 5 at 1220-22; Dunham, Day 4 at 1064-68, Day 9 at 183-84).

250) Michael Worcester testified that this was a mistake, but was unable to explain or resolve the mistake during his testimony. (Michael Worcester, Day 9 at 72–

59

73).

251) For several reasons, the court concludes that Worcester is entitled to an award of $173,794.56 for direct ship fees on the 271,544 items shipped to L.L. Bean customers in 2008.

252) Worcester had been a direct ship vendor to L.L. Bean for five or six years. (Holden, Day 6 at 1400). During that time, L.L. Bean had obtained data from Worcester about Worcester's costs included in the product price, and no direct ship fee had ever been shown in that data breaking down item costs. (Holden, Day 6 at 1400-02)

253) Although the record did not elaborate on how L.L. Bean and Worcester agreed on the unit prices for Worcester's products that L.L. Bean paid over the years, there is no reason to think that they were anything other than negotiated periodically on an arms' length basis. It also seems reasonable to infer that Worcester may well have shared its cost data with L.L. Bean on previous occasions to support Worcester's pricing.

254) If Worcester had suddenly inserted a $0.64 shipping cost into its prices charged to L.L. Bean, one would expect to have seen an across-the-board increase of $0.64 in L.L. Bean's price, and the record does not suggest that anything of the kind occurred. In fact, there is nothing in the record outside Worcester's discovery responses to suggest that L.L. Bean has in fact been double charged for shipping— nothing else, in other words, to suggest that L.L. Bean has paid, or is expected to pay, any more than the negotiated unit price it agreed to pay for each product, not including shipping. For that reason, the court finds that the unit costs charged to L.L. Bean did

60

not in fact include a shipping component, because that cost was billed separately by Worcester. Worcester's discovery responses were simply erroneous.

255) Ultimately whether the discovery responses are erroneous or not makes no difference from a contractual standpoint, because whatever Worcester calculates its costs of production to be does not excuse L.L. Bean from paying the unit prices it has agreed to pay. Thus, even if Worcester had in fact incorporated a shipping cost in its cost assumptions, nothing prevents Worcester from taking advantage of L.L. Bean's willingness to pay a shipping fee over and above the cost of the product itself. Admittedly, there is no evidence that Worcester had any such intention—Michael Worcester agreed that to include the direct ship fee in the unit costs would be inappropriate because Worcester was charging L.L. Bean separately for shipping.

256) Because L.L. Bean had agreed to pay a given price per item and also a $0.64 fee per item shipped over and above the item price, and because Worcester in fact shipped the 271,554 items in reliance on L.L. Bean's agreement to those terms, Worcester is entitled to the fee both as a matter of contract and in the alternative on a theory of unjust enrichment.

257) Certainly, it was a careless error for Worcester to create this issue by including a $0.64 cent shipping fee in its sworn responses to discovery requests, to repeat the error in a later response, and not to discover the errors and correct the responses before trial. However, in light of the foregoing, Worcester's reference to a $0.64 shipping fee in its discovery responses is more likely a mistake, as Worcester claims, than chicanery, as L.L. Bean sees it. *See* J.W. von Goethe, *Die Leiden des jungen Werthers*, Erstes Buch, Am. 4 Mai 1771 (1774) (" . . . Und ich habe, mein Lieber, wieder bei diesem kleinen Geschäft gefunden, dass Missverständnisse und Trägheit vielleicht

61

mehr Irrungen in der Welt machen als List und Bosheit. Wenigstens sind die beiden letzteren gewiss seltener").

258) The court concludes that Worcester is entitled to the $173,794.56 charge for shipping fees. For the same reason, L.L. Bean is not entitled to a refund of $0.64 per item for the 44,026 items that L.L. Bean paid for but that were not shipped, nor a reduction of $0.64 in the price of the 74,085 unfinished items. At the same time, L.L. Bean cannot be faulted for raising the issue, given Worcester's discovery responses.

## WORCESTER'S CLAIM FOR $94,564.73 FOR UNITS SOLD BEYOND PURCHASE ORDER QUANTITIES

259) Worcester claims to be entitled to an additional $94,564.73 for items sold to L.L. Bean beyond the quantities reflected in the L.L. Bean purchase orders. L.L. Bean objects on the ground the entitlement was not established in the evidence.

260) For several reasons, the court agrees with L.L. Bean's position:

- The parties have stipulated that L.L. Bean has paid Worcester for all of the 315,580 units that Worcester finished for L.L. Bean. The stipulation does not say whether or not the 315,580 units were all within the scope of the purchase orders, but the court assumes the stipulation covers any and all finished units.

- The 2008 letter agreement says that Worcester is not entitled to be paid for unfinished units beyond those specified in the purchase orders.

- Therefore, if Worcester's $94,564.73 claim is for finished units outside the purchase order quantities, L.L. Bean has already paid for them. If the claim is for finished but unsold units or for unfinished units, Worcester is not entitled to be paid for them under the 2008 letter agreement because they are outside the scope of the purchase orders.

- Finally and in any case, as L.L. Bean suggests, the evidence is insufficient to justify a finding that Worcester is entitled to this amount.

261) For these reasons, the court concludes Worcester has not proved its claim of $94,564.73, for goods produced beyond purchase order quantities.

WORCESTER'S COMPONENT CLAIM

262) As a threshold matter it should be noted that Worcester's component claim, at least in the form it was pursued at trial, was not specifically pled in Worcester's amended counterclaim. Because both parties have requested declaratory relief on essentially all aspects of this case, the components issue is discussed in depth in this Decision and Judgment. However, in practical terms, the variance between pleading and evidence makes no difference, for reasons that will be clear later.

263) As noted above, because Worcester had enough components on hand to make up to 446,115 units for L.L. Bean in 2008, and because it used enough of those to make 315,580 finished units, Worcester likely had about $585,000 in components left at the end of the 2008 season, consisting mostly of components purchased that year, plus some components left over from the 2007 season and again not used in 2008.

264) Many of the components not incorporated into finished products in 2008 likely were incorporated into pre-assembled units that were waiting for balsam to be added just before shipping, but that were not finished in 2008 as a result of L.L. Bean's directives to stop production.

265) L.L. Bean's obligation to Worcester covers three categories of components:

- As to the components leftover from the 2007 season, some of them probably were components within the scope of L.L. Bean's commitment, and others were purchased on Worcester's "own nickel." The evidence is simply insufficient to enable the court to determine how much of the component inventory left over after the 2007 season and again not used in the 2008 season consisted of inventory within the scope of L.L. Bean's commitment for the 2007 season or earlier seasons.

- L.L. Bean is also responsible for the components that would have been incorporated

63

in the 74,085 units that L.L. Bean bought through its purchase orders but that were not finished as a result of the production stoppage. At an average of $4 in components per unit, the value of components associated with the 74,085 units that were ordered but not finished is $296,340.

- Finally, L.L. Bean's commitment to reserve components for the 2008 season was, as noted above, limited to $80,228 of the $456,000 in components that Worcester purchased in 2008. Worcester's evidence affirmatively showed, first, that L.L. Bean promised to pay Worcester for $80,228 in reserve components if they could not be incorporated into L.L. Bean products; second, that Worcester had on hand the reserve components on the basis of L.L. Bean's commitment, and third, that L.L. Bean actually ordered 389,664 units, fewer than the 405,559 units in the forecast, meaning that L.L. Bean never ordered and Worcester never made the units to which the $80,228 in reserve component applied. Therefore, the evidence positively established that the reserve components had not been incorporated into L.L. Bean products. Given that evidence, L.L. Bean's countervailing evidence was unpersuasive: L.L. Bean's proof did not indicate that very many if any, of the items listed in the attachment to the 2008 letter agreement were incorporated into the 315,580 finished units L.L. Bean has paid for, so the court concludes that essentially all of L.L. Bean's reserve commitment remained outstanding at the end of the 2008 season.

266) Thus, of the $585,000 in leftover components designated for L.L. Bean products, the evidence shows that L.L. Bean was committed to pay Worcester for $376,568 ($296,340 + $80,228) worth, unless the components could be incorporated in products in future seasons. L.L. Bean's termination of the relationship after the 2008 season obviously precluded Worcester from thereafter using the components in L.L. Bean products, but Worcester remained obligated to mitigate its damages by attempting to recoup its investment in the components by other means.

267) L.L. Bean claims Worcester has recouped, or at least could reasonably have recouped, the cost of all of its leftover L.L. Bean components, either to another balsam product company or in the form of products sold to other customers. Worcester denies that contention on several grounds, including that some components have deteriorated and that some cannot be resold, or at least have not yet been resold. The mitigation issue is addressed in the next section.

64

268) Although L.L. Bean's component commitment covers $376,568 in leftover components, $296,340 of that amount is already reflected in the total value of the purchase orders. Only the reserve commitment of $80,228 is over and above the amount of the purchase orders. Therefore, only the reserve component amount is added to the total amount of the purchase orders and the direct ship fee figure to reflect Worcester's total entitlement for the 2008 season, before deductions are made for savings, mitigation of damages or any other reason.

269) To recapitulate, Worcester's contractual entitlement for the 2008 season, before consideration of any deductions for payments made, savings or other reasons, consists of:

| | |
|---|---|
| Total amount of purchase orders: | $6,682,915 |
| Direct ship fee for items shipped | $173,794.56 |
| L.L. Bean's total component commitment | $80,228 |

270) The total of these amounts is $6,936,937.56. From this figure must be deducted the stipulated amount of L.L. Bean's payments totaling $5,497,306. The difference between the two is $1,439,631.56.

271) The analysis now turns to what amounts should be deducted from the $1,439,631.56 figure to reflect what Worcester did save, and could reasonably have saved, as a result of cutting production, selling components and mitigating its damages in other ways.

## IV. Deductions From Worcester's Claim

272) L.L. Bean argues that there should be five types of deductions from

65

Worcester's claim[7]:

- brush deduction:  L.L. Bean and Worcester agree there should be a deduction from Worcester's claim for balsam brush not used in the 74,085 units that were included in L.L. Bean's purchase orders but never finished, but disagree as to the amount of the deduction.

- component deduction:  L.L. Bean asserts that Worcester's entire component claim (calculated above to be $376,568) should be disallowed and therefore deducted because Worcester has, or reasonably could have, recouped its entire investment in the components either by incorporating them in products sold to other customers or by selling them to another balsam products vendor.  Worcester disagrees.

- labor deduction:  again, the parties agree that there should be a deduction to reflect saved labor costs resulting from the production cutback, but disagree as to the amount

- overhead:  similarly, both parties agree to certain deductions but disagree on others

- deduction for "saved returns and allowances":  L.L. Bean asserts that there should be a deduction for returns and quality problems on the 271,554 items Worcester shipped to L.L. Bean customers, and a further deduction for what likely would have been the returns and quality problems on the 74,085 unfinished items. Worcester disagrees.

273)    Some general discussion of mitigation of damages is in order before the inquiry turns to each of the five listed areas in which L.L. Bean argues for a reduction in Worcester's claim.

274)    Initially, it should be noted that the duty to mitigate arises by operation of law, independent of any contractual or other undertakings of the parties.  Thus, the fact that the savings Morrill Worcester had in mind during the November 26, 2008 telephone conversation were limited to savings in production of items does not limit Worcester's duty to mitigate.  Even had the November 26 conversation never taken place, Worcester would still have a duty to mitigate its loss, although it would have had the option of finishing the remaining units and attempting to resell them, instead of

---

[7]  An additional deduction urged by L.L. Bean—for a refund of $0.64 per item paid for but not shipped—associated with a "direct ship fee" supposedly included in the cost per item has already been addressed in section IV, Worcester's Claim for Direct Ship Fees, *supra*.

66

stopping production as it agreed to do.

275) As the Maine Law Court has observed, "[t]he common law duty to mitigate damages survives Maine's enactment of the Uniform Commercial Code in 1963. While the U.C.C. does not explicitly require the mitigation of damages, it does provide that 'principles of law and equity' not displaced shall supplement the Code's provisions. 11 M.R.S.A. § 1-103 (1964). The duty to mitigate is also implicit in the Code's broad requirements of good faith, commercial reasonableness and fair dealing." *Schiavi Mobile Homes, Inc. v. Gironda*, 463 A.2d 722, 724-25 (Me. 1983).

276) In the same case, the court noted, "The touchstone of the duty to mitigate is reasonableness. The nonbreaching party need only take reasonable steps to minimize his losses; he is not required to unreasonably expose himself to risk, humiliation or expense." *Id.* at 725.

277) "[T]he duty to mitigate is properly characterized as a limitation on damages and simply prevents a plaintiff from recovering damages that it could reasonably have prevented without incurring additional cost, risk, or burden." *Kanawha-Gauley Coal & Coke Co. v. Pittston Minerals Group, Inc.*, 2011 U.S. Dist. LEXIS 80411, at *44-45 (S.D. W.Va. July 22, 2011).

278) In the present case, the limitations on the duty to mitigate mean that not all of the savings that L.L. Bean posits should be deducted.

279) Moreover, L.L. Bean as the party opposing Worcester's damages claim has the burden to prove that Worcester failed to mitigate its damages. *See Lee v. Scotia Prince Cruises Ltd.*, 2003 ME 78, ¶ 22, 828 A.2d 210, 216.

280) One aspect of the case that sets it apart from other instances in which mitigation of a seller's damages are analyzed is that Worcester is what the law

67

sometimes refers to as a "lost volume seller," meaning a seller that has sufficient capacity to meet foreseeable demand, and therefore is not necessarily made whole by reselling the item for the contract price, for the reason that the seller could have and would have made both sales.

281) The Law Court has defined the concept as follows:

Stated generally, the concept of lost-volume sales posits that a seller of goods who conducts a resale following a breach will not be "made whole" if only allowed to recover the difference between the contract price and resale price when the resale is made to a second customer, at the expense of a second sale. The concept presupposes a situation in which supply outstrips demand and in which the second customer would have been successfully solicited by the seller had the original breach not occurred. Assuming these conditions, the seller is awarded lost profits as compensation for his "loss" of a sale to one customer.

*Schiavi Mobile Homes, Inc.*, 463 A.2d at 726.

282) The Maine UCC recognizes the "lost volume seller" concept: "If the measure of damages [of the difference between market price and contract price, plus incidentals and less expenses saved] is inadequate to put the seller in as good a position as performance would have done, then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in this Article (section 2-710), due allowance for costs reasonably incurred and due credit for payments or proceeds of resale." 11 M.R.S. § 2-708(2).

283) The relevance of the "lost volume seller" concept to this case is that for Worcester to resell the 74,085 units for which L.L. Bean has not paid, even at the contract price, does not make Worcester entirely whole. "[B]y definition, a lost volume seller cannot mitigate damages through resale. Resale does not reduce a lost volume seller's damages because the breach has still resulted in its losing one sale and a corresponding profit." *R.E. Davis v. Diasonics, Inc.*, 826 F.2d 678, 682 (7th Cir. 1987).

68

284) Because Worcester had the capacity to sell the 74,085 items to L.L. Bean in 2008 and an additional 74,085 items in later years, Worcester would need to have received its expectancy on both sets of sales to be made whole.

285) As a practical matter, Worcester's lost volume seller status may not make much difference in the analysis, because L.L. Bean acknowledges that Worcester is, in effect, entitled to a profit on all 389,664 units reflected in the purchase orders, including the 74,085 units that L.L. Bean ordered but Worcester did not finish. However, in keeping with the approach the parties agreed to take in their November 26, 2008 telephone conversation, as explicated in court's summary judgment ruling, Worcester's entitlement on the unfinished units is reduced by subtracting what it saved and could have saved.

286) The analysis turns to each of the claimed deductions, in the order stated above.

DEDUCTION FOR BRUSH SAVINGS

287) Plaintiff Worcester (that is, Worcester Resources) purchased fresh balsam (or brush, as it is sometimes called in the wreath trade) for Worcester's balsam products from an affiliated family-owned entity called Worcester Holdings, which held title to the land from which Worcester obtained balsam for its products. As of 2008, Worcester Resources paid Worcester Holdings $0.45 per pound for brush. (Morrill Worcester, Day 9 at 171, Day 3 at 604-612).

288) Worcester has calculated savings for brush of about $65,000. L.L. Bean's calculation is that Worcester saved a total of $150,000.

289) Worcester's calculation appears to focus on what Worcester Holdings, the affiliate of Plaintiff Worcester Resources that owns and operates the forestlands

from which the brush is obtained, was able to save by not cutting brush. As a result of the production cutbacks, Worcester Holdings did not have to harvest as much brush for sale to Worcester Resources.

290) Worcester's rationale for including Worcester Resources in the brush equation is that the reason Worcester Wreath acquired forestlands that later were transferred to Worcester Holdings was to meet L.L. Bean's requirement that Worcester's products incorporate "Maine balsam," by assuring itself of a sufficient supply of balsam in Maine. (Morrill Worcester, Day 1 at 176,78, 182-183).

291) L.L. Bean's expert witness, Randall Dunham, focused instead on the amount that Worcester Resources saved by not having to purchase brush for the 74,085 units from Worcester Holdings. He assumed that Worcester's products use about four and a half pounds of brush on average. Mr. Dunham calculated that Worcester saved about $150,000 by not having to purchase the 300,000 pounds of brush needed to finish 74,085 units at $0.45 per pound. His calculations are based on Worcester's own purchasing records and discovery responses.

292) L.L. Bean also notes that its production cutbacks were all issued by December 9, with two weeks remaining in the production season. Because brush is affixed to items as close as possible to the time the items are shipped, so as to optimize freshness, L.L. Bean suggests that Worcester had ample time to avoid purchasing unnecessary brush for the 74,085 units that L.L. Bean ordered but that Worcester did not finish.

293) Ultimately, the court agrees with L.L. Bean that it is Worcester Resources's savings that must be the focus. Worcester Holdings is not a party to the case, nor a party to any contract with L.L. Bean as far as the record shows. The record

70

does not support disregarding the corporate form in the manner that Worcester's calculation would require.

294) The court deducts from Worcester's claim the sum of $150,000 to reflect savings for brush.

DEDUCTION FOR RE-USE OF COMPONENTS

295) For the reasons previously noted, the court finds that, at the end of the 2008 season, Worcester had on hand about $585,000 in leftover components designated for L.L. Bean products. Of that quantity, L.L. Bean was contractually committed, by virtue of the March 2008 commitment letter and the subsequent purchase orders, to purchase or pay for $376,568 worth, unless those components could be incorporated in products in future seasons.

296) L.L. Bean contends that Worcester's own inventory records and records of sales since the end of 2008 demonstrate that it has used essentially all of these components. Exhibits 156, 166 and 168 do, as L.L. Bean suggests, indicate that Worcester has used most of the leftover components.

297) Worcester contends that some of the components designated for L.L. Bean products have deteriorated to the point of being unusable. That may well be, but as noted above, some of those components were items L.L. Bean had committed to purchasing and others were not.

298) The court finds persuasive L.L. Bean's evidence that Worcester has incorporated hundreds of thousands of dollars in leftover components into products sold in 2009 and thereafter.[8] On the other hand, the court also finds that due to

---

[8]  L.L. Bean also suggests that Worcester also could have and should have sold any components it could not use to another wreath company, such as its competitor, Whitney Wreath. Such a

deterioration, not all of the components to which L.L. Bean had committed itself could be re-used. The deterioration was observed in 2011 but likely began in prior years. (Scott, Day 8 at 28, 36, 43, 45, 48, 68-69, 78, 84, 85).

299) Because deterioration was observed in partially completed items in storage from prior years, the court infers that those items likely were among the 74,085 units that L.L. Bean had ordered but Worcester never completed.

300) Moreover, it is undisputed that at least some components—anything with the L.L. Bean name or logo on it at least—could not be reused.

301) L.L. Bean has proved that Worcester has or could reasonably have recouped 90% of the value of the components to which L.L. Bean was contractually committed by using them in products sold to other buyers in 2009 and thereafter.

302) The remaining $37,657—one-tenth of the total value of the components that L.L. Bean had committed to purchase—fairly reflects the value of deteriorated components that L.L. Bean had committed to buy and that cannot be reused, and components that by their nature cannot be sold in products to other customers.

303) The ninety percent of L.L. Bean's outstanding component commitment that the evidence shows Worcester was able to re-use has a value of $338,911, and that amount will be deducted from Worcester's claim.

DEDUCTION FOR SAVINGS OF DIRECT COSTS OF LABOR

304) The parties agree that there should be a deduction from the amount due to Worcester for the amount that Worcester saved in labor costs as a result of the production cutback, but they have a disagreement amounting to about $21,000 regarding the amount of the deduction.

---

drastic step—tantamount to a partial liquidation of assets—goes beyond Worcester's express oral agreement to pass along savings and its UCC duty to mitigate damages.

305) Worcester calculated the total labor savings from ceasing production at $128,164.77. (Morrill Worcester, Day 8 at 235). However, its calculation appears to focus on only one of the three labor components associated with completing an item. The three components are the cost of assembling the item, the cost of decorating it with balsam, and what the parties refer to as "support labor." Worcester's estimate appears to cover only the first factor, which admittedly accounts for most of the labor cost.

306) L.L. Bean, through its witness, Randall Dunham, calculates Worcester's labor savings to be $149,158, based primarily on Worcester's own documents, including discovery responses, a figure that covers all three of the just-mentioned components of the labor cost of an item that is actually completed. By not having to complete 74,085 of the units covered in L.L. Bean's purchase orders, Worcester saved the cost to it of the labor associated with completing the units. That savings clearly falls within both Worcester's express promise to credit L.L. Bean with savings and its UCC duty to mitigate.

307) The evidence supports Mr. Dunham's analysis and therefore the court deducts an additional $149,158 from Worcester's entitlement.

DEDUCTION FOR VARIABLE OVERHEAD

308) L.L. Bean asserts that an additional $189,816 should be deducted from Worcester's claim to reflect "variable overhead" expenses that Worcester would have incurred had it completed the entire quantities specified in L.L. Bean's purchase orders, but did not incur with respect to the 74,085 items that Worcester did not complete.

309) L.L. Bean's expert witness, Randall Dunham, testified that he calculated Worcester's variable overhead by analyzing Worcester's internal books and records, including its QuickBooks detail income and expense, and Worcester's internal profit and

73

loss statements. (Dunham, Day 4, at 1068–69; Day 9, at 175–78). Mr. Dunham testified that through this analysis he was able to determine which of Worcester's expenses are properly characterized as fixed overhead, and those that should be characterized as variable overhead.

310) Fixed overhead includes expenses such as rent and office compensation, that do not vary according to volume of production. (Dunham, Day 4 at 1069). Variable overhead, on the other hand, includes expenses that do vary with the volume of production, such as workers' compensation premiums and payroll taxes, both of which are a function of labor costs, and other items such as repairs, maintenance to equipment, utilities, small tools, and fuel costs for equipment used in production. (Dunham, Day 4 at 1069, 1074–75).

311) Mr. Dunham's analysis of Worcester's savings as a result of the production cutback focuses on variable overhead only, because fixed overhead costs by definition would not be affected by the cutback.

312) Mr. Dunham calculated Worcester's total overhead (fixed and variable) for the 74,084 unfinished items to be $518,589, based on Worcester's own total overhead figures of between $7.00 and $7.72 per item. (Dunham, Day 4 at 1068–71; Ex. 141, 237 (Ex. A)). Based on the costs assigned in Worcester's books and records to fixed overhead items and variable overhead items, Mr. Dunham calculated that variable overhead items average 16.01% of total sales. That percentage of the $1,185,609 price of the 74,085 items is $189,816. (Dunham, Day 4 at 1068–71).

313) According to Mr. Dunham, Worcester's "variable overhead" saved as a result of not having to finish the 74,085 items falls into three categories:

- payroll taxes and workers compensation premiums that vary as a function of payroll (Dunham, Day 4 at 1074).

74

- royalties that L.L. Bean claims Worcester would have been obligated to pay if the remaining 74,084 units had been completed and sold, but did not have to pay as a result of the production cutbacks. (Dunham, Day 4 at 1072–74; Day 9 at 174).

- miscellaneous variable expenses, such as repairs, maintenance to equipment, utilities, small tools, and fuel costs for fork lifts.

314) Of the three areas, only the first mentioned can be said to have been within the contemplation of the parties to the November 26, 2008 telephone conversation because such costs are a direct function of Worcester's level of production. In other words, there is nothing to indicate that Morrill Worcester or the L.L. Bean representatives had royalties or fuel costs, for example, in mind. However, if Worcester did save royalties or the miscellaneous expenses, or could reasonably have saved them, Worcester's duty to mitigate requires that such savings be deducted from Worcester's entitlement. As on any issue involving mitigation of damages, L.L. Bean bears the burden of persuasion.

315) Worcester plainly would have incurred additional payroll tax and workers compensation costs had it completed the 74,085 items. Mr. Dunham's calculation of savings at $33,000 is justified and the court adopts it.

316) The other two items, however, were not proved.

317) The evidence indicated that Worcester has paid royalties, or at least reflected payment on its books of royalties, to a related Worcester company for Morrill Worcester's "knowledge of the wreath making business." (Worcester 30(b)(6) depo. (Morrill Worcester) at 299; Bruce, Day 7 at 1770; Michael Worcester, Day 9 at 20; Ex. 203, Ex. 212; Dunham, Day 4 at 1073-74, Day 9 at 174). Mr. Dunham assumed that royalties were paid on a per item basis, and calculated savings attributable to the 74,085 items accordingly. However, Worcester's royalty cost was not shown to be tied directly

75

to the volume of sales or production in the sense that labor costs or payroll taxes are. Worcester's November 2008 oral agreement to pass along savings did not encompass royalties, so the issue is analyzed under Worcester's UCC and common duties to mitigate damages, with L.L. Bean having the burden of proof. The evidence clearly indicated the existence of the royalty agreement on which L.L. Bean's argument depends. However, the evidence also indicated that royalties were not in fact paid by Worcester except in one year (Michael Worcester, Day 9 at 22), and instead were simply entered on Worcester's books and records as accrued liabilities or as an outstanding debt, that might be paid at some time in the future. (Bruce, Day 7, at 1569–71; Michael Worcester, Day 9 at 22). The evidence that the court found persuasive is that, despite the royalty agreement and the occasional payment made in the past, Worcester usually has not paid royalties, and, most importantly, did not pay royalties for the units that it did complete in 2008. If Worcester did not pay royalties on the units it did complete in 2008, there is no reason to think it would have paid royalties on the units it did not complete. Therefore, L.L. Bean failed to prove that Worcester saved any royalty payments by not having to complete all of the units that L.L. Bean had ordered. The analysis to the contrary by Mr. Dunham on which L.L. Bean's position largely depends is largely hypothetical and ignores the just-mentioned realities reflected in the evidence. Moreover, even if Worcester's royalty obligation to Morrill Worcester for the 2008 season is shown as a liability on Worcester's balance sheet, the evidence fails to persuade the court that should be any deduction for damages for saved royalties.

318) For similar reasons, the miscellaneous savings were not shown to be sufficiently tied to the volume of production or sales to support a finding that Worcester

actually saved those costs by not having to finish the 74,085 items. At least some of the included costs—the cost of purchasing tools, for example—would be incurred with any level of production. Equipment maintenance, too, is necessary to support any level of production and is not necessarily a direct function of how many items are produced.

319) Moreover, the evidence did not suggest that Worcester closed down production entirely as a result of the cutback,[9] so its utility costs would not necessarily be any lower as a result of not having to finish 74,085 items.

320) With regard to variable overhead, $33,000 will be deducted from Worcester's entitlement to reflect saved payroll taxes and workers compensation premiums.

DEDUCTION FOR RETURNS AND ALLOWANCES

321) L.L. Bean also asserts that there should be a deduction from Worcester's entitlement to reflect chargebacks against Worcester for returned items and quality problems. This proposed deduction has two components: one relates to the 271,554 items that Worcester actually shipped to customers, and the other relates to the 74,085 items that Worcester did not complete but would have shipped had the items been completed.

322) L.L. Bean asserts there should be a deduction of $81,538 to reflect returns and allowances for the 271,554 shipped items. Worcester's main objection is that, because L.L. Bean terminated the relationship, Worcester was deprived of the ability to negotiate L.L. Bean's figure downward. Michael Worcester testified that Morrill Worcester, "being who he is . . . likes to negotiate anything". (Michael Worcester, Day 9 at 17, 11–12).

---

[9] As noted in paragraph 160), *supra*, production continued after the stop order, albeit as to just a few product lines.

323) In the court's view, Worcester's point is irrelevant. This is fundamentally an action for accounting. The parties could have settled accounts in their usual manner through the year-end meeting, but the fact that the meeting never happened does not mean the issue cannot be raised here, and Worcester had an opportunity in this case to show that L.L. Bean's proposed chargeback figure should be reduced.

324) L.L. Bean's proposed deduction of $81,538 for the 271,554 shipped items is supported in the evidence. Consistent with the methodology employed at the end of previous seasons, L.L. Bean calculated the amount of returned or defective orders for which Worcester was responsible in the 2008 season at $81,538. (Ex. 176; Holden, Day 5 1196–1202).

325) As to the 74,085 unfinished items, L.L. Bean asserts that there should be a deduction of $17,884, based on the assumption that the total chargeback would equal at least 1.5% of the price of the items. Worcester's primary objection to this deduction is that it is based on speculation. However, L.L. Bean's position has a solid foundation in the historical data—just as a profits history provides a basis for awarding future lost profits, so the historical chargeback data supports L.L. Bean's position on this issue.

326) The chargeback percentages for the previous five years was as follows: 2003 1.9%, 2004 1.5%, 2005 2.7%, 2006, 3.1%, and 2007 1.88%. (Ex. 40, 50, 48, 52, 423; Holden, Day 5 at 1203–04). This data indicates that a 1.5% figure is reasonable, even modest. Moreover, although Worcester maintains the entire calculation is speculative, Morrill Worcester did not dispute the reasonableness of the 1.5% figure. (Morrill Worcester, Day 2 at 468).

327) For all of these reasons, the court finds that a further deduction of

$17,884 to reflect the probable amount of the chargeback on the 74,085 unfinished items, had they been finished and shipped, is appropriate.

328) It should be noted that, unlike prior deductions, this does not fall under the mitigation of damages heading. Rather, it reflects the historical reality that Worcester netted something less than the nominal purchase price as a result of chargebacks. Thus, the $17,884 deduction conceptually should be considered an adjustment to Worcester's entitlement rather than a savings to Worcester.

## V. Summary and Conclusion

### WORCESTER'S NET ENTITLEMENT

329) As noted in paragraph 270), Worcester's entitlement before any deductions is $1,439,631.56.

330) From this figure are deducted the following:

- $150,000 for brush savings

- $338,911 in savings through re-use of components to which L.L. Bean was contractually committed

- $149,158 in saved labor costs

- $33,000 in saved payroll taxes and workers compensation premiums

- $85,538 in chargebacks for the 271,554 items shipped in 2008

- $17,554 in probable chargebacks on the 74,085 unfinished items

331) The total of these deductions is $774,161, higher than Morrill Worcester's rough calculation of $646,000 in "avoided costs," (Ex. 143), presumably because it includes items that he did not include, but still less than L.L. Bean suggests.

332) Deducting $774,161 from $1,439,631.56 yields $665,470.56. Judgment shall be entered for Worcester in that net amount.

79

333)    Applied to the parties' pleadings, the foregoing analysis results in the

following:

- The sole count of L.L. Bean's complaint is for a declaratory judgment. The findings of fact and conclusions of law contained in this Decision and Judgment represent the court's grant of declaratory relief, as requested. Worcester's answer joins in the request.

- Count I, II, III and IV of Worcester's amended counterclaim are all claims for breach of contract.

- Count I relates to the 344,725 units in the initial purchase orders. Count II relates to the 44,939 items that were the subject of the September 22, 2008 purchase orders. Count III is for the entire purchase order quantity of 389,664 items. Worcester is entitled to judgment on Count III in the amount of $665,470.56 (the balance on the purchase orders, plus the award for components and "direct ship fees",[10] minus L.L. Bean's payments, and minus the deductions for actual savings and/or mitigation of damages, regarding brush, saved labor, saved variable overhead and the chargeback amount for both finished and unfinished items). Worcester is entitled to judgment on both Count I and II, but, because they are surplusage in light of Count III, not for any additional damages.

- Count IV is a claim for breach of contract, based on L.L. Bean's oral promise of November 26, 2008 to remain "responsible for the full value of the purchase orders minus savings." L.L. Bean is entitled to judgment on this count, because L.L. Bean never disputed its obligation to pay the full value of the purchase orders less savings—the issue has been as to what should be deducted to reflect savings.

- Count V, captioned Unconscionable Term, appears to be a request for the court to invalidate the November 26, 2008 agreement. Because the agreement is enforceable, judgment is granted to L.L. Bean on this count.

- Count VI of Worcester's amended counterclaim is for breach of contract, specifically

---

[10]    None of Worcester's four breach of contract counts alludes specifically to the "direct ship fee" claim, or for that matter to components. However, the combination of the fact that L.L. Bean requested declaratory relief on all issues and that the "direct ship fee" was in contention, both as an addition to Worcester's claim for the purchase order amounts and as a deduction from the purchase order amounts from L.L. Bean's viewpoint put it firmly among the central contested issues from both parties' perspectives. Also, the components in the 74,085 unfinished units were included in the purchase orders amounts that were specifically pleaded in Counts I-IV of Worcester's amended complaint. So both direct ship fees and components were clearly significant issues tried by consent in the case, as elements of damages from Worcester's perspective and as offsets against damages from L.L. Bean's standpoint.

with regard to L.L. Bean's position regarding chargebacks for the finished items. Judgment is granted to L.L. Bean on this count.

• Counts VII (fraud/misrepresentation) and VIII (negligent misrepresentation) of Worcester's amended counterclaim were addressed in the court's grant of partial summary judgment by virtue of the February 16, 2011 order on L.L. Bean's motion for partial summary judgment. Final judgment is entered for L.L. Bean on counts VII and VIII.

COSTS

334)    By rule, "costs shall be allowed as of course to the prevailing party, as provided by statute and by these rules, unless the court otherwise specifically directs." M.R. Civ. P. 54(d).    Considering both the summary judgment phase of this case as well as the trial phase, each party prevailed on significant issues, to the extent that it cannot be said that either party prevailed overall. Accordingly, the court declines to award costs to either party, and specifically directs that each party bear its own costs. There is no contractual, statutory or other basis in the various claims or defenses for awarding attorney fees, nor has either party made such a claim.

INTEREST

335)    The evidence did not reveal any contractual rate of interest, so the statutory pre- and post-judgment rates apply. Pre-judgment interest runs from the date of filing to the date of entry of judgment at the annual rate of 3.40 percent. Post-judgment interest shall run from the date of entry of judgment at the rate of 6.12 percent.

**Judgment**

Plaintiff L.L. Bean is hereby granted judgment on its complaint for declaratory judgment, to the extent of the findings of fact and conclusions of law herein.

Defendant Worcester is hereby granted judgment on its counterclaim in the amount of $665,470.56, with pre- and post-judgment interest as allowed by law.

81

Pursuant to M.R. Civ. P. 79(a), the clerk is hereby directed to incorporate this

Order by reference in the docket.

Dated April 6, 2012

A. M. Horton
Justice, Business and Consumer Court

Entered on the Docket: 4.6.12
Copies sent via Mail ___ Electronically ✓

82

STATE OF MAINE                                BUSINESS AND CONSUMER DOCKET
Cumberland, ss.


L.L. BEAN, INC.                          )
                                         )
        Plaintiff/Counterclaim Defendant )
                                         )
                                         )
                                         )
        v.                               )        Docket No. BCD-CV-09-39
                                         )
                                         )
WORCESTER RESOURCES, INC.                )
                                         )
        Defendant/ Counterclaim Plaintiff )


ORDER ON POST-JUDGMENT MOTIONS

Plaintiff L.L. Bean, Inc. ["L.L. Bean"] has filed a timely Motion to Alter or

Amend The Judgment pursuant to Rules 52(b) and 59(e) of the Maine Rules of Civil

Procedure. Defendant Worcester Resources, Inc. ["Worcester"] has filed an opposition

to the motion and has also filed a Motion To Exclude and To Strike regarding an

exhibit to L.L. Bean's reply memorandum. The court elects to decide both without oral

argument, *see* M.R. Civ. P. 7(b)(7). The court also elects not to await full briefing on

Worcester's motion, and dismisses it as moot, given the court's resolution of L.L. Bean's

motion.

For the reasons set forth below, the court grants L.L. Bean's motion in part and

otherwise denies it. The motion sets forth four areas in which L.L. Bean asserts the

judgment in this case issued after trial ["the Judgment"] should be amended. They are

addressed in the order presented in L.L. Bean's motion. The only one of the four

changes requested that the court agrees to and adopts is the first listed.

1

## 1. Double-Counting of L.L. Bean's Component Liability

L.L. Bean's first point is that the Judgment in effect double-counts Worcester's damages relating to components in the 74,085 units ordered but not finished, by calculating damages based on the total value of L.L. Bean's purchase orders and adding to that figure L.L. Bean's liability for the $296,340 in components incorporated into the unfinished 74,085 items. L.L. Bean is correct—the $296,340 figure was already included in the total purchase order figure and should not have been added again.

Worcester's opposition to that correction rests on the argument that Worcester is a "lost volume seller." The "lost volume seller" concept means simply that, because Worcester's capacity to produce balsam products is not limited to what L.L. Bean ordered, Worcester is entitled to its profit on a unit even if the unit could be resold or reused. The court mentioned the concept in the judgment, mainly to show that it had not been overlooked, but it does not apply to the components in question. It does not apply because L.L. Bean has not contested Worcester's right to its profit (measured as agreed by the difference between the total purchase order amount and savings that were or reasonably could have been realized by Worcester) on all items ordered by L.L. Bean.

The judgment as issued would compensate Worcester twice for the same damages, and therefore needs to be revised. The court is today issuing an Amended Decision and Judgment with the requested adjustment.

## 2. Damages for Worcester's Reserve Component Claim

L.L. Bean's second request is for the court to reduce damages by the $80,228 amount of L.L. Bean's reserve component. L.L. Bean's premise is that the Judgment erroneously shifted the burden of proof to L.L. Bean. The court disagrees.

The conclusion that gives rise to L.L. Bean's request appears in paragraph 265 of

2

the Judgment:

- L.L. Bean's proof did not indicate that very many if any, of the items listed in the attachment to the 2008 letter agreement were incorporated into the 315,580 finished units L.L. Bean has paid for, so the court concludes that essentially all of that commitment remained outstanding at the end of the 2008 season.

Contrary to L.L. Bean's interpretation, that finding and conclusion does not reflect any re-allocation of the burden of proof. L.L. Bean set out to show that Worcester had used up all of the components as to which L.L. Bean had a contractual commitment, and the reference to "L.L. Bean's proof" is to the evidence elicited by L.L. Bean on whether the $80,228 in reserve components still remained in Worcester's component inventory after the 2008 season.

Worcester's evidence affirmatively showed, first, that L.L. Bean promised to pay Worcester for $80,228 in reserve components if they could not be incorporated into L.L. Bean products; second, that Worcester had on hand the reserve components on the basis of L.L. Bean's commitment, and third, that L.L. Bean actually ordered 389,664 units, fewer than the 405,559 units in the forecast, meaning that L.L. Bean never ordered and Worcester never made the units to which the $80,228 in reserve component applied. Therefore, the evidence positively established that the reserve components had not been incorporated into L.L. Bean products. Given that evidence, L.L. Bean's countervailing evidence was unpersuasive.

So that the court's reasoning is clear, the preceding paragraph is incorporated into paragraph 265 of the Amended Decision and Judgment.

However, although the court did not accept L.L. Bean's position on the status of the reserve components at the end of the 2008 season, the court did go on to find that 90% of the components as to which L.L. Bean was contractually committed were used later in products sold to other customers, and reduced Worcester's component damages

3

by 90%. Judgment ¶¶301-303. Thus, the net damages awarded to Worcester attributable to the $80,228 in reserve components is 10% of that amount—just over eight thousand dollars.

### 3. The Royalty Issue

L.L. Bean's third requested change is that the court reconsider its conclusion in paragraph 317 of the Judgment that L.L. Bean failed to prove that Worcester's damages should be reduced by royalty payments that L.L. Bean claims Worcester saved by not having to complete all 389,664 units encompassed in L.L. Bean's purchase orders.

Worcester's November 2008 oral agreement to pass along savings did not encompass royalties, so the issue is analyzed under Worcester's UCC and common duties to mitigate damages, with L.L. Bean having the burden of proof. The evidence clearly indicated the existence of the royalty agreement on which L.L. Bean's argument depends. However, the evidence also indicated that royalties were not in fact paid by Worcester except in one year (Michael Worcester, Day 9 at 22), and instead were simply entered on Worcester's books and records as accrued liabilities or as an outstanding debt, that might be paid at some time in the future. (Bruce, Day 7, at 1569–71; Michael Worcester, Day 9 at 22). The evidence that the court found persuasive is that, despite the royalty agreement and the occasional payment made in the past, Worcester usually has not paid royalties, and, most importantly, did not pay royalties for the units that it did complete in 2008. If Worcester did not pay royalties on the units it did complete in 2008, there is no reason to think it would have paid royalties on the units it did not complete. Therefore, L.L. Bean failed to prove that Worcester saved any royalty payments by not having to complete all of the units that L.L. Bean had ordered. The analysis to the contrary by Mr. Dunham on which L.L. Bean's

4

position largely depends is largely hypothetical and ignores the just-mentioned realities reflected in the evidence. Moreover, even if Worcester's royalty obligation to Morrill Worcester for the 2008 season is shown as a liability on Worcester's balance sheet, the evidence fails to persuade the court that should be any deduction for damages for saved royalties.

Because the Judgment devoted only a paragraph to royalties, and to assure the court's reasoning is clear, the foregoing paragraph has been incorporated into paragraph 317 of the Amended Judgment.

### 4. The Direct Ship Fee Issue

In its last request, L.L. Bean asks the court to reconsider and change its findings and conclusions to the effect that Worcester did not double-bill Worcester for shipping fees by both including the fee in the unit cost and then billing it separately.[1] The Judgment analyzes the evidence in detail on this issue, Judgment ¶¶ 247-58, and on this issue, nearly all that can productively be said has been said. It is worthy to note that in the face of the conflicting evidence—Worcester's discovery responses indicating that the fee was included in unit costs and Worcester's insistence that the discovery responses were mistaken—the court chose to resolve the issue by looking at the historical evidence, and found persuasive the fact that L.L. Bean had verified

---

[1] L.L. Bean's particular concern seems to be with the court's statement that, "even if Worcester had in fact incorporated a shipping cost in its cost assumptions, nothing prevents Worcester from taking advantage of L.L. Bean's willingness to pay a shipping fee over and above the cost of the product itself. " L.L. Bean's motion cites testimony by Michael Worcester that Worcester agreed that it could not do that. That very testimony was part of the basis for the court's finding that Worcester had in fact not done that. The "even if" comment was simply intended to point out that, if Worcester had not agreed to bill the shipping fee separately instead of including the cost in its unit price, nothing prevented Worcester from factoring that cost into its unit prices. Again to clarify the court's reasoning, the court has modified paragraph 255 of the Judgment.

5

Worcester's costs a few years before and there was nothing to indicate that the costs had changed since then to include the cost of shipping. Judgment ¶254.

The court stands by its previous findings and conclusions to the effect that there was no double-billing of the shipping fee.

### Worcester's Motion To Exclude and To Strike

In light of the resolution of L.L. Bean's motion as to the direct shipping fee issue, it is clear that the court's review of Exhibit A to L.L. Bean's reply memorandum has not worked to Worcester's detriment, and the court sees no point to extending the already prodigious legal efforts expended in this case by letting the briefing on Worcester's Motion To Exclude and To Strike play out. The motion is dismissed.

IT IS HEREBY ORDERED:

1. Plaintiff L.L. Bean Inc.'s Motion to Alter or Amend The Judgment is granted to the extent set forth herein and in the Amended Decision and Judgment issued herewith as a final judgment, and is otherwise denied.

2. The Motion To Exclude and To Strike filed by Defendant Worcester Resources, Inc. is denied.

Pursuant to M.R. Civ. P. 79(a), the clerk is hereby directed to incorporate this order by reference in the docket.

Dated April 6, 2012

A. M. Horton
Justice, Business and Consumer Court

Entered on the Docket: 4.6.12
Copies sent via Mail ___ Electronically ✓

6

STATE OF MAINE
CUMBERLAND, ss.

BUSINESS AND CONSUMER DOCKET
Location:    Portland

L.L. BEAN, INC
     Plaintiff/Counterclaim Defendant

v.

DOCKET NO. BCD-CV-2009-39

WORCESTER RESOURCES, INC.
     Defendant/Counterclaim Plaintiff

## COUNSEL OF RECORD

**Party Name:**

L.L. Bean, Inc.

**Attorney Name:**

Daniel Nuzzi, Esq.

David Bertoni, Esq.

Worcester Resources, Inc.

Timothy Woodcock, Esq.

Ryan Dumais, Esq.